MARK BRADFORD, P.C.
Mark Bradford
299 12th Street
Brooklyn, New York 11215-4903
(347) 413-3287

CHRISTENSEN LAW OFFICE PLLC
Carl Christensen (*pro hac vice application to be filed*)
800 Washington Avenue North, Suite 704
Minneapolis, Minnesota 55401
(612) 823-4427

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
FOOD MARKET MERCHANDISING,
INC.,

              Plaintiff,         Index No. 1:15-CV-01758 (LAK) (HBP)

   -against-

                                     **COMPLAINT**
CALIFORNIA MILK PROCESSOR      **AND JURY DEMAND**
BOARD,

             Defendant.

------------------------------------------------------- x

      Plaintiff Food Market Merchandising, Inc., by its undersigned attorneys, Mark Bradford, P.C. and Christensen Law Office PLLC, for its Complaint alleges as follows:

### SUBSTANCE OF THE ACTION

      This is an action for federal trademark abandonment under Section 43 of the Trademark Act of 1946 (the "Lanham Act), 15 U.S.C. § 1051 *et seq.* and for cancellation of the abandoned trademark under 15 U.S.C. § 1064(3). Food Market Merchandising, Inc. brings this action based on California Milk Processor Board's naked licensing of the GOT MILK? trademark.

California Milk Processor Board has exercised no actual control over the quality of the products containing the mark and has thus abandoned its rights in the trademark. Food Market Merchandising, Inc. was the licensee of the GOT MILK? trademark and by virtue of being the only entity controlling the quality of that trademark, Plaintiff is entitled to have all of the benefits derived therefrom.

## JURISDICTION AND VENUE

1. This is an action for injunctive relief for violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, as a result of CMPB's abandonment of the Mark.

2. This Court has jurisdiction under Section 39 of the Lanham Act, 15 U.S.C. § 1121, under 28 U.S.C. §§ 1338(a) and 1338(b), and under principles of supplemental jurisdiction.

3. This Court has personal jurisdiction over the parties based on their regular, systematic, and continuous business activities within this jurisdiction.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, on the grounds that a substantial part of the events or omissions giving rise to the claims occurred here and a substantial part of the property that is the subject of the action is situated here.

## THE PARTIES

5. Plaintiff Food Market Merchandising, Inc. ("FMMI") is a Minnesota Corporation, with a principal place of business located at 6401 106th Street, Bloomington, MN 55438.

6. FMMI was the licensee of the GOT MILK? trademark for flavored drinking straws, toys, novelties, household products, confections, and personal care items (the "Products").

7.    Defendant California Milk Processor Board ("CMPB") is an advisory board of the California Department of Food and Agriculture, which has a principal place of business located at 1220 N Street, Sacramento, CA 95814.

8.    CMPB owns the federally-registered service mark and trademark GOT MILK? (the "Mark").

## FACTS

### A. FMMI Is Responsible for the Development of the Mark.

9.    FMMI has sold flavor infused straws for milk and other milk flavorings under the GOT MILK? Mark continuously in interstate commerce since at least as early as November 3, 2011.

10.    On November 3, 2011, FMMI and CMPB entered into a licensing agreement, attached hereto as Exhibit A (the "Agreement"), wherein CMPB licensed the use of the Mark to FMMI for FMMI's flavored drinking straws, toys, novelties, household products, confections, and personal care items.

11.    After executing the Agreement, FMMI expended significant resources designing and branding the Products, as well as ensuring the consistent quality of the Mark.

12.    FMMI has sold hundreds of thousands of units of Products bearing the Mark and has expended significant expense in product development, marketing, and legal services to develop, grow, and protect the Mark.

13.    FMMI has at all relevant times manufactured, marketed, and sold Products bearing the Mark through various channels of trade, including convenience stores, retailers, branded national chains, online sellers such as Amazon.com, direct-to-consumer online sales, and to distributors.

14. Since execution of the Agreement, communication regarding the Mark between FMMI and CMPB has been one-sided. CMPB's oversight had been limited to minimal overview of product artwork. FMMI made changes to the packaging without any input from CMPB.

15. Customer complaints that were received by CMPB were forwarded to FMMI blindly, with CMPB taking no action and requiring no follow up from FMMI.

16. When FMMI approached CMPB about the Product artwork for a chocolate milk straw product and identified brand inconsistancies, the CMPB pushed the issue back to FMMI and told FMMI that it had to work it out with the other licensee. CMPB said it was for the licensees to work out brand consistency.

