1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11    FOOD MARKET MERCHANDISING,              No.  2:15-cv-01083-TLN-CKD
      INC.,
12
                          Plaintiff,          **ORDER**
13
                 v.
14
      CALIFORNIA MILK PROCESSOR
15    BOARD,

16                        Defendant.

17    ─────────────────────────────────

18    CALIFORNIA MILK PROCESSOR
      BOARD,
19
                          Counterclaimant,
20
                 v.
21
      FOOD MARKET MERCHANDISING,
22    INC.; MAGIC STRAWS, LLC; REACH
      COMPANIES, LLC; JON TOLLEFSON;
23    DIVERSIFIED CONSUMER GOODS,
      LLC: DIVERSIFIED FLAVOR, LLC
24    and PAUL HENSON,

25
                        Counterdefendants.
26

27

28
                                     1

This matter is before the Court pursuant to Plaintiff and Counterdefendant Food Market Merchandising, Inc. ("FMMI") and Counterdefendants Magic Straws, LLC ("Magic Straws"), Reach Companies, LLC ("Reach"), and Jon Tollefson's (collectively, with FMMI, "Counterdefendants") Motions to Dismiss, or in the alternative, a more definite statement. (ECF Nos. 75 & 76.) Defendant and Counterclaimant California Milk Processor Board ("CMPB") opposes both motions. (ECF Nos. 79 & 80.) Counterdefendants filed replies. (ECF Nos. 81 & 82.) After carefully considering the parties' arguments, the Court hereby GRANTS Magic Straws's Motion to Dismiss (ECF No. 75) and GRANTS IN PART AND DENIES IN PART FMMI, Reach, and Tollefson's Motion to Dismiss. (ECF No. 76.)

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff and Counterdefendant FMMI is a Minnesota Corporation, with a principal place of business located at 6401106th Street, Bloomington, MN 55438. (FMMI's Amended Compl., ECF No. 11 ¶ 5.) FMMI was the licensee of the GOT MILK? trademark for flavored drinking straws, toys, novelties, household products, confections, and personal care items ("Products"). (ECF No. 11 ¶ 6.) Defendant and Counterclaimant CMPB is an advisory board of the California Department of Food and Agriculture, which has a principal place of business located in Sacramento, California. (ECF No. 11 ¶ 7.) CMPB owns the federally-registered service mark and trademark GOT MILK? (the "Mark"). (ECF No. 11 ¶ 8.)

In November 2009, CMPB and FMMI entered into a written License Agreement effective from November 3, 2009 through November 2, 2011 ("2009 License Agreement"). (CMPB's Second Amended Answer, ECF No. 53 ¶ 65.) In the 2009 License Agreement, CMPB granted FMMI a non-exclusive, non-transferable license to create, distribute, and sell Products bearing the Mark. (ECF No. 53 ¶ 65.)

In November 2010, a class action lawsuit was filed against FMMI. (ECF No. 53 ¶ 66.) CMPB alleges that the class action lawsuit prompted FMMI to set up two new entities (Magic

---

[1]    The following recitation of facts is taken, sometimes verbatim, from FMMI's Amended Complaint (ECF No. 11) and CMPB's Second Amended Answer. (ECF No. 53.)

Straws and Reach) so that it could transfer FMMI's assets bearing the Mark to the new entities. (ECF No. 53 ¶ 66.)

Around November 17, 2011, CMPB and FMMI entered into a new License Agreement effective from November 3, 2011 through November 2, 2015 ("2011 License Agreement"). (ECF No. 53 ¶ 68.) In the 2011 License Agreement, CMPB granted FMMI a non-exclusive, non-transferable license to create, distribute, and sell Products bearing the Mark. (ECF No. 53 ¶ 68.) FMMI agreed to pay CMPB 7% in royalties for every product it sold bearing the Mark. (Ex. F, ECF No. 48-2 at 25.) FMMI also agreed to pay CMPB royalties for any product bearing the Mark that sold six months after the 2011 License Agreement ended. (ECF No. 48-2 at 30.) The 2011 License Agreement did not contain a prohibition on FMMI selling GOT MILK? products to other entities who would not be bound to pay CMPB royalties. (*See generally* ECF No. 48-2 at 25–33.)

On November 18, 2011, Bryan Munkirs, an FMMI employee, allegedly helped set up Magic Straws as a limited liability company in the State of Minnesota. (ECF No. 53 ¶ 69.) CMPB alleges FMMI directed its employee Mr. Munkirs to set up Magic Straws so that FMMI could transfer its assets, including the GOT MILK? flavored drinking straws to Magic Straws. (ECF No. 53 ¶ 69.) CMPB alleges that FMMI's main purpose in doing so was to transfer its assets to Magic Straws in case a large monetary judgment was entered against FMMI in the class action lawsuit. (ECF No. 53 ¶ 69.)

CMPB alleges that sometime in 2012, FMMI requested that Magic Straws's name replace FMMI's name on retail vendor agreements. (ECF No. 53 ¶ 70.) CMPB alleges FMMI made this request so Magic Straws could invoice and receive payment from retailers instead of FMMI who was in the thick of a class action lawsuit and needed to get rid of its assets in case it lost the lawsuit. (ECF No. 53 ¶ 70.)

On December 27, 2012, Ryan Simafranca, an employee at a Minnesota law firm, which represents FMMI and Magic Straws, allegedly helped set up Reach as a limited liability company in the State of Minnesota. (ECF No. 53 ¶ 73.) CMPB alleges that FMMI and/or Magic Straws directed Mr. Simafranca to set up Reach so that Magic Straws and/or FMMI could transfer assets

3

including the GOT MILK? flavored drinking straws to Reach.  (ECF No. 53 ¶ 73.)  CMPB alleges FMMI's main purpose was to transfer it assets to Reach in case a large monetary judgment was entered against FMMI in the class action lawsuit.  (ECF No. 53 ¶ 73.)

CMPB alleges that around December 2012, in line with its plan to transfer its assets to Magic Straws and/or Reach to avoid its creditors, FMMI dismantled its website and put up an "under construction" notice and directed visitors to call Magic Straws's phone number to inquire about the GOT MILK? flavored drinking straws.  (ECF No. 53 ¶ 74.)  CMPB also alleges that sometime in 2013, FMMI changed its employees' dental insurance plans and 401(k) plans so that Reach was listed as the employer instead of FMMI.  (ECF No. 53 ¶ 75.)

Around August 2013, CMPB engaged in discussions with FMMI regarding the possibility of amending the 2011 License Agreement.  (ECF No. 53 ¶ 76.)  At that time, FMMI had not paid any royalties to CMPB under the 2011 License Agreement for about one and a half years.  (ECF No. 53 ¶ 76.)  FMMI and CMPB decided to negotiate an early termination of the 2011 License Agreement.  (ECF No. 53 ¶ 76.)

CMPB alleges that during the August 2013 negotiations, Jon Tollefson and Paul Henson, who purportedly hold a type of controlling interest in FMMI, Reach, and Magic Straws, both agreed that Henson would try to convince CMPB that: (1) it should heavily discount the remaining royalty payments FMMI owed to CMPB so FMMI would not file bankruptcy even though this representation was not true; (2) Henson was going to leave FMMI to start a new company unrelated to FMMI even though Henson would continue his former positions with FMMI, Magic Straws, and Reach; and (3) CMPB should license its Mark to Henson's new company for use on flavored drinking straws and other milk modifier products.  (ECF No. 53 ¶¶ 43–44, 77, 81.)

