1  Dale C. Campbell, State Bar No. 99173
   Josiah M. Prendergast, State Bar No. 292840
2  **WEINTRAUB TOBIN** CHEDIAK COLEMAN GRODIN
   Law Corporation
3  400 Capitol Mall, 11th Floor
   Sacramento, California   95814
4  Telephone:    916.558.6000
   Facsimile:    916.446.1611
5  Email: dcampbell@weintraub.com
           jprendergast@weintraub.com
6

7  Carl E. Christensen (admitted *pro hac vice*)
   **CHRISTENSEN LAW OFFICE PLLC**
8  800 Washington Avenue North, Suite 704
   Minneapolis, Minnesota   55401
9  Telephone:    612.823.4016
   Facsimile:    612.823.4777
10 Email: carl@clawoffice.com

11 Attorneys for Plaintiff and Counterdefendant Food Market Merchandising, Inc. and
   Counterdefendants Reach Companies, LLC and Jon Tollefson
12

13              UNITED STATES DISTRICT COURT

14             EASTERN DISTRICT OF CALIFORNIA

15

16 FOOD MARKET MERCHANDISING, INC.,       ) Case No. 2:15-cv-01083-TLN-CKD
                                          )
17              Plaintiff,                ) **MEMORANDUM OF POINTS AND**
                                          ) **AUTHORITIES IN SUPPORT OF**
18     vs.                                ) **PLAINTIFF AND COUNTER-**
                                          ) **DEFENDANT FOOD MARKET**
19 CALIFORNIA MILK PROCESSOR BOARD,       ) **MERCHANDISING, INC. AND**
                                          ) **COUNTERDEFENDANTS REACH**
20              Defendant.                ) **COMPANIES, LLC AND JON**
                                          ) **TOLLEFSON's SECOND MOTION TO**
21                                        ) **DISMISS COUNTERCLAIMS OF**
                                          ) **DEFENDANT AND**
22                                        ) **COUNTERCLAIMANT CALIFORNIA**
                                          ) **MILK PROCESSOR BOARD**
23                                        )
                                          )
24                                        )
                                          )
25 _____      )
                                          ) Date:    September 20, 2018
26 AND RELATED COUNTERCLAIM               ) Time:    2:00 p.m.
                                          ) Place:   Courtroom 2, Hon. Troy L. Nunley
27 _____      )

28

{2453456.DOCX;3}

*(left margin, vertical text)* weintraub tobin chediak coleman grodin

**TABLE OF CONTENTS**

I.  FACTUAL AND PROCEDURAL BACKGROUND ........................................................1

    A.  CMPB licenses use of the got milk? mark to FMMI for flavored drinking straws................................................................1

    B.  CMPB grants a license to Diversified Consumer Goods and Diversified Flavor. ................................................................1

II. PROCEDURAL HISTORY AND SUMMARY OF CLAIMS ......................................2

    A.  The TAC fails to cure the deficiencies of the previously dismissed claims ............................................................................2

III. ARGUMENT ..............................................................................................................4

    A.  Legal Standard ..............................................................................4

    B.  CMPB fails to allege facts sufficient to support a plausible inference that all of the Counterdefendants are alter egos of all the other Counterdefendants. ....................................................4

        1.  CMPB fails to allege facts from which the Court can plausibly infer that respecting Counterdefendants' corporate identities will lead to an inequitable result. ..............5

        2.  CMPB's allegations still fail to properly allege unity of interest and ownership. ........................................................6

    C.  This Court held that a cause of action cannot lie under the Lanham Act for the authorized distribution of genuine goods bearing a true mark. ......................................................................7

        1.  Count I still fails to allege a claim for trademark infringement. ..................................................................7

            a.  CMBP's amendment does not overcome the failings of the SAC—the authorized sale of genuine goods cannot give rise to infringement. ..........................................................7

            b.  CMPB still does not allege unauthorized manufacturing. ..................................................8

            c.  The alleged distribution of authorized goods after termination of the License cannot constitute infringement. ....................................10

            d.  CMPB fails to allege sufficient facts to support its argument that the drinking straws are not authentic. ..............................................10

            e.  CMPB's amended allegations fail to overcome its pleading deficiencies ..........................12

weintraub tobin chediak coleman grodin

2.   The second and third counts similarly fail to allege trademark infringement. ................................................. 13

D.   Court IV (unfair competition) fails because there is no trademark infringement. ....................................................... 14

E.   Counts V - VIII, seeking relief under the Lanham Act, still fail to state a claim. ............................................................. 15

1.   Count V – False Designation of Origin .................................. 15

2.   Count VI – Trademark Dilution .............................................. 15

3.   Count VII – Counterfeiting ....................................................... 15

4.   Count VIII – Contributory Trademark Infringement .............................. 16

F.   CMPB's fraud allegations do not comply with rule 9(b)'s heightened pleading standard. .................................................... 17

G.   CMPB failed to allege a cause of action for rescission ....................................... 20

weintraub tobin chediak coleman grodin

# TABLE OF AUTHORITIES

## ***Federal Cases***

*Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131 (D. Colo. 1980) ................................................................................ 10, 11

*Alonso v. Blackstone Fin. Grp., LLC*, 962 F.Supp.2d 1188 (E.D. Cal. 2013) ....................................................................................................4

*Am. Circuit Breaker Corp. v. Oregon Breakers, Inc.*, 406 F.3d 577 (9th Cir. 2004) ........................................................................................ 15

*Applied Info. Sci. Corp. v. eBay, Inc.*, 511 F.3d 966 (9th Cir. 2007) ........................................... 8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 4

*Blanco v. Am. Home Mortg. Servicing, Inc.*, 2009 U.S. Dist. LEXIS 119338 (E.D. Cal. Dec. 3, 2009) .............................................................. 17

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ........................................................................................ 8

*Bulgo v. Munoz*, 853 F.2d 710 (9th Cir. 1988) ...................................................................... 19

*Calvert v. Huckins*, 875 F.Supp. 674 (E.D. Cal. 1995) ......................................................... 7

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ................................... 16

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982) ........................................................................................................ 16

*Moenig v. Bank of Am., N.A.*, 2015 U.S. Dist. LEXIS 60814 (E.D. Cal. May 7, 2015) .............................................................................................. 7

*Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp.*, 707 F.2d 1054 (9th Cir. 1983) ............................................................................................ 10, 13

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 578 F.Supp.2d 1242 (E.D. Cal. 2008) ...................................................... 17

*S.E.C. v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) .................................................................... 6

*Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.*, 632 F.Supp. 1525 (S.D.N.Y. 1986) ................................................................................................ 10

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.* 53 F.3d 1073 (9th Cir. 1995) ............................................................................................................ 14

*Semegen v. Weidner*, 780 F.2d 727 (9th Cir. 1985) ............................................................. 17

*Shalaby v. Bernzomatic*, 281 F.R.D. 565 (S.D. Cal. 2012) ................................................... 20

weintraub tobin chediak coleman grodin

*Stewart v. Screen Gems-Emi Music, Inc.*, 81 F.Supp.3d 938 (N.D. Cal. 2015) .................................................................................................... 7