17. For example, the milk flavored straws bearing the GOT MILK? Mark have undergone three significant design changes as well as changes to the flavor formula.

18. Pursuant to the Agreement, FMMI changed manufacturers without CMPB's input.

19. During the term of the Agreement, FMMI also changed the packaging types for the Products.

20. FMMI sent samples of each new design for the Products to CMPB, but CMPB did not acknowledge, comment on, or approve or disapprove the design changes.

21. FMMI also initiated numerous meetings about marketing and promoting the Products, where they would dicuss ideas to promote the GOT MILK? brand straws. CMPB did not ever take any action regarding these marketing and promotion activities.

**B.    CMPB Did Not Retain Contractual Rights to Control the Quality of the Mark.**

22. The Agreement itself provides FMMI with little guidance on how CMPB planned to control the use of the Mark.

23. The Agreement contains only the following boilerplate quality control provisions:

> 2.3 QUALITY STANDARDS. LICENSEE acknowledges the high standards of quality and excellence established by CMPB with respect to the Mark. LICENSEE agrees that the Products, and its use of the Mark in connection with the Products, shall be of such quality, style and appearance so as to maintain such high standards and to reflect well upon CMPB. The Products shall comply with the standards, provisions and specifications of all applicable federal, state and local laws and regulations.
>
> 2.4 APPROVAL. LICENSEE shall not sell or distribute Products bearing the Mark until CMPB has received and approved samples thereof. Such approval shall be subject to CMPB's sole discretion but shall not be unreasonably withheld. LICENSEE shall provide CMPB such further samples of the Products as CMPB may request from time to time.

24. The only other provision in the Agreement outlining use of the Mark is found in Section 7.1 boilerplate language, which includes a few basic requirements, such as requiring that use of the Mark be restricted to the English language.

25. The Agreement is void of any specific minimum quality control measures.

### C. **CMPB has Not Exercised Actual Control Over the Quality of the Mark.**

26. To date, CMPB has not inspected any of the Products nor provided FMMI with any restrictions or feedback related to the Mark.

27. Simply put, CMPB has not exercised any actual control over the quality or use of the Mark.

28. CMPB's failure to respond to the Product samples that FMMI provided to it for approval was in direct violation of CMPB's obligations pursuant to Section 2.4 of the Agreement and further demonstrates the utter lack of regard that CMPB has shown in exercising any quality control over the Mark.

29. Furthermore, all consumer contact regarding the Mark or Products bearing the Mark are directed to FMMI. No action has been taken by CMPB to respond to, address, investigate, or remediate consumer complaints, comments, or inquiries.

30. CMPB has taken no other action to ensure that the licensed goods meet consumer expectations created by the presence of the Mark.

31. It is FMMI that has exercised all actual quality control over the Mark and the Products bearing the Mark.

32. It is FMMI that has spent significant resources protecting and controlling the quality and use of the Mark.

33. Due to the considerable expense and effort of FMMI, the quality with which the Mark is identified is first and foremost FMMI's Products.

34. CMPB has played no role in holding the Mark to any standard of quality.

35. By failing to exercise any actual quality control over the Mark and failing to include meaningful minimum quality control standards in the Agreement, CMPB engaged in naked licensing and has abandoned its rights in the Mark.

## CAUSES OF ACTION

### COUNT I
### Declaratory Judgment

36. FMMI repeats and realleges each and every allegation contained in the above paragraphs.

37. FMMI acted in good faith in entering into the licensing agreement with CMPB. FMMI reasonably expected CMPB to use its best efforts to maintain the goodwill and good reputation of the Mark.

38. Instead, CMPB licensed the Mark without controlling the nature and quality of the goods and services the licensee offers under the Mark.

39. CMPB did not retain any contractual right to exercise or control the nature and quality of the goods FMMI produced and sold under the Mark.

40. In fact, CMPB exercised no actual control over the quality of the goods FMMI produced and sold under the Mark.

41. CMPB's acts and omissions constituted an abandonment of any right to use the Mark.

42. FMMI has taken substantial action at a significant expense to develop, grow, and protect the Mark.

43. FMMI seeks a declaration from this Court that CMPB has engaged in uncontrolled or naked licensing of the Mark and thereby abandoned any rights it might otherwise have had in the Mark.