Around March 27, 2014, Henson allegedly informed CMPB that he was dissatisfied with how the negotiations were going with FMMI and he asked CMPB if he could enter into a new License Agreement with CMPB to sell GOT MILK? flavored drinking straws and other products once FMMI and CMPB finalized the termination of the 2011 License Agreement.  (ECF No. 53 ¶ 79.)  Henson allegedly informed CMPB that he was going to go off on his own to start a new

company called "Diversified Consumer Goods, LLC" ("DCG").  (ECF No. 53 ¶ 79.)

Around April 17, 2014, Henson allegedly asked CMPB to list DCG as the licensee under the new proposed License Agreement.  (ECF No. 53 ¶ 80.)  At the time, CMPB believed Henson was no longer an officer, director, or employee of FMMI or that he was in the process of terminating his relationship with FMMI before entering into a new licensing relationship with CMPB.  (ECF No. 53 ¶ 80.)  CMPB alleges that it has since discovered that Henson never disassociated himself from FMMI and its "alter egos" Reach and Magic Straws.  (ECF No. 53 ¶ 80.)

In June 2014, CMPB and FMMI entered into a First Amendment to License Agreement (the "FALA").  (Ex. G, ECF No. 48-2 at 35–36; ECF No. 53 ¶ 82.)  In the FALA, CMPB and FMMI agreed to terminate the 2011 License Agreement and post-date the termination to December 31, 2013.  (ECF No. 48-2 at 35.)  FMMI agreed to no longer distribute or sell Products bearing the Mark.  (ECF No. 48-2 at 35.)  FMMI also agreed it no longer had the right to dispose of any GOT MILK? products it had on hand or which were in the process of being manufactured as of December 31, 2013.  (ECF No. 48-2 at 35.)

Around July or August 2014, CMPB and DCG entered into a written License Agreement effective from August 2, 2014 through December 31, 2017 ("DCG License Agreement").  (Ex. H, ECF No. 48-2 at 38–68; ECF No. 53 ¶ 84.)  In the DCG License Agreement, CMPB granted DCG a non-exclusive, non-transferable license to use CMPB's Mark in connection with flavored drinking straws and other enumerated products.  (ECF No. 48-2 at 40; ECF No. 53 ¶ 84.)  Unlike in the 2011 License Agreement, CMPB added a prohibition in the DCG License Agreement that prevented DCG from selling CMPB's products to other entities without its consent.  (ECF No. 48-2 at 40–41.)

Around October or December 2014, CMPB and DCG entered into a Trademark License Assignment and Assumption Agreement (the "TLAAA").  (ECF No. 53 ¶ 86.)  In the TLAAA, CMPB and DCG agreed that DCG could assign its rights and obligations under the DCG License Agreement to Diversified Flavor, which is purportedly a Delaware limited liability company.  (ECF No. 53 ¶¶ 42, 86.)

5

On February 26, 2015, CMPB discovered FMMI was continuing to use the Mark in violation of the FALA and so CMPB's attorney wrote to Tollefson, who CMPB alleges is FMMI's Chief Executive Officer. (ECF No. 53 ¶ 87.) This letter demanded that FMMI cease all use of the Mark. (ECF No. 53 ¶ 87.) On March 3, 2015, FMMI's attorney wrote to CMPB's attorney and denied all unauthorized use of the Mark. (ECF No. 53 ¶ 88.) On March 5, 2015, CMPB's attorney wrote to FMMI's attorney to request that FMMI comply with the demands that CMPB's attorney wrote in the February 26, 2015 letter. (ECF No. 53 ¶ 89.) On March 10, 2015, FMMI filed a lawsuit against CMPB in the United States District Court for the Southern District of New York for trademark abandonment. (ECF No. 11; ECF No. 53 ¶ 90.) On April 17, 2015, CMPB's counsel wrote to FMMI's attorney to request an audit of FMMI's books and records, but FMMI's attorney allegedly refused this request on April 28, 2015. (ECF No. 53 ¶ 185.) On May 7, 2015, FMMI's case against CMPB was transferred to this Court pursuant to the forum-selection clause contained in the 2011 License Agreement. (ECF No. 53 ¶ 91.)

On August 4, 2015, CMPB notified Diversified Flavor that CMPB was immediately terminating DCG's License Agreement with CMPB due to DCG's material breach of that Agreement. (ECF No. 53 ¶ 92.) On September 28, 2015, CMPB filed fourteen counterclaims against FMMI, Reach, Magic Straws, DCG, Diversified Flavor, Henson, and Tollefson because CMPB believes Counterdefendants are alter egos of each other. (ECF No. 53 ¶¶ 101, 120–221.)

CMPB alleges Counterdefendants have a unity of interest and ownership such that they no longer exist as separate entities/individuals. (ECF No. 53 ¶ 102.) For instance, CMPB alleges Tollefson and Henson hold all the key positions in FMMI, Reach, Magic Straws, DCG, and Diversified Flavor. (ECF No. 53 ¶ 103.) CMPB alleges Tollefson is the Chief Executive Officer of FMMI and Magic Straws, Reach's Registered Agent and Manager, and holds other key positions in DCG and Diversified Flavor. (ECF No. 53 ¶ 104.) CMPB also alleges Henson is Magic Straws's Vice President, DCG's President, Diversified Flavor's Manager, and holds other key positions in FMMI and Reach. (ECF No. 53 ¶ 105.)

CMPB alleges FMMI, Reach, and Magic Straws use the same toll-free phone number. (ECF No. 53 ¶ 109.) FMMI's website, Magic Straws's website, and Reach's website all list the

6

same phone number to contact each company.  (ECF No. 53 ¶ 109.)  CMPB alleges calls for FMMI, Reach, and Magic Straws go to Tollefson's desk.  (ECF No. 53 ¶ 110.)  FMMI, Reach, and Magic Straws share the same office address and the building located at that address has the name "Reach Companies" on the main sign in front of the building.  (ECF No. 53 ¶ 111.)  The building also contains multiple doors with the name "FMMI" on them.  (ECF No. 53 ¶ 111.)

CMPB alleges that FMMI's accountant/bookkeeper sends daily emails to all Counterdefendants' employees to provide sales updates of Counterdefendants' products, including the flavored drinking straws bearing the Mark.  (ECF No. 53 ¶ 113.)  CMPB alleges Counterdefendants are usually represented by the same attorneys.  (ECF No. 53 ¶ 114.)  Magic Straws's name was allegedly used in commerce for an FMMI package bearing the Mark before Magic Straws was federally registered as a trademark.  (ECF No. 53 ¶ 115.)

CMPB alleges the incorporators and/or organizers of Reach, Magic Straws, DCG, and Diversified Flavor formed those entities with fraudulent intent to avoid creditors like CMPB and the class action plaintiffs.  (ECF No. 53 ¶ 116.)  CMPB alleges Counterdefendants believed that by selling the GOT MILK? flavored drinking straws to Reach and Magic Straws for little or no consideration, FMMI would have to pay fewer royalties to CMPB than in a normal arms-length transaction.  (ECF No. 53 ¶ 116.)  CMPB alleges that the incorporators formed DCG and Diversified Flavor to have "new" companies in place that could license GOT MILK? from CMPB for use with flavored drinking straws and other milk modifier products after Henson fraudulently induced CMPB into believing that these entities were unrelated to FMMI.  (ECF No. 53 ¶ 117.)