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (5th Cir. 1991) ................................................................................................ 13

*Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894 (9th Cir. 1997) .................................................. 11, 16

### State Cases

*Guido v. Koopman*, 1 Cal.App.4th 837 (1991) ...................................... 19

*Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523 (2000) .................................................................................................... 4

*United Guaranty Mortg. Indemn. Co. v. Countrywide Fin. Corp.*, 660 F.Supp.2d 1163 (C.D. Cal. 2009) ............................................... 20

### Federal Statutes

15 U.S.C. § 1051 *et seq.* [Lanham Act] ................................................ 8

15 U.S.C. § 1114 .................................................................................. 8

15 U.S.C. § 1116 ................................................................................ 16

15 U.S.C. § 1116(d)(1)(B) .................................................................. 16

Fed. R. Civ. P. 12(b)(6) ...................................................................... 2

Fed. R. Civ. P. 9(b) ........................................................................... 17

### State Statutes

Civil Code section 1691 ..................................................................... 20

weintraub tobin chediak coleman grodin

Pl. and Counterdefs' MPAs ISO Mot. to Dismiss
CMPB's Third Amended Counterclaims.
Case No. 2:15-cv-01083-TLN-CKD

Plaintiff and counterdefendant Food Marketing Merchandising, Inc. ("FMMI") and counterdefendants Reach Companies, LLC ("Reach") and Jon Tollefson ("Tollefson") (collectively, "Counterdefendants") move to dismiss counterclaimant California Milk Processor Board's ("CMPB") Third Amended Answer and Counterclaims ("TAC").

## I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    CMPB licenses use of the got milk? mark to FMMI for flavored drinking straws.**

As the Court is already familiar, the underlying facts are quite simple.  CMPB licensed (the "License") the got milk? mark (also referred to herein as the "Mark") for flavored drinking straws to FMMI. TAC ¶ 65, ¶ 68, Exh. F. The License obligated FMMI to pay 7% royalties based on "sales of products" and other measures. TAC Exh. F at 1. The License does not define what constitutes "sales of products" or the other measures. *Id*.  The License also did not enumerate any substantive quality control standards, TAC Exh. F, ¶ 2.3, and stated that CMPB had limited oversight: "CMPB has no further obligations under this Agreement other than the right to periodically monitor [FMMI's] use of the Mark on lettering and/or signage displayed solely on [FMMI's] Products."  *Id.* at ¶ 7.2.  The License also granted the right to inspect FMMI's books and records. *Id*. at ¶ 5.

In June 2014, CMPB and FMMI terminated the License, backdating the effective date to December 31, 2013 (the "Termination"). TAC at ¶ 82, Exh. G.  CMPB agreed that "royalties still due," including royalties for sales earned in 2013 but paid 2014, were approximately $350,000. TAC Exh. G, ¶ 3. CMPB and FMMI agreed to compromise to $200,000 and set out a schedule for FMMI to pay the compromised royalties.  "[CMPB] agrees to accept Two Hundred Thousand Dollars ($200,000) in full payment of the Total Royalties." TAC Exh. G, ¶ 4.  FMMI timely made all of the payments under the Termination, and the SAC does not allege otherwise.

**B.    CMPB grants a license to Diversified Consumer Goods and Diversified Flavor.**

In August 2014, CMPB entered into a written license agreement with DCG (the "Diversified License").  TAC ¶ 84, Exh. H.  Unlike the License, the Diversified License includes detailed clauses addressing royalty payments, inside (related-party) sales, and quality control measures.  Specifically, the Diversified License defines what constitutes a royalty payment over three and one-half pages of the contract, compared to what amounts to less than one page in the License. *Compare*

weintraub tobin chediak coleman grodin

TAC Exh. H at 2, 3, 4-7, with TAC Exh. F at 1, 2-3.

## II.    PROCEDURAL HISTORY AND SUMMARY OF CLAIMS

In 2016, Counterdefendants FMMI, Reach, and Tollefson moved to dismiss all of CMPB's counterclaims contained in the Second Amended Answer and Counterclaims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In its Order dated May 31, 2018, [Dkt. No. 90], the Court dismissed with leave to amend all counterclaims except Counts X through XIII against FMMI, which are all contract claims.  On May 15, 2018, CMPB filed and served its Third Amended Answer and Counterclaims [Dkt. No. 91]. FMMI moves to dismiss Counts I – IX, XIII and XIV and Reach, and Tollefson move to dismiss all CMPB's amended counterclaims under Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure.

### A.    The TAC fails to cure the deficiencies of the previously dismissed claims

CMPB did not add much of substance to the TAC. First, there are no new factual allegations in the trademark fact section, "BACKGROUND FACTS RE INFRINGEMENT, ETC." *Compare* TAC ¶¶ 93-100 to SAC ¶¶ 93-100. CMPB merely expounded upon its prior deficient allegations of "confusion" by adding the following text to each of the trademark claims:

> Consumers will likely be confused as to the source of these expired "got milk?" flavored drinking straws because they will purchase the product believing that the owner of the "got milk?" trademark is the source of the straws upon seeing the "got milk?" trademark on the packaging but then consumers will subsequently be confused as to whether CMPB is, in fact, the source once the consumer becomes aware of the faded coloring of the straw packaging, the faded coloring of the flavor beads within the straws and the insipid taste of the flavor beads. Such consumers will then question whether the expired "got milk?" flavored drinking straws, in fact, originate from CMPB, the owner of the "got milk?" trademark. Consumers will also likely be confused as to the source of these expired "got milk?" flavored drinking straws to the extent that some of the packaging for the straws still contains the expiration and/or best buy date and the consumer realizes that an expired product is being sold. This will likely cause the consumers to question whether the expired "got milk?" flavored drinking straws, in fact, originate from CMPB, the owner of the "got milk?" trademark, thus causing a likelihood of confusion among consumers. Furthermore, Counterdefendants are using "got milk?" display cases to advertise, display, and sell products that do not bear the "got milk?" marks or that bear an unauthorized or non-genuine "got milk?" mark. This will cause consumer confusion because consumers will not understand why non-got milk? products are being sold in "got milk?" display cases.
> ….
> This will likely cause confusion among consumers who will naturally assume that any packaging used in association with the "got milk?" trademark was approved by CMPB, the owner of the "got milk?" trademark.

*See* TAC ¶¶ 126, 131, 135, 141, 145, and 160.

CMPB did make a troublesome change to the "BACKGROUND FACTS." CMPB

weintraub tobin chediak coleman grodin

1    previously alleged that Henson's purported "threat" that FMMI would file bankruptcy was the sole

2    factual basis for its fraud.  Specifically, CMPB alleged:

3         In or about August 2013, TOLLEFSON and HENSON agreed that HENSON would attempt
          to convince CMPB that: (a) it should heavily discount the remaining royalty payments owed
4         by FMMI to CMPB *so that FMMI would not file bankruptcy even though TOLLEFSON and
          HENSON knew this was not true*.