44. Further, FMMI seeks a declaration from this Court that FMMI is the rightful owner of the Mark.

## RELIEF SOUGHT

WHEREFORE, FMMI prays for judgment against CMPB as follows:

1. Entering an order:

   a. Judgment granting FMMI the declaratory relief it seeks;

   b. An order awarding FMMI its costs in this action; and,

   c. Such other and further relief to which FMMI may be entitled as a matter of law or equity or which this Court deems just and proper.

## JURY DEMAND

FMMI requests a trial by jury on all triable issues alleged in this complaint.

Dated: New York, New York  
March 9, 2015

MARK BRADFORD, P.C.

By _____  
Mark Bradford (MB 6002)  
299 12th Street  
Brooklyn, New York 11215-4903  
Telephone: (347) 413-3287  
Email: mb@markbradfordpc.com

Carl Christensen (*pro hac vice application to be filed*)  
CHRISTENSEN LAW OFFICE PLLC  
800 Washington Avenue North, Suite 704  
Minneapolis, Minnesota 55401  
Telephone: (612) 823-4427  
Email: carl@clawoffice.com

Attorneys for Plaintiff

# EXHIBIT A

## got milk?® LICENSE AGREEMENT

This License Agreement ("Agreement") is effective as of the 3rd day of November, 2011 (the "Effective Date") and is entered into by and between The California Milk Processor Board, an instrumentality existing under the laws of the State of California and the regulations promulgated by the California Department of Food and Agriculture ("CDFA"), having its principal place of business at 101 S. El Camino Real, Suite 202, San Clemente, CA 92672 ("CMPB"), and Food Market Merchandising, Inc. (FMMI) ("LICENSEE"), a business located at 6401 W 106th St. Bloomington, MN 55438.

### RECITALS

A. CMPB owns and uses the federally-registered service mark and trademark **got milk?** (Reg. Nos. 1,903,870; 2,689,741; and 3,730,703) (the "Mark") in connection with its services, activities, mandate and authority;

B. LICENSEE provides flavored drinking straws, toys, novelties, household products, confections and personal care items;

C. LICENSEE desires to use the Mark on flavored drinking straws, toys, novelties, household products, confections and personal care items; and

D. CMPB is willing to permit such use of the Mark under the terms and conditions set forth in this Agreement.

### NOW THEREFORE, THE PARTIES AGREE AS FOLLOWS:

1. **Definitions.**

    a. <u>Products</u>: flavored drinking straws, toys, novelties, household products, confections and personal care items.

    b. <u>Territory</u>: Worldwide.

    c. <u>Term</u>: From November 3, 2011 to November 2, 2015.

    d. <u>Royalty</u> (in U.S. dollars): 7% of the aggregate invoice price collected for LICENSEE's sales of the Products bearing the Mark less all taxes, credits, refunds, and returns.

2. GRANT OF LICENSE.

1 of 9

got milk?® LICENSE AGREEMENT
_____ / LICENSEE _____ / CMPB

2.1 GRANT OF LICENSE. CMPB hereby grants to LICENSEE a non-exclusive, nontransferable, license to create, distribute and sell Products bearing the Mark within the Territory during the Term. LICENSEE may only use the Mark as a collective whole and shall not separately use any element or elements of the Mark.

2.2 RESERVATION OF RIGHTS. CMPB hereby reserves any and all rights not expressly and explicitly granted in this Agreement, including CMPB's right to authorize or license use of the Mark or any other mark, phrase or names containing **"got milk?"** to any third party for use in connection with any other goods and services. Without limiting the rights reserved in the preceding sentence, CMPB hereby reserves any and all rights to use, authorize use or license use of the Mark or any other marks, phrases or names containing **"got milk?"** worldwide in any language. No right is provided to use any other CMPB trademark, service mark, Internet domain name, or trade name.

2.3 QUALITY STANDARDS. LICENSEE acknowledges the high standards of quality and excellence established by CMPB with respect to the Mark. LICENSEE agrees that the Products, and its use of the Mark in connection with the Products, shall be of such quality, style and appearance so as to maintain such high standards and to reflect well upon CMPB. The Products shall comply with the standards, provisions and specifications of all applicable federal, state and local laws and regulations.

2.4 APPROVAL. LICENSEE shall not sell or distribute Products bearing the Mark until CMPB has received and approved samples thereof. Such approval shall be subject to CMPB's sole discretion but shall not be unreasonably withheld. LICENSEE shall provide CMPB such further samples of the Products as CMPB may request from time to time.