CMPB alleges Counterdefendants failed to observe corporate formalities and disregarded the corporate form by setting up 401(k) plans for FMMI employees under Reach and transferring FMMI's employee health plan to Reach.  (ECF No. 53 ¶ 118.)  CMPB alleges that failing to disregard the corporate existence of FMMI, Reach, Magic Straws, DCG, and Diversified Flavor would result in fraud or injustice as follows: (1) if FMMI transferred some or all of its remaining inventory of GOT MILK? flavored drinking straws to Reach and/or Magic Straws prior to December 31, 2013, then CMPB may be precluded under the first sale doctrine[2] from recovering

---

[2]     The first sale doctrine provides that "the right of a producer to control distribution of its trademarked

trademark infringement damages for ongoing sales of those drinking straws if the Court determines Reach and Magic Straws are distinct from FMMI; (2) CMPB may be preventing from recovering additional monies owed to it by FMMI relating to the ongoing sales of the GOT MILK? flavored drinking straws because FMMI transferred some or all of its assets to Reach, Magic Straws, DCG, Diversified Flavor, Tollefson and/or Henson; and (3) CMPB may be prevented from recovering additional monies owed to it by DCG and/or Diversified Flavor under the parties' terminated License Agreement if DCG and/or Diversified Flavor transferred some or all of their assets to Reach, Magic Straws, FMMI, Tollefson, and/or Henson.  (ECF No. 53 ¶ 119.)

## II.    STANDARD OF LAW

### A.    Motion to Dismiss

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim . . . is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

On a motion to dismiss, the factual allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court is bound to give plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads

---

product does not extend beyond the first sale of the product." *Sebastian Intern., Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 at 1074 (9th Cir. 1995).

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. 544, 556 (2007)).

Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant–unlawfully–harmed–me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting *Twombly*, 550 U.S. at 570). Only where a plaintiff has failed to "nudge[] [his or her] claims . . . across the line from conceivable to plausible[,]" is the complaint properly dismissed. *Id*. at 680. While the plausibility requirement is not akin to a probability requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id*. at 678. This plausibility inquiry is "a context–specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

If a complaint fails to state a plausible claim, "'[a] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)); *see also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in denying leave to amend when amendment would be futile). Although a district court should freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to

deny such leave is 'particularly broad' where the plaintiff has previously amended its complaint[.]" *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (quoting *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

"For purposes of a motion to dismiss, we accept all well-pleaded allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 783 (9th Cir. 2012).

> [Further,] the court need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences. But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be [evaluated] on evidentiary grounds.

*In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (citation omitted).

A party asserting claims for fraud must also meet the heightened pleadings standard set forth in Rule 9(b), which provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

B. <u>Motion for More Definite Statement</u>

A motion for a more definite statement should be denied unless the pleading is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). This is because "a motion for a more definite statement is used to attack unintelligibility, not mere lack of detail." *San Bernadino Pub. Employees Ass'n v. Stout,* 946 F.Supp. 790, 804 (C.D. Cal. 1996). This is a liberal standard as the parties are expected to familiarize themselves with the claims and ultimate facts through the discovery process. *See Famolare, Inc. v. Edison Brothers Stores, Inc.,* 525 F.Supp. 940, 949 (E.D. Cal. 1981). "Thus, a motion for a more definite statement should not be granted unless the defendant literally cannot frame a responsive pleading." *Bureerong v. Uvawas,* 922 F.Supp. 1450, 1461 (C.D. Cal. 1996) (citing *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104, 1114 (N.D. Cal. 1979)).

# III.    ANALYSIS

CMPB brings fourteen counterclaims against Counterdefendants for trademark infringement, unfair competition, false designation of origin, trademark dilution, counterfeiting, contributory trademark infringement, fraud, and breach of contract.  (ECF No. 53 ¶¶ 120–221.) Counterdefendants move to dismiss CMPB's counterclaims for several reasons: First, CMPB's alter ego theory is insufficient to join Counterdefendants Magic Straws, Reach, and Tollefson. Second, there is no cause of action for trademark infringement (Counts I–III) and unfair competition (Count IV) based on a licensee's use of genuine goods bearing a true mark.  Third, CMPB's counterclaims for false designation of origin (Count V), trademark dilution (Count VI), counterfeiting (Count VII), and contributory trademark infringement (Count VIII) fail to state a claim under the Lanham Act.  Fourth, CMPB's fraud claim (Count IX) does not satisfy Federal Rule of Civil Procedure ("Rule") 9(b)'s heightened pleading standard.  Fifth, CMPB fails to state a claim for breach of the 2011 License Agreement (Counts X & XI), breach of the FALA (Count XII), and rescission (Count XIII).  (*See generally* ECF Nos. 75 & 76.)  The Court will address each of these arguments below.

A. <u>CMPB's Alter Ego Theory As Against Magic Straws, Reach, & Tollefson</u>

Counterdefendants assert CMPB does not specify which corporate or individual Counterdefendants are alter egos of other Counterdefendants.   (ECF No. 75-1 at 14; ECF No. 76-1 at 11.)  Counterdefendants further argue CMPB's allegations fail to properly allege unity of interest and ownership. (ECF No. 75-1 at 18–20; ECF No. 76-1 at 12–14.)  Finally, Counterdefendants contend CMPB fails to allege facts establishing that an inequitable result will occur if the Court regards Counterdefendants as separate corporate identities.  (ECF No. 75-1 at 16–18; ECF No. 76-1 at 14.)

i. *Failure to Specify Which Counterdefendants Are Alter Egos of Which Other Counterdefendants*

Counterdefendants argue that CMPB's "shotgun pleading" fails to specify which Counterdefendants are alter egos of which other Counterdefendants, and as a result, Counterdefendants do not have proper notice to mount a defense.  (ECF No. 75-1 at 14; ECF No.

76-1 at 12.)  Counterdefendants further argue that CMPB fails to allege "specific conduct by each [C]ounterdefendant that would justify piercing the corporate veil."  (ECF No. 76-1 at 11; *see also* 75-1 at 15–16.)  In support of their arguments, Counterdefendants cite *Kingsburg v. Apple Packers, Inc. v. Ballantine Packers Co.*, 2010 U.S. Dist. LEXIS 7198, at *14 (E.D. Cal. 2010) for the proposition that a complaint is deficient when it does "not specify which Corporate Defendant is the alter ego of which other corporate entity and/or which Individual Defendant is the alter ego of which Corporate Defendant" and it did "not allege what each individual defendant[] did that would justify piercing the corporate veil."  (ECF No. 75-1 at 14; ECF No. 76-1 at 11.) Counterdefendants also cite *Destfino v. Kennedy*, 2009 U.S. Dist. LEXIS 18138, at *17–19 (E.D. Cal. 2009) for the proposition that a "shotgun pleading" that incorporates by reference all prior paragraphs into each cause of action, naming each defendant in each cause of action, and "alleg[ing] that each defendant did everything" violates Rule 8.  (ECF No. 76-1 at 12.)