5    SAC ¶ 77 (emphasis to show deleted language). That factual allegation has been amended:

6         In or about August 2013, FMMI, TOLLEFSON and HENSON agreed that HENSON would
          attempt to convince CMPB that: (a) CMPB should heavily discount the remaining royalty
7         payments owed by FMMI to CMPB *even though there was no basis in fact for doing so*.

8    TAC ¶ 77 (emphasis to show added language).

9         Other altered allegations in the same paragraph allege FMMI refused access to books:

10        CMPB, in good faith, believed FMMI's and HENSON's representations regarding the
          amount of past due royalties FMMI owed to CMPB because, despite numerous requests,
11        FMMI failed and refused to provide CMPB access to FMMI's books and records to verify
          the amount of past due royalties.

12        CMPB's insubstantial amendments to the "ALTER EGO/FRAUD BACKGROUND

13   FACTS" similarly fail to cure the prior defects. CMPB merely expounded upon its prior conclusory

14   allegations.  For instance, CMPB added language that recognition of the corporate entities would

15   promote fraud or injustice "because, as mentioned above, there is evidence that these entities were

16   formed to hide corporate assets including from CMPB, creditors, etc." TAC ¶ 119. It also has added

17   a legal conclusion masquerading as a "factual allegation" that recognizing the corporate entities will

18   purportedly promote fraud or injustice: "because these entities are using their corporate status to

19   commit tortious conduct, hide money and other assets, avoid liabilities, prevent creditors from

20   collecting their debts and conduct business in secret to avoid the pre-existing liabilities of the other

21   Counterdefendant entities" (TAC ¶ 121); and "because CMPB may be precluded from adequately

22   pursuing its claims for monetary damages against those entities." TAC ¶ 124.

23        Finally, CMPB added language in Count VIII for contributory infringement as follows:

24   "Counterdefendants intentionally induced FMMI to infringe the 'got milk?' marks" by supplying

25   goods or services "to FMMI even though Counterdefendants knew or had reason to know that FMMI

26   was engaging in infringement of the 'got milk?' marks."  TAC ¶ 166.

27

28

**weintraub tobin** chediak coleman grodin

**III.    ARGUMENT**

**A.    Legal Standard**

Dismissal is warranted under rule 12(b)(6) either where the complaint lacks a cognizable legal theory, or where the complaint presents a cognizable legal theory yet fails to plead essential facts. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015). Regarding the requirement to plead essential facts, the "threshold requirement" under rule 8(a)(2) that "the 'plain statement' possess enough heft to show that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). To meet the threshold requirement, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (internal quotations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662 at 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

**B.    CMPB fails to allege facts sufficient to support a plausible inference that all of the Counterdefendants are alter egos of all the other Counterdefendants.**

Under California law, Counterdefendants FMMI, Reach, Magic Straws, DCG, and Diversified Flavors, are "regarded as [] legal entit[ies], separate and distinct from [their] stockholders, officers, directors, with separate and distinct liabilities and obligations. *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (2000). The TAC again invites the Court to disregard Counterdefendants' separate identities, "pierce the corporate veil," and hold all Counterdefendants liable for the actions of each other counterdefendant without pleading any new material facts that would justify invoking this "extreme remedy." *Id.* at 539.

CMPB must allege facts showing that (1) Counterdefendants have such a unity of interest and ownership that "the separate personalities" of the corporations do not exist, and (2) there will be an "inequitable result" if the Court respects Counterdefendants' separate corporate identities. *Id.* at 526. "Conclusory allegations of alter ego status are not sufficient to survive a motion to dismiss." *Alonso v. Blackstone Fin. Grp., LLC*, 962 F.Supp.2d 1188, 1194 (E.D. Cal. 2013). The Court should

weintraub tobin chediak coleman grodin

1  dismiss all alter ego claims related to Magic Straws, Reach, and Tollefson and alter ego claims
2  asserted against FMMI in Count XIV.

3        **1.**     **CMPB fails to allege facts from which the Court can plausibly infer that**
4  **respecting Counterdefendants' corporate identities will lead to an inequitable result.**

5       CMPB again alleges that respecting Counterdefendants' corporate identities would result in
6  fraud or injustice because (1) FMMI transferred inventory to Reach or Magic Straws prior to
7  December 31, 2013 to take advantage of the first sale doctrine (*compare* SAC ¶ 119 to TAC ¶ 121);
8  and (2) CMPB may not be able to recover from FMMI if it prevails because FMMI transferred assets
9  to other Counterdefendants (compare SAC ¶ 119 to TAC ¶ 122). CMPB now alleges that respecting
10  Counterdefendants' corporate identities would result in fraud or injustice "because these entities are
11  using their corporate status to commit tortious conduct, hide money and other assets, avoid
12  liabilities, prevent creditors from collecting their debts and conduct business in secret to avoid the
13  pre-existing liabilities of the other Counterdefendant entities" (TAC ¶ 121); and "because CMPB
14  may be precluded from adequately pursuing its claims for monetary damages against those entities."
15  *Id.* ¶ 124. The Court previously found the first two allegations were insufficient because they only
16  alleged problems a dissatisfied creditor may experience attempting to recover unsatisfied debts,
17  which is insufficient to establish injustice. Order p. 16.  *Accord Sonora*, 83 Cal.App.4th at 539.
18  ("Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard.").

19       CMPB's new allegations, TAC ¶¶ 119, 120, 124, merely restate with more conclusory
20  language that the Counterdefendants' injustice is that CMPB may not be able to collect from FMMI
21  or the other Counterdefendants. CMPB's new allegations merely repackage the same insufficient
22  conclusory allegations: that Counterdefendants are using their corporate status to "commit tortious
23  conduct, hide money and other assets, avoid liabilities, prevent creditors from collecting their debts
24  and conduct business in secret to avoid the pre-existing liabilities of the other Counterdefendant
25  entities" and are precluding CMPB from "adequately pursuing its claims for monetary damages
26  against those entities." These conclusory allegations are just more of the same rejected theory—that
27  the injustice perpetuated by Counterdefendants is that CMPB may not be able to collect.  CMPB
28  never alleges that it thought it was contracting with an entity other than FMMI or Diversified.

weintraub tobin chediak coleman grodin

Pl. and Counterdefs' MPAs ISO Mot. to Dismiss
CMPB's Third Amended Counterclaims.
Case No. 2:15-cv-01083-TLN-CKD

weintraub tobin chediak coleman grodin

CMPB's "injustice/fraud" allegations still rest on the misguided notion that a subsequent transfer of assets from FMMI to Reach or Magic Straws will preclude CMPB from recovering royalties; but these allegations center on the terms of the License, which does not prohibit inside sales. TAC ¶ 66, Exh. F. In comparison, CMPB made sure to include an inside sales prohibition in the Diversified License.  *Id.* at ¶ 84, Exh. H. CMPB's dissatisfaction with the terms of the License and the freely-negotiated royalty settlement does not give rise to an inequitable result nor does Counterdefendants "claim [of] protection [through] the first sale doctrine." *Id.* ¶ 116.