3. PAYMENT OF ROYALTY. LICENSEE shall pay CMPB the Royalty specified in 1(d) as follows:

a. <u>Royalty Payments</u>: Within ten (10) days after the end of each calendar quarter, LICENSEE shall pay to CMPB the Royalty attributable to LICENSEE's sales during such calendar quarter ("Royalty Payment"). LICENSEE's obligations to pay royalties hereunder shall survive termination of this Agreement.

For the rights granted to LICENSEE herein, LICENSEE shall pay CMPB the Royalty Payments exclusive of any applicable taxes. LICENSEE shall be responsible for all applicable national, state and local taxes, value added or sales taxes, exchange, interest, banking, collection and other charges and levies and assessments pertaining to payments other than U.S. taxes based on CMPB's net income. If LICENSEE is required by law to make any deduction or to withhold from any sum payable to CMPB by LICENSEE hereunder, (i) LICENSEE shall effect such deduction or withholding, remit such amounts to the appropriate taxing authorities and promptly

got milk?® LICENSE AGREEMENT
____/ LICENSEE  ____/CMPB

furnish CMPB with tax receipts evidencing the payments of such amounts, and (ii) the sum payable by LICENSEE upon which the deduction or withholding is based shall be increased to the extent necessary to ensure that, after such deduction or withholding, CMPB receives and retains, free from liability for such deduction or withholding, a net amount equal to the amount CMPB would have received and retained in the absence of such required deduction or withholding.

4. STATEMENTS. LICENSEE shall furnish CMPB, together with each Royalty Payment, complete statements fully describing gross sales, number description and actual selling price of all Products bearing the Mark sold or distributed by LICENSEE during the preceding quarter. Receipt or acceptance by CMPB of any statements furnished pursuant to this Agreement or any sums paid hereunder shall not preclude CMPB from questioning the correctness thereof at any time, and any inconsistencies or mistakes therein shall be immediately rectified and the appropriate payments made by LICENSEE.

5. BOOKS AND RECORDS; RIGHT TO AUDIT AND INSPECT. LICENSEE shall maintain and make available to CMPB, CDFA, and the State of California, or their agents or representatives, for inspection, copying and audit, at reasonable times and during regular business hours, books and records of all information relevant to the performance of this Agreement. LICENSEE's obligations under this Section 5 shall continue for three (3) years after LICENSEE's final payment under this Agreement.

6. OWNERSHIP OF MARK.

6.1 CMPB OWNERSHIP. LICENSEE hereby acknowledges the validity of, and CMPB's ownership of, the federally registered Mark, and any U.S. Patent and Trademark Office applications and/or registrations thereto, agrees that it will do nothing inconsistent with such ownership and agrees that all use of the Mark by LICENSEE shall inure to the benefit of CMPB. LICENSEE agrees that nothing in this Agreement shall give LICENSEE any right, title or interest in the Mark other than the right to use the Mark in accordance with this Agreement. LICENSEE agrees not to register or attempt to register the Mark as a trademark, service mark, Internet domain name, trade name, or any similar mark or name, with any domestic or foreign governmental or quasi-governmental authority which would be likely to cause confusion with the Mark. LICENSEE may not register or use the Mark or an abbreviation of the Mark as part of an Internet domain name.

7. USE OF THE MARK; PROTECTION OF THE MARK.

7.1 PROPER USE. LICENSEE agrees that all use of the Mark shall only occur in conjunction with lettering and/or signage displayed solely on LICENSEE's Products and shall be in strict compliance with the terms of this Agreement. LICENSEE may use the Mark as set forth in Section 2.1. LICENSEE shall submit to CMPB a specific description of the way in which LICENSEE intends to use the Mark, for CMPB's approval, at least twenty (20) business days before LICENSEE actually uses the Mark. LICENSEE agrees not to modify the Mark.

got milk?® LICENSE AGREEMENT
/ LICENSEE    /CMPB

LICENSEE agrees not to use any other trademark or service mark in combination with the Mark other than as described in Section 2.1. The Mark shall always be used in the English language. At CMPB's request, LICENSEE agrees that it will print the symbol denoting mark registration, "®", on all Products and/or advertising or packaging thereof. At CMPB's request, LICENSEE shall also include the statement "'got milk?' is a registered trademark and servicemark of the California Milk Processor Board" on all Products and/or advertising or packaging thereof. The provisions of this paragraph shall survive the expiration or termination of this Agreement. LICENSEE has no right to sublicense, transfer or assign the use of the Mark or use the Mark for any other purpose other than the purpose described herein. LICENSEE may not use the Mark in connection with, or for the benefit of, any third party's products or services. LICENSEE further agrees not to use the Mark in a manner that is or could be deemed by CMPB, in its reasonable judgment, to be obscene, in poor taste, and/or in a manner that directly, explicitly or maliciously disparages CMPB, CDFA or their activities.