In response, CMPB argues that unlike in *Destfino*, where the court determined that the "shotgun" nature of the plaintiff's fraud claims violated Rule 8, the instant matter involves alter ego allegations that make it "possible to determine which statements and fraudulent conduct are attributed to each Counterdefendant."  (ECF No. 80 at 7–8.)  For instance, CMPB argues that in its ninth count for fraud it attributed statements and fraudulent conduct to Henson and FMMI, and to remaining Counterdefendants as alter egos of Henson and FMMI.  (ECF No. 80 at 8.) Moreover, CMPB argues that unlike in *Kingsburg*, where the court determined the plaintiff failed to allege who was the alter ego of who and failed "to allege how each Corporate Defendant [was] linked to each Individual Defendant or to the other corporations," here, CMPB adequately alleged how Counterdefendants are linked to one another.  (ECF No. 79 at 7; ECF No. 80 at 5.)  For example, CMPB alleged Tollefson and Henson hold all the key positions in FMMI, Reach, Magic Straws, DCG, and Diversified Flavor.  CMPB also alleged that Counterdefendants use the same toll-free phone number, list the same phone number to contact each company, have all calls directed to Tollefson's desk, and share a common address.  (ECF No. 53 ¶¶ 103–105, 109, 111.)

Further, CMPB argues that it adequately alleged what Henson and Tollefson did that would justify piercing the corporate veil.  (ECF No. 75-1 at 8; ECF No. 76-1 at 7.)  For instance,

CMPB alleged Tollefson and Henson agreed that Henson would misrepresent that FMMI was going to go bankrupt unless CMPB cut FMMI a deal on past-due royalties. (ECF No. 53 ¶¶ 77, 81.) Moreover, CMPB alleged Henson misrepresented that he was going to dissociate himself from FMMI, Reach, and Magic Straws to start DCG so that CMPB would enter into a licensing relationship with DCG. (ECF No. 53 ¶ 80.)

The Court finds that CMPB's alter ego allegations put Counterdefendants on notice of the charges against them. Unlike in *Kingsburg*, CMPB alleged for nearly five pages how each corporate Counterdefendant is linked to each individual Counterdefendant. (ECF No. 53 ¶¶ 101–119; *Kingsburg*, 2010 WL 2817056, at *5 (stating that the court is troubled by the plaintiff's failure to link the corporate defendants to each individual defendant or to the other corporations).) Furthermore, unlike in *Destfino*, this case involves alter ego allegations and thus, incorporation of prior allegations "promotes simple, concise pleadings." *Destfino*, 2009 WL 63566, at *4. Also, unlike in *Destfino*, CMPB identifies the parties involved and their individual role with clarity and specificity. *Id*. at *8. For instance, CMPB identifies Henson and Tollefson's positions in each corporate Counterdefendant and specifies the representations they allegedly made. (ECF No. 53 ¶¶ 77, 81, 103–105, 166, 196.) CMPB also describes the business operations of each corporate Counterdefendant and the affiliations each corporate Counterdefendant has with each other. (*See generally* ECF No. 53.)

For the reasons stated, the Court is not persuaded by Counterdefendants' first reason to dismiss CMPB's alter ego allegations as against Reach, Magic Straws, and Tollefson.

*ii.*     *Failure to Establish Unity of Ownership & Interest*

Counterdefendants argue that CMPB's allegations that Counterdefendants share the same phone number, web design company, same attorneys, and same directors are not dispositive. (ECF No. 75-1 18–19.) Further, Counterdefendants argue that CMPB fails to allege "that the corporate [C]ounterdefendants have an ownership interest in each other," which "is a pre-requisite to alter ego liability." (ECF No. 76-1 at 13.) Counterdefendants also argue CMPB fails to allege "substantial ownership and dominance, corporate capitalization or insolvency, a failure to observe corporate formalities, absence of regular board meetings, and nonfunctioning

directors." (ECF No. 75-1 at 19.) Counterdefendants argue that, at most, CMPB alleges a relationship or affiliation between corporate entities, which is insufficient to support a theory of alter ego liability. (ECF No. ECF No. 75-1 at 18–19; ECF No. 76-1 at 13–14.)

CMPB argues it adequately alleged unity of interest and ownership among Counterdefendants by alleging "commingling of funds and other assets of the…entities," "identical equitable ownership in the…entities," "use of the same offices and employees," "use of one [entity] as a mere shell or conduit for the affairs of the other," "disregard of corporate formalities," "lack of segregation of corporate records," and "identical directors and officers." (ECF No. 79 at 10.)

California law requires two conditions to be met before the alter ego doctrine can be invoked. "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000).[3] Factors a court considers in determining whether to apply the doctrine are "commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other." *Sonora*, 83 Cal. App. 4th at 538–39. Additional factors courts consider include "inadequate capitalization, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers." *Id.* at 539. No single factor governs and courts must consider all the circumstances to determine whether to apply the alter ego doctrine. *Id.* "Alter ego is an extreme remedy, sparingly used." *Id.*

The "unity of interest and ownership" prong of the alter ego test requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (quoting *Doe v. Unocal Corp.*, 248 F.3d

---

[3]    The parties agreed that California law would govern the 2011 License Agreement and therefore, the Court applies California law. (Ex. F, ECF No. 48-2 at 30.)

915, 926 (9th Cir. 2001) (internal quotations omitted)). "This test envisions pervasive control over the subsidiary, such as when a parent corporation 'dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation.'" *Ranza*, 793 F.3d at 1073 (quoting *Unocal*, 248 F.3d at 926) (internal quotations omitted)). "Total ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1073 (citing *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2009)).

Here, CMPB alleged many relevant factors under the "unity of interest" prong of the alter ego test. Namely, CMPB alleged transfer of assets, identical equitable ownership, use of the same office and employees, use of one entity as the mere shell or conduit for the affairs of the other entity, disregard of corporate formalities, lack of segregation of corporate records, and identical directors and officers. (ECF No. 53 ¶¶ 43–44, 63, 66, 69–71, 75, 103–108, 111, 118–119.) The Court does note CMPB failed to allege any facts or make any arguments concerning Counterdefendants holding themselves out as liable for each others' debt or inadequate capitalization. (*See* ECF No. 79 at 10; *Sonora*, 83 Cal. App. 4th at 538–39.) The Court need not determine at this stage whether or not CMPB establish a unity of ownership and interest because, for reasons stated below, the Court finds that CMPB failed to satisfy the "inequitable result" prong of the alter ego test.

### iii. *Failure to Establish An Inequitable Result*

Counterdefendants argue CMPB is merely a "dissatisfied creditor" who "wants more money for royalties," which is insufficient to establish an inequitable result to support a theory of alter ego liability. (ECF No. 75-1 at 16–17; *see also* ECF No. 76-1 at 14.) In support of their argument, Counterdefendants cite *NuCal Foods, Inc. v. Quality Egg LLC*, 887 F. Supp. 2d 977, 992 (E.D. Cal. 2012) for the proposition that "[t]o prove injustice, the plaintiff must be more than just a creditor attempting to recover unsatisfied debts."

CMPB acknowledges that a dissatisfied creditor attempting to recover unsatisfied debts does not prove injustice for purposes of the alter ego test, but CMPB argues that under *NuCal*, an inequitable result is found where the plaintiff shows "**that a defendant's conduct amounted to**

15

**bad faith**." (ECF No. 79 at 9; ECF No. 80 at 9 (emphasis retained).) CMPB argues it alleged Counterdefendants' bad faith conduct by alleging that Counterdefendants removed the expiration and best by dates on the GOT MILK? flavored drinking straws. (ECF No. 79 at 9; ECF No. 80 at 9–10.)