     **2.**     **CMPB's allegations still fail to properly allege unity of interest and ownership.**

     If the Court finds that CMPB has actually alleged a sufficient injustice by recognizing the corporate separateness of the Counterdefendants, CMPB still has not adequately alleged a sufficient unity of interest and ownership among the Counterdefendants. CMPB's unity of interest and ownership allegations still boil down to the following conclusory statements: (1) Tollefson and Henson, and non-parties Aaron Bible, Jeff Wilcox, and Bryan Munkirs, hold management or officer positions at several of the Counterdefendants (TAC ¶¶ 103-108); (2) FMMI, Reach, and Magic Straws share a telephone number (TAC ¶ 109); (3) Magic Straws' website states that the MAGIC STRAWS branded products are a Reach product (TAC ¶ 110); (4) Countedefendants share office space in a building with "Reach Companies" on the front and "multiple doors with the name 'FMMI' on them" (TAC ¶ 111); (5) FMMI helped create Magic Straws' website (TAC ¶ 112); (6) FMMI's bookkeeper emails Counterdefendants' employees (TAC ¶ 113); (7) Counterdefendants use the same lawyers (TAC ¶ 114); (8) Magic Straws' trademark application for "Magic Straws" includes an FMMI document stating that the Mark was first used in commerce before Magic Straws came into existence (TAC ¶ 115); and (9) Counterdefendants "set[] up 401(k) plans for FMMI employees under Reach and transferring FMMI's employee health plan to Reach" (TAC ¶ 118).

     The TAC still does not allege that the corporate counterdefendants have an ownership interest in each other. Because the Ninth Circuit has held that "[o]wnership is a pre-requisite to alter ego liability, and not a mere 'factor' or 'guideline,'" *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003), CMPB's alter ego allegations fail as a matter of law. The only allegations concerning ownership claim that Henson and Tollefson are both "***the*** owner . . . or holder of any other type of

*controlling* interest in FMMI, Reach, Magic Straws, DCG, and Diversified Flavor." TAC ¶¶ 43 &

44 (emphasis added). CMPB does not explain how two or more different people or entities all can

be the sole or controlling owners of a company at the same time. CMPB fails to follow rule 8's

"plain statement" requirement by making inherently contradictory statements. *See Moenig v. Bank*

*of Am., N.A.*, 2015 U.S. Dist. LEXIS 60814, at *11 (E.D. Cal. May 7, 2015) ("[C]ontradictory factual

allegations do not meet rule 8's requirement of a 'short and plain statement.'").

The remainder of CMPB's scattershot allegations still allege, at most, that

Counterdefendants are affiliated with one another and have common officers and employees.

Alleging a relationship or affiliation between corporate entities, or even their corporate officers, is

insufficient to attribute the contacts of one to the other for the purpose of imposing the court's

jurisdiction or liability through a theory of alter ego liability.   Courts routinely dismiss claims that

rely on allegations of routine interactions between affiliated companies or individuals. *Calvert v.*

*Huckins*, 875 F.Supp. 674, 678-79 (E.D. Cal. 1995) (rejecting alter ego claim on motion to dismiss

where plaintiff alleged joint ownership, interlocking directors and officers, integrated financial

reports, guaranteed promissory notes by the parent, and shared legal counsel); *Stewart v. Screen*

*Gems-Emi Music, Inc.*, 81 F.Supp.3d 938, 956 (N.D. Cal. 2015) (finding that equitable ownership,

use of the same employees and offices, and identical officers and directors in the parent and

subsidiary are insufficient to support a unity of interest).

**C.    This Court held that a cause of action cannot lie under the Lanham Act for the authorized distribution of genuine goods bearing a true mark.**

**1.    Count I still fails to allege a claim for trademark infringement.**

**a.    CMBP's amendment does not overcome the failings of the SAC—the authorized sale of genuine goods cannot give rise to infringement.**

CMPB's claims for trademark infringement based on the sale of genuine goods bearing a

true mark fail even if the sales occurred against CMPB's wishes. This Court previously dismissed

CMPB's trademark claims (Counts I - III) because CMPB never described how a consumer would

be confused as to the source of the drinking straws. Order at 17. CMPB's amendments add vague

conclusory language of consumer confusion, which are not enough to maintain a claim for trademark

infringement.

weintraub tobin chediak coleman grodin

Sale of genuine goods cannot constitute trademark infringement. The gravamen of CMPB's revised allegations is still that FMMI and the other Counterdefendants, in their own right and as FMMI's alter egos, continued to distribute and sell genuine got milk? branded products after the termination of the License. TAC ¶¶ 93-100. These allegations are unchanged from the SAC. *See* SAC ¶¶ 93-100.  CMPB still acknowledges that FMMI transferred its entire inventory to Magic Straws or Reach before the execution of the Termination (TAC at ¶ 95) and that FMMI paid royalties on the transfer. TAC Exh. G, ¶ 3.

Trademark law protects against a usurper passing its goods off as the goods of the trademark holder. The Lanham Act, 15 U.S.C. § 1051 *et seq*., provides recourse for owners of federally registered trademarks against anyone using the owner's mark, without his or her consent, in a way that causes confusion for the consumer. 15 U.S.C. § 1114.  For ordinary claims of trademark infringement, a claimant must allege the infringer: (1) used any production of a registered mark; (2) in commerce; (3) in connection with the sale or distribution of any goods; (4) where doing so likely caused, or had the potential to cause, confusion among consumers. *Applied Info. Sci. Corp. v. eBay, Inc.*, 511 F.3d 966, 970-72 (9th Cir. 2007).  However, "[o]nce a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark liability." *NEC Elec. v. CAL Circuit Abco*, 810 F.2d 1506, 1508-09 (9th Cir. 1987). The purpose of trademark law is to protect *consumers* from sellers that confuse or deceive the origin or make of a product. *Id.* This protection provides for the consistency and quality of trademarks affixed to products in the channels of commerce, where the benefit to consumers is weighted, in a sense, against the rights afforded to trademark owners.  There is no likelihood for confusion when genuine goods bearing the true mark are distributed and sold to consumers. "[C]onfusion ordinarily does not exist when a *genuine* article bearing a *true* mark is sold." *Id.* (emphasis added).

### b.   CMPB still does not allege unauthorized manufacturing.

CMPB's trademark infringement claims are based solely on the use of the Mark in the sale of drinking straws. TAC ¶ 121. CMPB makes no allegations that FMMI or the other Counterdefendants manufactured counterfeit goods.  Rather, CMPB's charging allegations include:

- (a) Counterdefendants have got milk? inventory; (b) the product is expired; (c) expiration dates have been removed; (d) dates have been falsely represented to customers;

weintraub tobin chediak coleman grodin

(e) incorrect dates have been indicated on packaging; and (f) Counterdefendants are using got milk? display cases.  TAC ¶ 94.

• FMMI transferred its inventory of authentic got milk? brand goods to Magic Straws and Reach.  TAC ¶ 95.