7.2 MONITORING BY CMPB. LICENSEE acknowledges that CMPB has no further obligations under this Agreement other than the right to periodically monitor LICENSEE's use of the Mark on lettering and/or signage displayed solely on LICENSEE's Products. If CMPB determines that LICENSEE is using the Mark improperly, CMPB shall notify LICENSEE, and LICENSEE shall remedy the improper use within two (2) business days following receipt of such notice from CMPB. Use of the Mark in any manner inconsistent with this Agreement shall constitute material breach of this Agreement. If such material breach has not been cured within two (2) business days following receipt of notice from CMPB, this Agreement shall be terminated.

7.3 PROTECTION. LICENSEE agrees to cooperate with CMPB in protecting, enforcing and defending CMPB's rights in the Mark. LICENSEE agrees to notify CMPB of any infringements, imitations, claims or other problems with respect to the Mark which may arise or otherwise come to LICENSEE's attention. CMPB shall have the sole right, but not the obligation, to take any action on account of any such infringement, imitation, claim or problem. LICENSEE agrees not to institute any suit nor take any other action on account of such infringements, imitations, claims or problems without the prior express written consent of CMPB.

8. CONFIDENTIAL INFORMATION AND DISCLOSURE. Unless required by law, and except to assert its rights hereunder or for disclosures to its own employees on a "need to know" basis, LICENSEE agrees not to disclose the terms of this Agreement or matters relating thereto without the prior written consent of CMPB, which consent shall not be unreasonably withheld.

9. INDEMNIFICATION

9.1 INDEMNIFICATION BY LICENSEE. LICENSEE shall indemnify and hold harmless CMPB, CDFA, the State of California, and each of their officers, agents, and employees (the "Indemnified Parties") from any and all liabilities, damages, claims, suits, judgments, costs and expense (including reasonable attorneys' fees), directly or indirectly incurred, as a result of: (a)

the actions of LICENSEE relating to this Agreement and the actions contemplated herein; (b) the breach of any of the provisions of this Agreement by LICENSEE; (c) any claims or allegations by third parties or government agencies arising out of or in connection with any alleged breach of the provisions of this Agreement by LICENSEE; (d) any claims by third parties based upon contract resulting directly from any activity contemplated by this Agreement; (e) any claims by third parties based upon any representations or warranties arising out of or in connection with the respective products or services, representations or art work of LICENSEE, or upon alleged patent, trademark or copyright infringement or unfair competition in connection with the respective products or services, representations or art work of LICENSEE; (f) acts or omissions of any firm employed by LICENSEE to perform any portion of the duties or obligations contained herein; and (g) any claims for products liability, contractual liability or personal injury arising out of LICENSEE'S manufacture, sale or distribution of any Products.  LICENSEE shall promptly notify the Indemnified Parties thereof in writing, and LICENSEE shall assume and direct the defense thereof.  The foregoing obligations are conditioned on the Indemnified Parties: (i) giving LICENSEE written notice of the relevant claim, (ii) cooperating with LICENSEE, at the Indemnifying Party's expense, in the defense of such claim, and (iii) giving LICENSEE the right to control the defense and settlement of any such claim, except that LICENSEE shall not enter into any settlement that affects the Indemnified Parties' rights or interest without the Indemnified Parties' prior written approval.  The Indemnified Parties shall have the right to participate in the defense at their own respective expense

9.2   INDEMNIFICATION BY CMPB.  CMPB agrees to indemnify LICENSEE and to hold LICENSEE harmless from any and all loss, damages, claims or causes of action, including reasonable legal fees and expenses that may be incurred by LICENSEE, arising out of a third party claim insofar as it is based on an allegation that the license furnished to LICENSEE in this Agreement infringes any copyright or registered trademark in existence on the Effective Date, but only if LICENSEE does all of the following: (a) notifies CMPB of that action in writing within five (5) business days; (b) gives CMPB the right to control and direct the defense and settlement of that action; (c) makes no compromise, settlement, or admission of liability; and (d) provides reasonable assistance and cooperates in the defense of that action at CMPB's expense.  CMPB will have no responsibility for the settlement of any claim, suit or proceeding made by LICENSEE without Licensor's prior written approval.