Even assuming CMPB's allegations are true and Counterdefendants acted in bad faith, CMPB "must [also] make allegations of facts from which it appears that recognition of the corporate entity would sanction a fraud or promote injustice." *NuCal*, 887 F. Supp. 2d at 992 (citing *Monaco v. Liberty Life Assur. Co.*, No. C06-07021, 2007 WL 1140460, at *4 (C.D. Cal. 2007)); *S.E.C. v. Hickey*, 322 F.3d at 1128. Here, CMPB concludes Counterdefendants acted in bad faith but makes no argument for how Counterdefendants' corporate separateness would promote fraud or injustice. (ECF No. 79 at 9; ECF No. 80 at 9–10.) Instead, CMPB only alleges fraud or injustice in relation to a dissatisfied creditor attempting to recover unsatisfied debts, which is insufficient to establish injustice for purposes of the alter ego doctrine. (ECF No. 53 ¶ 119 (alleging failing to disregard the corporate existence of Counterdefendant may prevent CMPB from recovering additional monies owed to it by FMMI).)

For the reasons stated, CMPB failed to establish an inequitable result for purposes of the alter ego doctrine. Thus, all counterclaims against Magic Straws, Reach, and Tollefson that are premised on an alter ego theory of liability are dismissed with leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (stating that a district court should liberally grant leave to amend unless amendment would be futile).

    B. <u>CMPB's Counterclaims Against Counterdefendants In Their Own Right</u>

    *i.      Counts I–IV: Trademark Infringement & Unfair Competition*

FMMI, Reach, and Tollefson ("FMMI Counterdefendants") make several arguments for why CMPB's trademark infringement claims fail. (ECF No. 76-1 at 14–20.) The Court need only address one of FMMI Counterdefendants' argument to conclude it will dismiss CMPB's trademark infringement claims. *Landis v. North American Co.*, 299 U.S. 248, 254 (1936) (stating that courts have inherent power to control the disposition of the cases on its docket for the sake of judicial economy).

FMMI Counterdefendants argue that the authorized sale of genuine goods does not give rise to infringement because there is no likelihood of confusion as to the source or origin of the genuine goods.  (ECF No. 76-1 at 16.)  CMPB responds that it alleged that FMMI Counterdefendants made unauthorized or non-genuine uses of the Mark.  (ECF No. 80 at 10.)

"[T]o establish a claim of direct trademark infringement, a plaintiff must show: (1) it has valid, protectable trademarks, and (2) that defendant's use of the marks in commerce is likely to cause confusion." *Free Kick Master LLC v. Apple Inc.*, 140 F. Supp. 3d 975, 979 (N.D. Cal. 2015) (citing *Applied Info. Sciences Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007)).  With respect to the first element, the parties agree that CMPB owns the Mark.  (ECF No. 11 ¶ 8; ECF No. 53 ¶ 8.)  With respect to the second element, CMPB makes the conclusory allegation that FMMI Counterdefendants' sale and distribution of expired GOT MILK? drinking straws in unapproved packaging causes likelihood of confusion.  (ECF No. 53 ¶ 121.)  However, CMPB never describes how consumers would be confused as to the source of the drinking straws. Because CMPB failed to allege how consumers would likely be confused as to the source of the drinking straws, the Court dismisses with leave to amend CMPB's trademark infringement claims against FMMI Counterdefendants (Counts I–III).  CMPB's claim two for trademark infringement against Magic Straws (Count II) similarly fails because CMPB does not allege any additional facts for likelihood of confusion as to that claim.  *Free Kick Mater LLC*, 140 F. Supp. 3d at 979 (stating that a plaintiff alleging trademark infringement must establish likelihood of confusion). Consequently, the Court also dismisses with leave to amend CMPB's unfair competition claim (Count IV) because it is predicated on CMPB's deficient trademark infringement claims. (*See* ECF No. 53 ¶¶ 133–138.)

  ii. *Counts V-VIII: False Designation of Origin, Trademark Dilution, Counterfeiting, & Contributory Trademark Infringement*

   a. Count V: False Designation of Origin

FMMI Counterdefendants argue that CMPB's claim for false designation of origin fails because CMPB failed to plead how there is likelihood of confusion as to the source of the GOT MILK? products.  (ECF No. 76-1 at 20.)  Specifically, FMMI Counterdefendants argue "the

resale of the branded straws is not a false designation of origin and is not likely to cause confusion." (ECF No. 76-1 at 20.)  CMPB does not address this likelihood-of-confusion argument in its opposition.  (ECF No. 80 at 15– 16.)  Instead, CMPB reiterates the same argument it made in defense of its trademark infringement and unfair competition claims that FMMI Counterdefendants "made unauthorized or non-genuine uses of the [GOT MILK?] marks."  (ECF No. 80 at 16.)  Because CMPB failed to allege likelihood of confusion as discussed above, the Court dismisses CMPB's false designation of origin claim (Count V) with leave to amend.

### b.  Count VI: Trademark Dilution

FMMI Counterdefendants argue that CMPB's trademark dilution claim fails because "no claim for dilution will lie in the sale or resale of authorized genuine goods."  (ECF No. 76-1 at 21.)  CMPB argues that FMMI Counterdefendants did not make authorized or genuine uses of the Mark.  (ECF No. 80 at 16.)  To prove a trademark dilution claim, a trademark owner "must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008) (citing 15 U.S.C. § 1125(c)(1)).  "Dilution refers to the whittling away of the value of a trademark when it's used to identify different products." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002) (internal quotations omitted).  A showing of competition or a likelihood of confusion is not required. *Jada Toys, Inc.*, 518 F.3d at 634 (citing *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004)).

Here, CMPB alleged that FMMI Counterdefendants' commercial use of its famous mark in commerce is likely to cause "dilution by tarnishment through harming the reputation of CMPB's famous [GOT MILK?] marks."  (ECF No. 53 ¶150.)  Specifically, CMPB alleged that FMMI Counterdefendants' sales of unauthorized, expired GOT MILK? products would harm CMPB's reputation.  (ECF No. 53 ¶¶ 94, 121, 126, 130.)  "Tarnishment occurs when a defendant's use of a mark similar to a plaintiff's [mark] presents a danger that consumers will form unfavorable associations with the mark." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868,

881 (9th Cir. 1999).  While it is reasonable to conclude that FMMI Counterdefendants' alleged

sale of expired GOT MILK? products would cause CMPB reputational harm, CMPB never

alleged FMMI Counterdefendants used a similar, but different mark to identify non-GOT MILK?

products.  *MCA*, 296 F.3d at 903 (stating that dilution refers to the use of a trademark to identify

different products); *see also Avery*, 189 F.3d at 881 (stating that tarnishment is the use of a mark

similar to the trademark owner's mark that would cause negative associations with the owner's

mark).  Thus, the Court dismisses CMPB's trademark dilution claim (Count VI) with leave to

amend.