• Magic Straws claims to be the creator of the got milk? brand flavor straw campaign. TAC ¶ 96.

• On a LinkedIn page, Reach says it leads the got milk? brand.  TAC ¶ 97.

• Magic Straws has a link to buy straws that leads to third parties that purport to sell the got milk? branded straws.  TAC ¶ 98.

• The packaging lists Magic Straws as the distributor of got milk? straws.  TAC ¶ 99.

• The Reach website had the got milk? logo on it.  TAC ¶ 100.

These allegations remain unchanged from the SAC.

The three "Counts" alleging infringement make no suggestion that FMMI or the Counterdefendants manufactured unauthorized (i.e. counterfeit) goods or that they passed off goods bearing the Mark as their own.  CMPB uses the word "manufacture" only once in its entire 72-page TAC in a "Background Facts" allegation that:

> FMMI continues to manufacture, distribute and/or sell flavored drinking straws bearing the "got milk?" marks in violation of the First Amendment to License Agreement's provision that FMMI cease all use of the "got milk?" marks effective December 31, 2013. CMPB is informed and believes and thereon alleges that FMMI has continued such unauthorized use of the "got milk?" marks in its own capacity and through its alter egos, the other Counterdefendants in the instant lawsuit.  TAC ¶ 93.

However, this conclusory, disjunctive clause is insufficient to allege unauthorized manufacture of "got milk?" branded straws. This "Background Fact" simply alleges that FMMI committed one of three possible acts. It is not an allegation that FMMI manufactured straws post-Termination. This disjunctive list of possible acts is unsupported by any factual allegation and contradicts the factual allegations in the subsequent paragraphs. For example, the First Count alleges trademark infringement solely on the grounds that FMMI used the got milk? mark to "sell" straws after the Termination.  The Court's Order dismissing CMPB's trademark infringement claims clearly characterized the Counterdefendants' rebuttal as arguing that the "sale of genuine goods does not give rise to infringement." Order, p. 17. Yet, as discussed below in relation to the Counterfeiting claim, section III.E.3, CMPB never uses terms consistent with the manufacture of unauthorized goods or non-genuine goods in any of the trademark-related claims.

weintraub tobin chediak coleman grodin

{2453456.DOCX;3}                                        9

Pl. and Counterdefs' MPAs ISO Mot. to Dismiss
CMPB's Third Amended Counterclaims.
Case No. 2:15-cv-01083-TLN-CKD

weintraub tobin chediak coleman grodin

### c. The alleged distribution of authorized goods after termination of the License cannot constitute infringement.

CMPB's conclusory allegations of trademark infringement rest on its frustration with the alleged distribution of got milk? flavored drinking straws through Magic Straws rather than on any cognizable claim for infringement. It is well settled that a trademark infringement claim does not lie in the mere impermissible distribution of authorized goods. The Court in *Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.*, 632 F.Supp. 1525, 1528 (S.D.N.Y. 1986), held "the unauthorized sale of authorized goods does not give rise to a claim for trademark infringement." Indeed, the *Sasson* court relies heavily on the Ninth Circuit's ruling in *Monte Carlo Shirt, Inc. v. Daewoo Int'l (Am.) Corp.*, 707 F.2d 1054, 1058 (9th Cir. 1983). In *Sasson* and in *Monte Carlo*, the question before the court was similar to the question here: whether the unauthorized sale of genuine goods bearing a true mark constitutes trademark infringement. *Monte Carlo*, 707 F.2d at 1058 ("The goods sold … were not imitations of Monte Carlo shirts; they were genuine product[s], planned and sponsored by Monte Carlo and produced for it on contract for future sale. The [goods] were not altered or changed from the date of their manufacture to the date of their sale."). Here, the facts are analogous: The got milk? flavored straws were not imitations, they were genuine products, planned and produced in concert with the License and the got milk? flavored straws were not altered or changed from the date of their manufacture. Therefore, there is no likelihood of confusion for the consumer, whether or not the alleged post-Termination conduct was authorized by CMPB. *Accord id.* at 1058 ("[The] source [of the goods] was Monte Carlo; the absence of Monte Carlo's authorization of the discount retailers to sell does not alter this.").

### d. CMPB fails to allege sufficient facts to support its argument that the drinking straws are not authentic.

CMPB attempts to circumvent the rule that the unauthorized sale of genuine goods does not constitute trademark infringement by including a factually devoid argument that the drinking straws in question were not genuine supposedly because Counterdefendants allegedly *sold* the subject goods past their best-by dates, rendering the straws "non-genuine, unauthorized products." TAC ¶ 126. This allegation, even if taken as true, is a misplaced attempt to shoehorn this case into the unique and factually distinct holding in *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131 (D. Colo. 1980).

In *Coors*, a reseller, not a trademark licensee, sold and distributed Coors beer bearing the genuine COORS mark, but did so without following the strict quality controls promulgated by Coors. *Id*. at 136. Coors's distribution agreement imposed a duty on its distributors to strictly monitor and destroy old, outdated product. "No beer should remain in retail stores after 60 days from packaging" and "[e]ach distributor is required to remove, at its cost, beer bearing dates exceeding 60 days from the retailer's store and is required to destroy the same." *Id*. at 132-33.  The distributor did not follow Coors's strict quality control measures and delivered warm, skunky beer, chipping away at Coors's goodwill and the consuming public's high expectation affiliated with Coors beer.  *Id*.  For that reason, the *Coors* court found the distributor's failure to follow the strict quality control measures deceived the consuming public.

Here, CMPB has not alleged, and cannot allege, the factual precursors to state a plausible claim to take advantage of the *Coors* exception. See the absence of quality control requirements in the License. TAC Exh. F. To survive these motions to dismiss, CMPB must allege FMMI's use of an identical, non-genuine got milk? mark in connection with the sale of goods was likely to cause confusion or deception in the eyes of the consumer. *Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 899 (9th Cir. 1997). CMPB authorized FMMI to use the Mark on flavored straw products—and FMMI did just that.  Even accepting CMPB's allegations regarding removal of best-by dates or sale beyond those dates, altering a best-by date, in itself, does not render the got milk? flavored straw products non-genuine because CMPB makes no factual averment as to its purported quality control measures. To the contrary, the License includes no quality control standards. *See* TAC Exh. F. The only controls relate to CMPB approval of samples and artwork. TAC Exh. F, ¶ 2.4.  No quality control standards require an expiration date or establish that the product in fact expires. TAC ¶ 68, Exh. F, ¶ 2.3.  The closest provision in the License regarding product quality standards is section 2.3's vague requirement that the products must comply with "all applicable federal, state, and local laws and regulations." CMPB makes no allegation that any law or regulation required FMMI to include an expiration/best-by date or that the product should not be sold beyond any particular date.  If such a law or regulation exists, CMPB, as an instrumentality of CDFA, has a duty to allege it.