9.3   SURVIVAL.  The obligations established by Paragraphs 9.1 and 9.2, above, shall survive termination of this Agreement.

10. TERMINATION

10.1 TERM AND TERMINATION.  The rights granted to LICENSEE by this Agreement shall begin on the Effective Date and continue for the Term, unless terminated earlier as provided in Section 7.2 or this Section 10.1.  CMPB shall have the right to terminate this Agreement immediately, by delivering written notice of such termination to LICENSEE, upon the occurrence of one or more of the following: (a) any material breach by LICENSEE of its

obligations under this Agreement, or (b) use of the Mark by LICENSEE in a manner which is directly, explicitly or maliciously disparaging of CMPB, CDFA or their activities and services.

10.2 EFFECT OF TERMINATION. Upon termination of this Agreement for any reason: (i) the license granted herein shall immediately cease and all rights granted to LICENSEE hereunder shall revert to CMPB; (ii) except as permitted below, LICENSEE shall immediately cease and refrain from further use of the Mark; and (iii) unless termination is due to LICENSEE's breach, LICENSEE, for a period not to exceed six (6) months thereafter, may dispose of Products bearing the Mark which are on hand, or are in the process of manufacture, as of the effective date of termination, subject to the Royalty provisions set forth above. All sums accrued or owed to CMPB through the termination date shall be due and payable within thirty (30) days of the termination date. All sums accrued or owed to CMPB thereafter shall be paid within thirty (30) days of the end of the calendar quarter in which such sums accrued.

11. GENERAL

11.1 GOVERNING LAW. This Agreement shall be subject to and governed in all respects by the statutes and laws of the State of California without regard to the conflicts of laws principles thereof. The Superior Court of Sacramento County and/or the United States District Court for the Eastern District of California shall have exclusive jurisdiction and venue over all controversies in connection herewith, and each party hereby consents to such exclusive and personal jurisdiction and venue.

11.2 ENTIRE AGREEMENT. This Agreement constitutes the entire Agreement and understanding between CMPB and LICENSEE and integrates all prior discussions between them related to its subject matter. No modification of any of the terms of this Agreement shall be valid unless in writing and signed by an authorized representative of each party.

11.3 ASSIGNMENT. LICENSEE may not assign any of its rights or delegate any of its duties under this Agreement, or otherwise transfer this Agreement (by merger, operation of law or otherwise) without the prior written consent of CMPB. Any attempted assignment, delegation or transfer in derogation hereof shall be null and void.

[The remainder of this page is intentionally left blank.]

11.4 NOTICES. All notices required or permitted hereunder shall be given in writing addressed to the respective parties as set forth below and shall either be (a) personally delivered; (b) transmitted by postage prepaid certified mail, return receipt requested; or (c) transmitted by nationally-recognized private express courier, and shall be deemed to have been given on the date of receipt if delivered personally, or two (2) days after deposit in mail or express courier. Either party may change its address for purposes hereof by written notice to the other in accordance with the provisions of this Subsection. The addresses for the parties are as follows:

| | |
|---|---|
| TO THE CALIFORNIA MILK PROCESSOR BOARD: | W. Stephen James<br>Executive Director<br>The California Milk Processor Board<br>101 S. El Camino Real, Suite 202<br>San Clemente CA 92672 |
| TO LICENSEE: | Jon Tollefson<br>President<br>Food Market Merchandising, Inc.<br>6401 W. 106th St.<br>Bloomington, MN 55438 |

11.5 WAIVER. Any waiver, either expressed or implied, by either party of any default by the other in the observance and performance of any of the conditions, covenants of duties set forth herein shall not constitute or be construed as a waiver of any subsequent or other default.

11.6 HEADINGS. The headings to the Sections and Subsections of this Agreement are included merely for convenience of reference and shall not affect the meaning of the language included therein.