### c.   Count VII: Counterfeiting

FMMI Counterdefendants argue that CMPB's counterfeiting claim is "factually deficient"

because CMPB did not allege "an identical non-genuine mark is being used in connection with

the sale of goods that is likely to cause confusion or deception in the eyes of the consumer with

regard to the claimant's genuine registered mark."  (ECF No. 76-1 at 21.)  Additionally, FMMI

Counterdefendants argue "CMPB's pleading is unfounded" because it affixed CMPB's true mark

on genuine goods before the termination of the 2011 License Agreement.  (ECF No. 76-1 at 21.)

In response, CMPB argues that it alleged that "[t]he mark used by [FMMI] was **a non-**

**genuine mark** identical to the [GOT MILK?] marks" and that FMMI Counterdefendants

"counterfeited CMPB's [GOT MILK?] marks…in California and interstate commerce."  (ECF

No. 80 at 16 (emphasis retained) (quoting ECF No. 53 ¶ 156–157).)  CMPB also argues that it

alleged that FMMI Counterdefendants continued to manufacture drinking straws bearing the GOT

MILK? mark after the termination of the 2011 License Agreement.  (ECF No. 80 at 16 (citing

ECF No. 53 ¶ 93).)  Finally, CMPB argues that FMMI Counterdefendants' reliance on 15 U.S.C.

§ 1116(d)(1)(B) is misplaced because § 1116(d)(1)(B) states that the term "counterfeit mark"

"does not include any mark used on or in connection with goods or services of which the

manufacture[r] or producer was, **at the time of the manufacture**…authorized to use the mark

[by the trademark owner]…for the type of goods or services so manufactured."  (ECF No. 80 at

16 (emphasis retained) (quoting 15 U.S.C. § 1116(d)(1)(B)).)  CMPB argues that here, FMMI

Counterdefendants continued to manufacture the GOT MILK? drinking straws after it was no

1  longer authorized to do so.  (ECF No. 80 at 16–17.)

2  "Section 1114 of the Lanham Act, which establishes the trademark counterfeiting cause of

3  action, prohibits the use of 'any reproduction, counterfeit, copy, or colorable imitation of a

4  registered mark in connection with the sale…of any goods…[where] such use is likely to cause

5  confusion…or to deceive.'" *Westinghouse*, 106 F.3d at 899 (quoting 15 U.S.C. 1114(1)(a)).

6  "[T]he important test is whether the practice of the defendant is likely to cause confusion, not

7  whether the defendant duplicated the plaintiff's mark." *Id.*  Here, CMPB only makes a

8  conclusory allegation that FMMI Counterdefendants used a non-genuine, identical mark and it

9  did not allege how such use would likely cause confusion.  (ECF No. 80 at 16–17 (citing ECF

10  No. 53 ¶ 157.)  Thus, the Court dismisses CMPB's counterfeit claim (Count VII) with leave to

11  amend.

12              d.  Count VIII: Contributory Trademark Infringement

13  FMMI Counterdefendants argue that CMPB's contributory trademark infringement claim

14  fails "because CMPB's [underlying] trademark infringement claim fails." (ECF No. 76-1 at 21–

15  22.)  FMMI Counterdefendants also argue that "CMPB fails to sufficiently plead any intent to

16  induce illegal substitution or any continuation of sale that Counterdefendants knew would result

17  in trademark infringement." (ECF No. 76-1 at 22.)  CMPB argues that it properly alleged

18  trademark infringement, which the Court already concluded is not the case.  CMPB also argues

19  that it "adequately alleged that Counterdefendants 'continued to sell products to customers [i.e.

20  FMMI] whom the infringer [i.e. Reach and Tollefson] knew used the products to engage in

21  trademark infringement." (ECF No. 80 at 17–18.)

22  The United States Supreme Court held that to make a claim for contributory trademark

23  infringement, one must allege the infringer either: (1) did so with an intent to induce illegal

24  substitution; or (2) continued to sell products to customers whom the infringer knew used the

25  products to engage in trademark infringement.  *Inwood*, 456 U.S. at 860.  With respect to the first

26  prong, CMPB does not make any allegations that Reach and Tollefson intentionally induced

27  FMMI to infringe.  (*See* ECF No. 53 ¶¶ 162–164.)  With respect to the second prong, CMPB

28  alleges Reach and Tollefson "supplied goods and/or services to FMMI even though [Tollefson

and Reach] knew or had reason to know that FMMI was engaging in service mark and/or trademark infringement of the [GOT MILK?] marks." (ECF No. 53 ¶ 163.) However, CMPB did not adequately allege that FMMI engaged in trademark infringement. (*See* ECF No. 53 ¶¶ 120–132.) As there must be an underlying trademark infringement to form contributory infringement, CMPB fails to satisfy this prong. *Perfect 10, Inc. v. Visa Intern. Service Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007). Thus, the Court dismisses CMPB's contributory trademark infringement (Count VIII) claim with leave to amend.

### iii. Count IX: Fraud

FMMI Counterdefendants argue that CMPB's fraud claim fails to satisfy Rule 9(b)'s heightened pleading standard. FMMI Counterdefendants argue that CMPB does not allege with particularity what is false or misleading about FMMI and Henson's alleged statements "regarding FMMI's *possible* bankruptcy" and "FMMI's representation that it owed CMPB royalties of $350,000." (ECF No. 76-1 at 23 (emphasis retained).) FMMI Counterdefendants also argue that "CMPB's allegation that Henson told CMPB that FMMI may go bankrupt in the future is not actionable because '[t]he law is well established that actionable representation must pertain to past or existing material facts.'" (ECF No. 76-1 at 23.) Finally, FMMI Counterdefendants argue that CMPB's purported reliance on Henson's statement was not reasonable because "Section 5 of the 2011 License [Agreement] provides that CMPB shall have the right to inspect, copy, and audit FMMI's 'books and records of information relevant to the performance of this Agreement.'" (ECF No. 76-1 at 24.) FMMI Counterdefendants contend that CMPB's reliance on Henson's purported representations is unreasonable because "no reasonable person would modify an agreement worth hundreds of thousands of dollars without exercising its contractual audit rights." (ECF No. 76-1 at 24.)

In response, CMPB objects to FMMI Counterdefendants raising a Rule 9(b) argument because CMPB argues it was not apprised in the Notice of Motion and Motion (ECF No. 76) that FMMI Counterdefendants intended to move to dismiss CMPB's fraud claim.[4] (ECF No. 80 at

---

[4]  While it is true that FMMI Counterdefendants did not state they move to dismiss CMPB's counterclaims under Rule 9(b) in their Notice of Motion (ECF No. 76 at 2), FMMI Counterdefendants' Motion to Dismiss has a bolded section labeled, "**F. CMPB's fraud allegations do not comply with [R]ule 9(b)'s heightened pleading**

18.) The Court will nevertheless analyze this argument for the sake of judicial economy. *Landis*, 299 U.S. at 254. Below, the Court will explain why CMPB's claim must be dismissed. The Court will dismiss with leave to amend so CMPB has an opportunity to attempt to cure this claim.

Under California law, the "indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) (quoting *Moore v. Brewster*, 96 F.3d 1240, 1245 (9th Cir. 1996)). "Rule 9(b) demands that when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct…so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* at 1106 (internal quotations omitted) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (citing *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (internal quotations omitted)). "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* (quoting *Decker v. GlenFed, Inc.* (*In re Glen Fed, Inc. Sec. Litig.*), 42 F.3d 1541, 1548 (9th Cir. 1994)).