Pl. and Counterdefs' MPAs ISO Mot. to Dismiss
CMPB's Third Amended Counterclaims.
Case No. 2:15-cv-01083-TLN-CKD

**e.** **CMPB's amended allegations fail to overcome its pleading deficiencies.**

CMPB adds language to the TAC to try to plead trademark infringement in the face of the Court's dismissal.  First, as noted above, the TAC does not add any substantively new factual allegations.  *Compare* SAC ¶¶ 93-100 *with* TAC ¶¶ 93-100. CMPB merely recites the same conclusory statements as to consumer confusion.  Breaking those down, the Court can see that the allegations do not allege consumer confusion as it relates to trademark infringement.  CMPB alleges:

> Consumers will likely be confused as to the source of these expired "got milk?" flavored drinking straws because they will purchase the product believing that the owner of the "got milk?" trademark is the source of the straws upon seeing the "got milk?" trademark on the packaging but then consumers will subsequently be confused as to whether CMPB is, in fact, the source once the consumer becomes aware of the faded coloring of the straw packaging, the faded coloring of the flavor beads within the straws and the insipid taste of the flavor beads.

*See* TAC ¶ 126.  Here, in one long run-on sentence, CMPB seems to say that consumer confusion will occur when customers purchase "got milk" straws and discover that the packaging is faded, the flavor bead coloring is faded, and the taste is insipid.  First, these allegations in this count are conclusory arguments unsubstantiated by any factual allegation. There are no factual allegations in the TAC that the straw packaging is, in fact, faded, that the flavor bead color is, in fact, faded, or that the taste is, in fact, insipid.  *See* TAC ¶¶ 93-100. CMPB never even alleges it has examined any such product for color or taste.  For that reason alone, the Court should disregard these conclusory arguments.

Second, consumer confusion for trademark infringement does not mean that the consumer is puzzled by packaging color, bead color, or taste of genuine goods. What "confusion" means in the trademark context is that the defendant's use of plaintiff's trademark is likely to cause mistake as to the source or origin of the of the plaintiff's goods. 15. U.S.C. § 1125.  The truth is that, because these goods are authorized and genuine, their source or origin is CMPB. The fact that customers are dissatisfied with the quality of these genuine goods because of their age or because they may have "expired" does not give rise to consumer confusion as to the source: "Such consumers will then question whether the expired 'got milk?' flavored drinking straws, in fact, originate from CMPB, the owner of the 'got milk?' trademark." TAC ¶ 126. Again, CMPB is the source or origin of these authorized and genuine straws, regardless of the packaging or flavor bead color or taste. *Compare*

weintraub tobin chediak coleman grodin

*Monte Carlo*, 707 F.2d at 1058. ("[The] source [of the goods] was Monte Carlo; the absence of Monte Carlo's authorization of the discount retailers to sell does not alter this.").  The Court should reject CMPB's arguments that somehow the passage of time has transformed goods from genuine to non-genuine:

> Consumers will also likely be confused as to the source of these expired "got milk?" flavored drinking straws to the extent that some of the packaging for the straws still contains the expiration and/or best buy date and the consumer realizes that an expired product is being sold.

*Id.* CMPB even doubles down on the conclusory allegation that expired goods are infringing goods:

> This will likely cause the consumers to question whether the expired "got milk?" flavored drinking straws, in fact, originate from CMPB, the owner of the "got milk?" trademark, thus causing a likelihood of confusion among consumers. Furthermore, Counterdefendants are using "got milk?" display cases to advertise, display, and sell products that do not bear the "got milk?" marks or that bear an unauthorized or non-genuine "got milk?" mark. This will cause consumer confusion because consumers will not understand why non-got milk? products are being sold in "got milk?" display cases.

*Id.* This expanded allegation implies that previously authorized or genuine goods, by virtue of their expiration, become unauthorized or non-genuine. CMPB never explains how these goods are "unauthorized," "non-genuine," or "non-got milk products."  This assertion is wholly antithetical to trademark law.  CMPB makes a final argument to try to survive dismissal:

> Furthermore, in some instances, the packaging used by Counterdefendants to sell and/or distribute the flavored drinking straws bearing the "got milk?" marks was never submitted for approval to CMPB as required by the parties' License Agreements. This will likely cause confusion among consumers who will naturally assume that any packaging used in association with the "got milk?" trademark was approved by CMPB, the owner of the "got milk?" trademark.

*Id.* CMPB claims rights in the word mark "got milk?" FMMI manufactured genuine goods bearing the word mark "got milk?"  CMPB never explains how unauthorized product art transforms a genuine good bearing a properly-licensed "got milk?" trademark into a good for which CMPB is not the source or origin. *Cf. Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1117 (5th Cir. 1991), *aff'd* sub nom. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) (holding that registration of product packaging as trade dress is required for trademark protections for packaging).

## 2. The second and third counts similarly fail to allege trademark infringement.

CMPB's Second Count against Magic Straws (and the other Counterdefendants "in their own right and as FMMI's alter egos") and the Third Count against Reach (and the other Counterdefendants "in their own right as Reach's alter ego") fail to state a claim for trademark

weintraub tobin chediak coleman grodin

{2453456.DOCX;3}

13

Pl. and Counterdefs' MPAs ISO Mot. to Dismiss
CMPB's Third Amended Counterclaims.
Case No. 2:15-cv-01083-TLN-CKD

weintraub tobin chediak coleman grodin

infringement for the same reasons as set forth in section III.C.1, above.

By arguing that once-genuine goods can become non-genuine in the future, CMPB is attempting an end-run around the first sale doctrine. CMPB's real grudge is that it cannot curtail downstream sales of genuine and authorized goods, a fact CMPB admits. CMPB alleges that a downstream purchaser's intent to claim the first sale doctrine as a defense to CMPB's trademark infringement claims is evidence of fraud and injustice.  TAC ¶¶ 116, 121.  However, the first sale doctrine prevents CMPB's efforts to curtail downstream sales of the genuine and authorized "got milk?" branded goods. Courts have consistently held that the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. *Sebastian Int'l, Inc. v. Longs Drug Stores Corp*. 53 F.3d 1073, 1075 (9th Cir. 1995). The first sale doctrine guarantees that products bearing genuine trademarks will be identified with the mark owner, serving the legitimate purposes of trademark law—the owner gains the goodwill associated with the quality of the product and the consumer gets exactly what he or she bargained for.  CMPB's right to control FMMI's distribution of the Mark is limited: "[One] who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Id*. at 1076.

**D.     Court IV (unfair competition) fails because there is no trademark infringement.**

CMPB's unfair competition claim fails because CMPB fails to allege any particular fact against any particular Counterdefendant.  In fact, the only charging allegation blends all of the counterdefendants together into one:

> The acts described *supra* of the Counterdefendants, both in their own right and as alter egos of each other, constitute unfair competition and are in infringement of CMPB's common-law rights in the "got milk?" marks.  TAC ¶ 139.