11.7 INDEPENDENT CONTRACTORS. The parties acknowledge and agree that they are dealing with each other hereunder as independent contractors. Nothing contained in the Agreement shall be interpreted as constituting either party the joint venture or partner of the other party or as conferring upon either party the power of authority to bind the other party in any transaction with third parties.

11.8 SURVIVAL. The provisions of Section 2.2 (Reservation of Rights), 6 (Ownership of Mark), 7.3 (Protection), 8 (Confidential Information and Disclosure), 10.2 (Effect of Termination) and 11 (General) will survive any termination of this Agreement.

11.9 EQUITABLE RELIEF. LICENSEE recognizes and acknowledges that a breach by LICENSEE of this Agreement will cause CMPB irreparable damage which cannot be readily remedied in monetary damages in an action at law, and may, in addition thereto, constitute an infringement of the Mark. In the event of any default or breach by LICENSEE that could result in irreparable harm to CMPB or cause some loss or dilution of CMPB's goodwill, reputation, or rights in the Mark, CMPB shall be entitled to immediate injunctive relief to prevent such irreparable harm, loss, or dilution in addition to any other remedies available.

11.10 SEVERABILITY. Except as otherwise set forth in this Agreement, the provisions of this Agreement are severable, and if any one or more such provisions shall be determined to be invalid, illegal or unenforceable, in whole or in part, the validity, legality and enforceability of any of the remaining provisions or portions thereof shall not in any way be affected thereby and shall nevertheless be binding between the parties hereto. Any such invalid, illegal or unenforceable provision or portion thereof shall be changed and interpreted so as to best accomplish the objectives of such provision or portion thereof within the limits of applicable law.

11.11 ATTORNEYS' FEES. In the event of any action, suit, or proceeding brought by either party to enforce the terms of this Agreement, the prevailing party shall be entitled to receive its costs, expert witness fees, and reasonable attorneys' fees and expenses, including costs and fees on appeal.

11.12 COMPLIANCE WITH FAIR EMPLOYMENT AND HOUSING ACT. During the performance of this Agreement, LICENSEE and its permitted subcontractors shall not unlawfully discriminate against any employee or applicant for employment because of race, religion, color, national origin, ancestry, physical handicap, medical condition, marital status, age (over 40), or sex. LICENSEE shall insure that the evaluation and treatment of its employees and applicants for employment are free of such discrimination. LICENSEE shall comply with the provisions of the Fair Employment and Housing Act (Government Code § 12900 et seq. and the applicable regulations promulgated thereunder (California Code of Regulations, Title 2, § 7285.0 et seq.). The applicable regulations of the Fair Employment and Housing Commission implementing the Government Code § 12990 set forth in Chapter 5 of Part 2.8 of Division 3 of Title 2 of the California Code of Regulations are incorporated into this contract by reference and made a part hereof as if set forth in full. LICENSEE shall give written notice of its obligations under this Section 11.12 to labor organizations with which it has a collective bargaining agreement.

11.13 CONTEMPT OF COURT. By signing this Agreement, LICENSEE swears under penalty of perjury that no final unappealable finding of contempt of court by a Federal court has been issued against LICENSEE within the immediately preceding two-year period because of LICENSEE's failure to comply with an order of a Federal court which orders LICENSEE to comply with an order of the National Labor Relations Board.

got Milk?® LICENSE AGREEMENT
/ LICENSEE   / CMPB

11.14 INSURANCE. LICENSEE shall obtain and maintain, during the Term, a Commercial General Product Liability insurance policy (the "LICENSEE's Insurance Policy") issued by an insurer with an "A" rating, with a combined single limit of liability of not less than One Million Dollars ($1,000,000.00) per occurrence and per person. LICENSEE's Insurance Policy shall name CMPB, CDFA, the State of California, and each of their officers, agents, and employees as insureds, as their interests may appear. LICENSEE's Insurance Policy shall insure against any and all liability for personal injuries or property damage, arising out of, resulting from, or incident to the negligent acts or omissions of LICENSEE and any products liability arising from the manufacture, sale and distribution of any Product(s). In addition, LICENSEE shall obtain and maintain, throughout the Term, the necessary workers' compensation insurance or qualified self-insurance to cover its employees.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

"CMPB":

The California Milk Processor Board

By: _____
W. STEPHEN JAMES
Executive Director

Date:

"LICENSEE":

Food Market Merchandising, Inc.

By: _____
JON TØLLEFSON
President

Date: 11-17-11