Here, CMPB failed to explain what was false about Henson's purported representation regarding FMMI's *possible* bankruptcy. (*See* ECF No. 53 ¶¶ 166, 169.) Further, "actionable misrepresentations must pertain to past or existing material facts" because "[s]tatements or predictions regarding future events are deemed to be mere opinions which are not actionable." *Cansino*, 224 Cal. App. 4th at 1469. Moreover, pursuant to the 2011 License Agreement, CMPB has the legal right to examine FMMI's books and records to verify whether Henson's purported representations were false. (ECF No. 48-2 at 27.) Thus, it is hard to believe that CMPB reasonably relied on Henson's representations before offering FMMI a "seriously reduced final royalty payment." (ECF No. 53 ¶ 196.) For the foregoing reasons, CMPB's fraud claim (Count

---

standard." (ECF No. 76-1 at 22.) Moreover, Magic Straws already apprised CMPB in its Notice of Motion and Motion to Dismiss that CMPB's fraud claim does not satisfy Rule 9(b). (ECF No. 75 at 2; ECF No. 75-1 at 20–22.) In response to Magic Straws's Rule 9(b) argument, CMPB merely stated it "adequately pled its fraud claim" but "if the Court determines otherwise, CMPB requests leave to amend" to "more clearly" allege its fraud claim. (ECF No. 79 at 10.)

IX) is dismissed with leave to amend.

        *iv.*     *Counts X, XI, XII, & XIV: Breach of License Agreement & Breach of the FALA*

CMPB alleges in its tenth cause of action for Breach of License Agreement that "FMMI breached Sections 6 and 7.3 of the 2011 License Agreement by filing and continuing to prosecute the instant lawsuit against CMPB." (ECF No. 53 ¶ 179.) CMPB alleges in its eleventh cause of action for Breach of License Agreement that FMMI breached Section 5 of the 2011 License Agreement by "refus[ing] to allow CMPB to conduct an inspection and audit of FMMI's books and records." (ECF No. 53 ¶ 187.) CMPB alleges in its twelfth cause of action that FMMI breached the FALA by continuing to distribute and sell GOT MILK? products after the termination of the 2011 License Agreement. (ECF No. 53 ¶ 192.) CMPB alleges in its fourteenth cause of action that DCG and Diversified Flavor breached the agreements it had with CMPB. (ECF No. 53 ¶¶ 203–221.) Before analyzing CMPB's tenth, eleventh, and twelfth causes of action below, the Court dismisses with leave to amend CMPB's fourteenth cause of action against Counterdefendants as alter egos of DCG and Diversified Flavor because, as explained above, CMPB did not adequately allege its alter ego theory.

        a.   Count X: Breach of License Agreement

FMMI argues that its "complaint requests a judicial declaration stating that CMPB has abandoned its ownership rights through naked licensing." (ECF No. 76-1 at 24–25.) FMMI argues that if it prevails, "CMPB voluntarily surrendered any ownership right, and therefore FMMI could not be liable for attacking an existing ownership right." (ECF No. 76-1 at 25.) Further, FMMI argues that "if FMMI is wrong, CMPB has no claim for damages because its ownership is affirmed and the [2011] License [Agreement] has an attorneys' fees provisions that will make CMPB whole." (ECF No. 76-1 at 25.) In response, CMPB argues that "FMMI's filing and prosecution of its Amended Complaint is a breach of Section 7.3" because "[f]iling a lawsuit to ask a federal court to name FMMI the owner of one of the most famous trademarks in history is not 'protecting, enforcing and defending CMPB's rights in the [GOT MILK?] Mark." (ECF No. 80 at 18–19 (quoting ECF No. 48-2 at 28).)

Section 6.1 of the 2011 License Agreement provides that FMMI "will do nothing

inconsistent with" "CMPB's ownership of" the Mark.  (ECF No. 48-2 at 27.)   Section 7.3

provides that FMMI agreed to "cooperate with CMPB in protecting, enforcing and defending

CMPB's rights in the Mark" and FMMI agreed to not "institute any suit nor take any other action

on account of" "any infringements, imitations, claims or other problems with respect to the Mark

which may arise or come to [FMMI's] attention" without CMPB's prior express written consent.

(ECF No. 48-2 at 28.)

The elements of a breach of contract claim are "(1) the existence of a contract, (2)

plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the

resulting damage to the plaintiff."  *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821

(2011).  With respect to the first element, it is undisputed that there was a contract that stated that

FMMI cannot "institute any… action on account of…claims or other problems with respect to the

Mark…without the prior express written consent of CMPB."  (ECF No. 48-2 at 28.)  With respect

to the second element, FMMI makes no argument in its motion or reply that CMPB failed to

perform its end of the 2011 License Agreement.  (*See generally* ECF Nos. 76 & 82.)  As to the

third element, CMPB adequately alleged FMMI breached Section 7.3 of the 2011 License

Agreement by alleging that "[i]nstead of 'protecting, enforcing, and defending CMPB's rights' in

the [GOT MILK?] service marks and trademarks," FMMI filed a lawsuit against CMPB seeking

to be named the owner of the GOT MILK? marks.  (ECF No. 53 ¶ 176.)  Likewise, CMPB also

adequately alleged FMMI breached Section 6.1 by virtue of FMMI's lawsuit attempting to assert

ownership of CMPB's mark.  Finally as to the fourth element, CMPB alleged "it suffered and will

suffer damage to its business, reputation and goodwill and loss of sales and profits CMPB would

have made but for [FMMI's] acts."  (ECF No. 53 ¶ 180 (referencing ECF No. 53 ¶¶ 128, 132,

138, 142, 161, 164, etc.).)  Thus, CMPB adequately alleged a breach of the 2011 License

Agreement.

For the foregoing reasons, FMMI's Motion to Dismiss CMPB's tenth cause of action for

Breach of License Agreement is denied.  (ECF No. 53 ¶¶ 172–180.)  The Court will not order

CMPB to provide a more definite statement for this claim because CMPB's Second Amended

Answer is not "so vague or ambiguous that a party cannot reasonably be required to frame a

1  responsive pleading." Fed. R. Civ. P. 12(e).

2        b. <u>Count XI: Breach of License Agreement</u>

3        CMPB alleges in its eleventh cause of action for Breach of License Agreement that FMMI

4  breached Section 5 of the 2011 License Agreement, which gave CMPB the right to inspect, copy,

5  and audit FMMI's books and records of all information relevant to the performance of the 2011

6  License Agreement for three years after FMMI's final payment under the 2011 License

7  Agreement.  (ECF No. 53 ¶ 183 (citing ECF No. 48-2 at 27).)  FMMI argues that Section 4(B) of

8  the FALA – the modified audit rights provision – "supplanted the audit rights provision in the

9  [2011] License [Agreement]."  (ECF No. 76-1 at 25 (citing ECF No. 48-2 at 36)).)  To support

10  this argument, FMMI cites Section 5 of the FALA which provides that the 2011 License

11  Agreement, as modified by this FALA, constitutes the entire agreement and understanding

12  between CMPB and FMMI.  (ECF No. 76-1 at 25 (citing ECF No. 48-2 at 36).)  FMMI contends

13  that based on the plain meaning of the FALA's language, Section 4(B) limited CMPB's audit

14  rights only to instances where FMMI failed to make negotiated royalty payments.  (ECF No. 76-1

15  at 25.)  FMMI argues that because CMPB did not allege that FMMI failed to make the negotiated

16  royalty payments, "CMPB had no right to audit FMMI."  (ECF No. 76-1 at 25.)