Furthermore, CMPB repeats the same allegations described in section III.C.1.e, above, that the packaging color, bead color, taste of the straws, as well as the product art, all transform genuine and authorized goods into non-genuine and unauthorized goods. *See* TAC ¶ 135. Again, these allegations wholly ignore that CMPB is the source or origin of these authorized and genuine straws, regardless of the packaging color, flavor bead color, taste, or product art. *See* TAC 141. CMPB's conclusory statement, "Counterdefendants have infringed the 'got milk?' marks as alleged herein," is wholly

contrary to the law. *Id.* CMPB's failure to state any claim for trademark infringement is fatal to its

unfair competition claim.  *See* Order at 17.

**E.      Counts V - VIII, seeking relief under the Lanham Act, still fail to state a claim.**

**1.      Count V – False Designation of Origin**

CMPB does not plead how Counterdefendants used the Mark in a manner that misrepresents

the origin of the Mark when it cannot contemporaneously meet its burden for trademark

infringement. False designation of origin claims follow the same likelihood of confusion analysis.

*See Am. Circuit Breaker Corp. v. Oregon Breakers, Inc.*, 406 F.3d 577, 584 (9th Cir. 2004).  CMPB

makes nothing more than a legal conclusion of false designation, relying wholly on the purported

merits of its trademark infringement and unfair competition claims.  This is especially true since

CMPB only makes one vague disjunctive conclusory reference to possible "manufacture" of goods.

All other references are to unauthorized distribution of genuine goods. *See* section III.C.1.b.  As

genuine goods, the resale of the straws does not falsely designate origin and cannot cause confusion.

**2.      Count VI – Trademark Dilution**

CMPB's claim for dilution is not supported by the law, and the amendment fails to cure that

deficiency. In its Order, the Court held that "CMPB never alleged FMMI Counterdefendants used a

similar, but different mark to identify non-GOT MILK? products" Order, p. 19. The TAC still does

not allege that Counterdefendants used a similar mark to identify non-"got milk?" products.

Therefore, the clam of trademark dilution still fails.

**3.      Count VII – Counterfeiting**

CMPB's amended claim for counterfeiting remains factually deficient. First, as discussed in

section III.C.1.b above, CMPB's entire claim of counterfeiting rests on the disjunctive allegations

contained in ¶ 93 of the TAC. The Court should note that CMPB's single disjunctive "background"

allegation, which merely states that "FMMI continues to manufacture, distribute and/or sell," is

nothing more than a hypothetical conclusory pronouncement devoid of any factual allegation. *Id.*

If CMPB could factually allege "manufacturing" consistent with rule 11, it was required to

do so, especially after FMMI and Counterdefendants attacked the sufficiency of the conclusory

disjunctive allegations on two occasions. CMPB never uses terms consistent with the manufacture

of unauthorized goods or non-genuine goods in any of the trademark-related claims. Such terms would include "passing off," "knock-off," or "copy." Instead, as detailed above in section III.C.1.e, the amendments to the TAC identify the harm as arising from sale of purportedly "expired" authorized and genuine goods as well as use of unauthorized package art. CMPB's choice to allege the injury as relating from the sale of expired goods and not knock-off goods demonstrates that its claims have nothing to do with the manufacture of unauthorized or non-genuine goods.

To make a *prima facie* showing of trademark counterfeiting, a claimant must allege an identical non-genuine mark is being used in connection with the sale of goods that is likely to cause confusion or deception in the eyes of the consumer with regard to the claimant's genuine registered mark. *Westinghouse*, 106 F.3d at 899. Similar to claims of trademark infringement and unfair competition, the element of likely confusion is the focus of this analysis. *Id.* Here, CMPB does not sufficiently allege that a non-genuine version of the Mark. Even a cursory reading of 15 U.S.C. § 1116 demonstrates that CMPB's pleading is deficient. "[Counterfeiting] does not include any mark or designation used on or in connection with goods or services…which the manufacturer…was…authorized to use…by the holder of the right to use such mark or designation." 15 U.S.C. § 1116(d)(1)(B). CMPB authorized FMMI to use the Mark on the genuine goods. TAC Exh. F. All genuine goods affixed with the true Mark were created before the Termination, and CMPB does not allege otherwise. A mere change in the parties' contractual relationship does not, under trademark law, automatically alter the substance of the mark or turn already-produced, genuine goods affixed with that mark into counterfeit goods. *See Westinghouse*, 106 F.3d at 899.

### 4. Count VIII – Contributory Trademark Infringement

CMPB's claims for contributory trademark infringement also fail because CMPB's infringement claims fail. The Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 860 (1982) held that a claim for contributory infringement must allege the infringer either: (1) did so with an intent to induce illegal substitution; or (2) continued to sell products to customers whom the infringer knew used the products to engage in trademark infringement. *See, also, Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (holding trademark liability can extend to those assisting "others in direct trademark

weintraub tobin chediak coleman grodin

weintraub tobin chediak coleman grodin

infringement."). Here, CMPB does not allege a cognizable legal theory of contributory trademark infringement because its trademark infringement claims fail. Moreover, CMPB merely states that "Counterdefendants intentionally induced FMMI to infringe the 'got milk?' marks" by supplying goods or services "to FMMI even though Counterdefendants knew or had reason to know that FMMI was engaging in infringement of the 'got milk?' marks." TAC ¶ 166. In light of the fact that the TAC is completely void of any factual allegations of "passing off," these contradictory allegations fail to state a claim for contributory infringement.

**F.     CMPB's fraud allegations do not comply with rule 9(b)'s heightened pleading standard.**

CMPB's claim for fraud, Count IX, fails. Special matters, such as fraud, must be pleaded with sufficient particularity. Fed. R. Civ. P. 9(b). The elements of fraud are "[A] misrepresentation (of false representation, concealment, or nondisclosure); knowledge of falsity; intent to defraud; justifiable reliance; and resulting damage." *Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*, 578 F.Supp.2d 1242, 1250 (E.D. Cal. 2008). Unlike rule 8(a)(2), pleading special matters under rule 9(b) requires specific allegations to give each defendant notice of specific misconduct that is alleged to constitute fraud, so that she may defend against the charge rather than merely deny that she did something wrong. *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Furthermore, "where multiple defendants are asked to respond to allegations of fraud, the complaint must inform each defendant of his alleged participation in the fraud." *Blanco v. Am. Home Mortg. Servicing, Inc.*, 2009 U.S. Dist. LEXIS 119338, at *22 (E.D. Cal. Dec. 3, 2009).

CMPB's amended fraud claim is now supposedly based on Henson's alleged representation that CMPB heavily discounted royalty payments "even though there was no basis in fact for doing so." TAC ¶ 77. It further alleges that Henson and FMMI purportedly misrepresented to CMPB the past due royalties. ¶¶ 169 – 172. CMPB allegedly believed FMMI's and Henson's representations regarding the amount of past due royalties. *Id.* CMPB supposedly believed these representations because, despite CMPB's numerous requests, FMMI failed and refused to provide CMPB access to FMMI's books and records to verify the amount of past due royalties, as was CMPB's right under the license. *Id*

CMPB's factual description of the false and misleading statements in the TAC completely deviate from the CMPB's prior allegations.  In the SAC, CMPB alleged that FMMI's potential bankruptcy was the basis for fraud: "FMMI was going to go bankrupt and CMPB would not get anything unless it cut FMMI 'a deal' on past due royalties." SAC ¶ 166. Now, after the Court ruled the "potential bankruptcy" allegations were legally insufficient, CMPB alleges a substantially different misrepresentation—that FMMI and Henson made certain representations related to royalties that CMPB allegedly believed but were not able to verify (despite contractual audit rights), and that it now asserts were false.