17        CMPB argues that FMMI and CMPB never agreed in the FALA that the additional audit

18  rights in the FALA "would supplant the original audit rights in the [2011] License Agreement."

19  (ECF No. 80 at 19.)  CMPB argues that this is evidenced by the fact that the FALA had "very

20  specific language" whenever it intended to eliminate a provision from the 2011 License

21  Agreement.  (ECF No. 80 at 19.)  For instance, CMPB argues that Section 2 of the FALA states

22  that "Section 10.2(iii) (sell-off) [of the 2011 License Agreement] shall have no further force or

23  effect and [FMMI] may no longer distribute or sell the Products."  (ECF No. 80 at 19–20 (quoting

24  ECF No. 48-2 at 35).)

25        As stated above, the elements of a breach of contract are "(1) the existence of a contract,

26  (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the

27  resulting damage to the plaintiff."  *Oasis West Realty, LLC*, 51 Cal.4th at 821.  With respect to the

28  first element, neither party disputes there was a contract.  As to the second element, FMMI makes

no argument in its motion or reply that CMPB failed to perform its end of the 2011 License Agreement. (*See generally* ECF Nos. 76 & 82.) With respect to the third element, CMPB adequately alleged FMMI breached it by refusing to allow CMPB to conduct an audit of its books and records pursuant to Section 5 of the 2011 License Agreement. (ECF No. 53 ¶ 185.) Specifically, CMPB alleged that on April 17, 2015, after FMMI filed suit against it, CMPB's attorney wrote to FMMI's attorney requesting an audit and on April 28, 2015, FMMI's attorney denied that request. (ECF No. 53 ¶ 185.)

FMMI's argument that Section 4(B) supplants Section 5 of the 2011 License Agreement is unavailing. Sections 4(B) and Section 5 of the FALA do not provide that the added audit rights in the FALA supplant Section 5 of the 2011 License Agreement. (ECF No. 48-2 at 36.) Section 4(B) adds audit rights instead of eliminating audit rights by providing that if FMMI fails to make a negotiated royalty payment, CMPB, CDFA, and the State of California have the right to perform a royalty compliance audit of FMM. (ECF No. 48-2 at 36.) Further, Section 5 states that "[n]o modification of any of the terms of the [2011 License] Agreement or this [FALA] shall be valid unless in writing and signed by an authorized representative of each party." (ECF No. 48-2 at 36.) As CMPB notes, the FALA provided specific language when it intended to eliminate a provision of the 2011 License Agreement. (*See, e.g.*, Section 2 of the FALA, ECF No. 48-2 at 35.) Because "FMMI's most recent royalty payment to CMPB took place on or about September 17, 2014," FMMI was obligated under Section 5 of the 2011 License Agreement to allow CMPB to conduct an audit of its books and records until at least September 2017. (ECF No. 80 at 19 (citing ECF No. 48-2 at 27).) CMPB alleges FMMI refused to allow CMPB to conduct an audit of its books and records in April 2015. (ECF No. 53 ¶ 185.) Thus, CMPB adequately alleged a breach occurred. With respect to the final element for a breach-of-contract claim, CMPB alleges "it suffered and will suffer damage to its business, reputation and goodwill and loss of sales and profits CMPB would have made but for [FMMI's] acts." (ECF No. 53 ¶ 188 (referencing ECF No. 53 ¶¶ 128, 132, 138, 142, 161, 164, etc.).)

For the foregoing reasons, FMMI's Motion to Dismiss CMPB's eleventh cause of action for Breach of License Agreement is denied. (ECF No. 53 ¶¶ 181–188.) The Court will not order

CMPB to provide a more definite statement for this claim because CMPB's Second Amended Answer is not "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e).

### c. Count XII: Breach of the FALA

CMPB alleges in its twelfth cause of action for Breach of the FALA that FMMI breached and continues to breach the FALA by distributing and selling GOT MILK? products. (ECF No. 53 ¶ 192.) Although the twelfth cause of action is listed in the motion and notice of motion, FMMI does not make any specific argument for why CMPB's twelfth cause of action should be dismissed. (*See generally* ECF No. 76.) Accordingly, FMMI has failed to meets its burden and its Motion to Dismiss CMPB's twelfth cause of action for Breach of the FALA is denied. (ECF No. 53 ¶¶ 189–193.) The Court will not order CMPB to provide a more definite statement for this claim because CMPB's Second Amended Answer is not "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e).

### v. Count XIII: Rescission (the FALA)

FMMI argues that "CMPB's rescission claim depends on its fraud claim" and "CMPB has not pleaded a cause of action for fraud." (ECF No. 76-1 at 25–26.) FMMI also argues that "Civil Code section 1691 provides that a party seeking rescission must act 'promptly upon discovering the facts which entitle him to rescind.'" (ECF No. 76-1 at 26.) The Court need not address the second argument as the first argument is determinative.

"Under California law, a party to a contract has grounds to rescind the contract if the consent of the party seeking rescission was obtained through fraud." *Citicorp Real Estate v. Smith*, 155 F.3d 1097, 1103 (9th Cir. 1998) (citing Cal. Civ. Code § 1689(b)(1)). However, "in order to escape from its obligation the aggrieved party must rescind by prompt notice." *Id*. The party seeking rescission may forfeit its right to rescind where the delay substantially prejudiced the other party. *Id*. The Court dismisses CMPB's rescission claim (Count XIII) with leave to amend because as the Court already stated, CMPB did not adequately allege fraud, on which this rescission claim is predicated.

### C. CMPB's Request for an Order Preventing Counterdefendants from Filing an Answer

In CMPB's opposition to Counterdefendants' Motion to Dismiss (ECF No. 76), CMPB argues that "the [C]ourt should not allow the FMMI Counterdefendants to file Answers and Counterclaims" because the FMMI Counterdefendants failed to do so by the Court-imposed deadline. (ECF No. 80 at 21 (citing Rule 15(a)(3)) (requiring a response to an amended pleading to be made in a timely manner unless the Court orders otherwise).) The Court will not respond to this procedurally improper request that is irrelevant to the matter at hand. *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief – they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

## IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Counterdefendants' request for a more definite statement (ECF Nos. 75 & 76) is DENIED.

2. Every claim is dismissed with leave to amend as to any Counterdefendant who is alleged to be an alter ego within that claim.

3. COUNT II (trademark infringement) against Magic Straws is dismissed with leave to amend.

4. COUNTS I-VIII (trademark infringement, unfair competition, false designation of origin, trademark dilution, counterfeiting, and contributory trademark infringement) against Reach and Tollefson are dismissed with leave to amend.

5. COUNTS I–IX (trademark infringement, unfair competition, false designation of origin, trademark dilution, counterfeiting, contributory trademark infringement, and fraud), XIII (rescission), & XIV (breach of license agreement) against FMMI are dismissed with leave to amend.

6. COUNTS X–XII (breach of license agreement and breach of the FALA) against FMMI are not dismissed.

///

IT IS SO ORDERED.

Dated: May 30, 2018

_____
Troy L. Nunley
United States District Judge