CMPB makes no effort to try to explain why the TAC contains factually inconsistent allegations of fraud than the SAC.  In the SAC, CMPB alleged that it agreed to terminate the License with FMMI because FMMI was more than one and one-half years behind on royalty payments. SAC ¶¶ 76, 166.   It pleads that, during negotiations to terminate FMMI's License, it relied on representations made by Henson regarding FMMI's *possible* bankruptcy, as well as FMMI's representation that it owed CMPB royalties of $350,000.00.  *Id.* at ¶ 166. CMPB alleges Henson and FMMI made those statements "in order to induce CMPB to provide FMMI a seriously reduced final royalty payment…" *Id.*  CMPB goes on to allege that it "was ignorant of the true state of FMMI's financial condition and the amount of royalties owed to CMPB," and that it would not have agreed to the Termination if it had known at that time that those representations by Henson and FMMI were false.  *Id.* at ¶ 169.  Notably, CMPB does not include a single allegation explaining with particularity what is false or misleading about FMMI's and Henson's alleged statement or why the alleged statement was false.

In the TAC, CMPB drops the gravamen of its prior fraud claim, "possible bankruptcy," without explanation, and now expounds that it believed FMMI and Henson with respect to the amount of the royalties due because FMMI failed and refused to provide CMPB access to FMMI's books and records to verify the amount of past due royalties. TAC ¶¶ 169, 170, 172. CMPB also alleges that FMMI's and Henson's actions were intentional (¶170), and CMPB would not have discounted the royalties due if it could have determined the actual amount of past due royalties (¶169). Ultimately, its main contention, that it heavily discounted royalty payments "even though

weintraub tobin chediak coleman grodin

Pl. and Counterdefs' MPAs ISO Mot. to Dismiss
CMPB's Third Amended Counterclaims.
Case No. 2:15-cv-01083-TLN-CKD

1    there was no basis in fact for doing so" (*see* TAC ¶ 77) smacks of opinion and not actionable

2    representation.  "[A]n actionable misrepresentation must relate to fact and cannot be based on an

3    expression of opinion or a prediction." *Bulgo v. Munoz*, 853 F.2d 710, 716 (9th Cir. 1988).

4         The only significant difference between the allegations in the SAC and the TAC is the

5    removal of the allegations related to FMMI filing bankruptcy and the addition of allegations related

6    to access to books and records. The altered allegations in the TAC do nothing to demonstrate

7    reasonable reliance. The Court dismissed the fraud claim because CMPB failed to explain what was

8    false about Henson's purported representation regarding FMMI's possible bankruptcy and because

9    CMPB had the legal right to examine FMMI's books and records to verify whether Henson's

10   purported representations were false. Order, p 22. Thus, it is hard to believe that CMPB reasonably

11   relied on Henson's representations before offering FMMI a "seriously reduced final royalty

12   payment." *Id.*

13        The TAC's allegation of reliance is less reasonable than it was in the SAC.  In the TAC,

14   CMPB now alleges that they relied on FMMI's and Henson's representations because FMMI

15   refused to allow CMPB access to its books and records.  If, under the SAC, CMPB's reliance was

16   not reasonable because CMPB had access to FMMI's books, then, under the TAC, CMPB's reliance

17   is even less reasonable because FMMI purportedly refused access to its books. It is not reasonable

18   that CMPB relied on the representation that FMMI owed $350,000 if FMMI refused access to its

19   books.  Moreover, CMPB alleges that there was no basis in fact for CMPB to reduce the royalty

20   payments owed to it. TAC ¶ 77.  It is not plausible that CMPB could rely on statements by Henson

21   and FMMI that it knows where wholly unsupported.

22        CMPB's allegations demonstrate, as a matter of law, that its purported reliance on Henson's

23   statement was not reasonable.  *See Guido v. Koopman*, 1 Cal.App.4th 837, 843 (1991) ("[W]hether

24   a party's reliance was justified may be decided as a matter of law if reasonable minds can come to

25   only one conclusion based on the facts."). Section 5 of the 2011 License provides that CMPB shall

26   have the right to inspect, copy, and audit FMMI's "books and records of all information relevant to

27   the performance of this Agreement."  SAC ¶ 183, Exh. F at p. 3. CMPB now alleges that it requested

28   an audit at the time Henson allegedly misrepresented the royalties owed to CMPB, and FMMI did

weintraub tobin chediak coleman grodin

weintraub tobin chediak coleman grodin

not cooperate. Because no reasonable person would modify an agreement worth hundreds of thousands of dollars while being denied its contractual audit rights, CMPB cannot, as a matter of law, allege that it justifiably relied on Henson's statements about the royalties owed to CMPB. *See United Guaranty Mortg. Indemn. Co. v. Countrywide Fin. Corp.*, 660 F.Supp.2d 1163, 1189 (C.D. Cal. 2009) (finding that allegations of reasonable reliance were implausible on their face where mortgage insurer was entering into multi-million dollar transaction and had an express right to audit files before the deal closed); *Shalaby v. Bernzomatic*, 281 F.R.D. 565, 574 (S.D. Cal. 2012) (finding that plaintiff failed to adequately allege reasonable reliance on alleged misrepresentations).

**G.     CMPB failed to allege a cause of action for rescission.**

Count XIII alleges a cause of action for rescission against FMMI and the other Counterdefendants, as alter egos of FMMI. (TAC ¶¶ 197-205.) First of all, CMPB's rescission claim depends on its fraud claim (*id.*, ¶¶ 199-203), and, as explained above, CMPB has not pleaded a cause of action for fraud. CMPB's rescission claim fails on that basis alone. Furthermore, as argued before, Civil Code section 1691 provides that a party seeking rescission must act "promptly upon discovering the facts which entitle him to rescind," and that the party seeking rescission "[r]estore to the other party everything of value which he has received from him under the contract or offer to restore the same upon condition that the other party do likewise, unless the latter is unable or positively refuses to do so." Here, CMPB can no longer restore FMMI to the License rights it surrendered. CMPB's failure to explain its delay and inability to restore the License is fatal to its rescission claim.

Dated:  June 29, 2018                    Respectfully submitted,

                                         **WEINTRAUB TOBIN** CHEDIAK COLEMAN GRODIN
                                         Law Corporation

                                         By:___s/ Dale C. Campbell_____
                                              Dale C. Campbell
                                              State Bar No. 99173

                                         Attorneys for Plaintiff and Counterdefendant
                                         Food Market Merchandising, Inc. and Counterdefendants
                                         Reach Companies, LLC and Jon Tollefson