UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOOD MARKET MERCHANDISING, INC., | No.  2:15-cv-01083-TLN-CKD |
| Plaintiff, | **ORDER** |
| v. | |
| CALIFORNIA MILK PROCESSOR BOARD, | |
| Defendant. | |

| |
|---|
| CALIFORNIA MILK PROCESSOR BOARD, |
| Counterclaimant, |
| v. |
| FOOD MARKET MERCHANDISING, INC.; MAGIC STRAWS, LLC; REACH COMPANIES, LLC; JON TOLLEFSON; DIVERSIFIED CONSUMER GOODS, LLC: DIVERSIFIED FLAVOR, LLC and PAUL HENSON, |
| Counterdefendants. |

1    This matter is before the Court on Plaintiff and Counterdefendant Food Market

2    Merchandising, Inc. ("FMMI") and Counterdefendants Reach Companies, LLC ("Reach"), Jon

3    Tollefson ("Tollefson"), and Magic Straws, LLC's ("Magic Straws") (collectively, with FMMI,

4    "Counterdefendants") Motions to Dismiss.  (ECF Nos. 96, 98.)  Defendant and Counterclaimant

5    California Milk Processor Board ("CMPB") opposes both motions.  (ECF Nos. 99, 100.)

6    Counterdefendants filed replies.  (ECF Nos. 102, 103.)  For the reasons set forth below, the Court

7    GRANTS in part and DENIES in part Counterdefendants' Motions to Dismiss.

8    **I.   FACTUAL AND PROCEDURAL BACKGROUND**[1]

9    CMPB owns the federally registered service mark and trademark GOT MILK? ("the

10   Mark").  (ECF No. 91 at ¶ 37.)  In November 2009, CMPB and FMMI entered into a written

11   license agreement ("2009 License Agreement"), which granted FMMI a non-exclusive, non-

12   transferable license to create, distribute, and sell flavored drinking straws, toys, novelties,

13   household products, confections, and personal care products bearing the Mark.  (*Id.* at ¶¶ 38, 65.)

14   In November 2010, a class action lawsuit titled *Medical West Ballas Pharmacy Ltd. v.*

15   *Food Market Merchandising, Inc*, Case No. 10 SL-CC04659, was filed against FMMI ("*Medical*

16   *West*").  (ECF No. 91 at ¶ 66.)  CMPB alleges FMMI directed an employee to establish Reach

17   and Magic Straws so FMMI could transfer assets bearing the Mark to the new entities in an effort

18   to avoid paying any judgment associated with the class action.  (*Id.* at ¶¶ 62, 69, 70, 73.)  In

19   February 2014, a former employee named Robert Spinner ("Spinner") also sued FMMI to recover

20   unpaid commissions.  (*Id.* at ¶ 78.)  CMPB alleges FMMI formed Reach and Magic Straws to

21   avoid creditors like CMPB, Spinner, and the *Medical West* class action plaintiffs.  (*Id.* at ¶ 116.)

22   In November 2011, CMPB and FMMI entered into a new license agreement ("2011

23   License Agreement").  (*Id.* at ¶ 68.)  CMPB alleges in August 2013, FMMI, Tollefson, and Paul

24   Henson ("Henson") agreed Henson would attempt to convince CMPB that he was going to start

25   his own independent company, unrelated to FMMI, and it should discount the remaining royalty

26

27   ---

[1]    The parties are well aware of the facts of this case as outlined in the Court's May 20, 2018
order.  (ECF No. 90.)  Accordingly, the Court identifies only facts relevant to decide the pending

28   motions.

payments due from FMMI even though there was no basis in fact for doing so.  (ECF No. 91 at ¶ 77.)  During 2013 and 2014, CMPB alleges it negotiated the early termination of 2011 License Agreement as a result of FMMI's failure to pay royalties under the contract.  (ECF No. 91 at ¶ 64.)  In June 2014, CMPB alleges it terminated the 2011 License Agreement with FMMI by executing the First Amendment to the License Agreement ("FALA"), which required FMMI to stop distributing products bearing the Mark.  (*Id.* at ¶ 82.)  In July or August 2014, CMPB alleges it entered into a new license agreement ("2014 License Agreement") with Diversified Consumer Goods, LLC ("DCG") based on Henson's representation that he was no longer an Officer, Director, or employee of FMMI.  (*Id.* at ¶¶ 80, 84.)  CMPB also asserts it agreed to the FALA based on representations from FMMI, Tollefson, and Henson, which FMMI knew were false and fraudulent.  (*Id.* at ¶ 199–202.)

CMPB alleges FMMI, Reach, Tollefson, Magic Straws, DCG, Diversified Flavor, LLC ("Diversified"), and Henson are all alter egos of each other.  (*See generally* ECF No. 91 at 101–124.)  CMPB specifically alleges FMMI, Reach, Magic Straws, DCG, and Diversified all share the same office space and telephone number. (ECF No. 91 at ¶¶ 38–43, 62.)  CMPB further alleges FMMI transferred its employees' dental insurance and 401(k) plans to Reach in an effort to transfer assets and avoid creditors.  (*Id.* at ¶ 75.)  CMPB asserts Tollefson and Henson are the owners, Chief Executive Officers, Presidents, Managers or holders of a controlling interest in the corporate entities.  (*Id.* at ¶¶ 43, 44.)

On February 26, 2015, CMPB alleges it discovered FMMI was continuing to use the Mark in violation of the FALA, and FMMI continues to manufacture, distribute, and/or sell products bearing the Mark in violation of the FALA.  (*Id.* at ¶¶ 87, 93.)  CMPB further alleges Counterdefendants sold GOT MILK? flavoring straws past their expiration and in violation of the FALA.  (*Id.* at ¶ 126.)  CMPB contends consumers will likely be confused as to the source of the expired straws and will believe the unauthorized and non-genuine products originated from CMPB.  (*Id.*)  As a result, CMPB contends it will suffer damage to its business, reputation, and goodwill.  (*Id.* at ¶¶ 129, 133, 137.)

/ / /

3

1   On March 10, 2015, FMMI brought the instant action against CMPB for trademark

2   abandonment in the Southern District of New York.  (ECF No. 1.)  On May 7, 2015, the action

3   was transferred to this Court pursuant to 28 U.S.C. § 1404(a).  (ECF No. 17.)  On May 21, 2015,

4   CMPB filed an answer and fourteen counterclaims for trademark infringement, unfair

5   competition, false designation of origin, trademark dilution, counterfeiting, contributory

6   trademark infringement, fraud, and breach of contract.  (ECF No. 22.)

7   CMPB filed a Second Amended Answer and Counterclaims on September 20, 2015.

8   (ECF No. 53.)  On June 17, 2016, Counterdefendants filed motions to dismiss CMPB's

9   counterclaims.  (ECF Nos. 75, 76.)  On May 31, 2018, the Court dismissed many of CMPB's

10   counterclaims with leave to amend.  (ECF No. 90.)  On June 15, 2018, CMPB filed its Third

11   Amended Answer and Counterclaims ("TAAC").  (ECF No. 91 at 44–68.)  Counterdefendants

12   filed the instant motions on June 29, 2018, and July 24, 2018.[2]  (ECF Nos. 96, 98.)

13   **II.     STANDARD OF LAW**

14   A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

15   sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Federal Rule of

16   Civil Procedure ("Rule") 8(a) requires that a pleading contain "a short and plain statement of the

17   claim showing that the pleader is entitled to relief."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79

18   (2009).  Under notice pleading in federal court, the complaint must "give the defendant fair notice

19   of what the claim . . . is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S.

20   544, 555 (2007) (internal quotations omitted).  "This simplified notice pleading standard relies on

21   liberal discovery rules and summary judgment motions to define disputed facts and issues and to

22   dispose of unmeritorious claims."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).

23   On a motion to dismiss, the factual allegations of the complaint must be accepted as true.

24   *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  A court is bound to give plaintiff the benefit of every

25   reasonable inference to be drawn from the "well-pleaded" allegations of the complaint.  *Retail*

26
27
28

---

[2]     Counterdefendants FMMI, Reach, and Tollefson brought a single motion together (ECF No. 96), and Magic Straws filed a separate motion (ECF No. 98).  However, both motions present nearly identical arguments and rely extensively on the same precedent.  Unless the Court indicates otherwise, it will address the arguments raised by Counterdefendants simultaneously.

1   *Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A plaintiff need not allege

2   "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to

3   relief." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads

4   factual content that allows the court to draw the reasonable inference that the defendant is liable

5   for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. 544, 556 (2007)).

6          Nevertheless, a court "need not assume the truth of legal conclusions cast in the form of

7   factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir.

8   1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an

9   unadorned, the defendant–unlawfully–harmed–me accusation." *Iqbal*, 556 U.S. at 678.  A

10  pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

11  elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678

12  ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

13  statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove

14  facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not

15  been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459

16  U.S. 519, 526 (1983).

17         Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough

18  facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697 (quoting

19  *Twombly*, 550 U.S. at 570).  Only where a plaintiff has failed to "nudge[] [his or her] claims . . .

20  across the line from conceivable to plausible," is the complaint properly dismissed. *Id.* at 680.

21  While the plausibility requirement is not akin to a probability requirement, it demands more than

22  "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  This plausibility inquiry is

23  "a context–specific task that requires the reviewing court to draw on its judicial experience and

24  common sense." *Id.* at 679.

25         If a complaint fails to state a plausible claim, "[a] district court should grant leave to

26  amend even if no request to amend the pleading was made, unless it determines that the pleading

27  could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130

28  (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 484, 497 (9th Cir. 1995)); *see*

1   *also Gardner v. Marino*, 563 F.3d 981, 990 (9th Cir. 2009) (finding no abuse of discretion in

2   denying leave to amend when amendment would be futile).  Although a district court should

3   freely give leave to amend when justice so requires under Rule 15(a)(2), "the court's discretion to

4   deny such leave is 'particularly broad' where the plaintiff has previously amended its complaint."

5   *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 520 (9th Cir. 2013) (quoting

6   *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004)).

7        **III.   ANALYSIS**

8        Counterdefendants move to dismiss CMPB's counterclaims for several reasons: (1)

9   CMPB fails to allege Counterdefendants are alter egos of each other; (2) CMPB cannot

10  sufficiently allege its trademark claims; and (3) CMPB's fraud claim does not meet the

11  heightened pleading standard of Rule 9(b).  It bears mentioning that the Court granted

12  Counterdefendants' previous motions to dismiss based on substantially similar arguments.  The

13  Court will address Counterdefendants' arguments in turn.

14        A.   <u>CMPB's Alter Ego Theory</u>

15        Counterdefendants assert the Court should not impose alter ego liability because CMPB

16  fails to allege sufficient facts to support its alter ego theory.  (ECF No. 96-1 at 9–12; ECF No. 98-

17  1 at 14–20.)  More specifically, Counterdefendants argue CMPB fails to allege unity of interest

18  and ownership or that an inequitable result will occur if the Court regards Counterdefendants as

19  separate entities.[3]  (ECF No. 96-1 at 10–11; ECF No. 98-1 at 17–20.)

20        In order to state an alter ego theory, CMPB must allege facts that support the following:

21  (1) Counterdefendants have "such a unity of interest and ownership" that "separate personalities"

22  no longer exist; and (2) there would be "an inequitable result if the acts in question are treated as

23  those of the corporation alone."  *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523,

24  538 (2000); *see also McLoughlin v. L. Bloom Sons Co.*, 206 Cal. App. 2d 848, 851 (1962)

---

25  [3]        Counterdefendants also argue CMPB has not specified which corporate defendant is the
26  alter ego of which other corporate entity or individual.  (ECF No. 98-1 at 14–15.)  The Court
    previously considered this argument at length and found CMPB's alter ego allegations
27  sufficiently notified Counterdefendants of its claims.  (ECF No. 90 at 11–13.)  Counterdefendants
    offer no further justification for the Court to revisit its prior determination, and the Court declines
28  to do so.

1    (finding the same two requirements apply when the entity sought to be held liable is another

2    corporation instead of an individual).  The Court will address each prong of the alter ego test in

3    turn.

4                    *i.    Unity of Ownership and Interest*

5           Counterdefendants argue CMPB fails to allege unity of ownership and interest because it

6    does not allege Counterdefendants have an ownership interest in each other.  (ECF No. 98-1 at

7    11–12.)  Counterdefendants contend while CMPB's "scattershot allegations" indicate that

8    Counterdefendants are affiliated with one another and have common officers and employees, such

9    a showing is insufficient for the purpose of imposing the Court's jurisdiction through alter ego

10   liability.  (*Id.* at 12.)

11          The "unity of interest and ownership" prong of the alter ego test requires "a showing that

12   the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality

13   of the former."  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (2015) (quoting *Doe v. Unocal Corp.*,

14   248 F.3d 915, 926 (9th Cir. 2011) (internal quotation marks omitted)).  This test is satisfied where

15   "a parent corporation uses its subsidiary 'as a marketing conduit' and attempts to shield itself

16   from liability."  *Doe*, 248 F.3d at 926.  Similarly, "inadequate capitalization of a subsidiary may

17   alone be a basis for holding the parent corporation liable for the acts of the subsidiary."  *Id.*

18   (citing *Slottow v. American Cas. Co. of Reading, Pennsylvania*, 10 F.3d 1355, 1360 (9th Cir.

19   1993).

20          Here, CMPB alleges many facts relevant to the "unity of interest" prong.[4]  CMPB alleges

21   transfer of assets, identical equitable ownership, use of the same office and employees, use of one

22   entity as the mere shell or conduit for the affairs of the other entity, disregard of corporate

23   formalities, lack of segregation of corporate records, and identical directors and officers.  (ECF

24   No. 91 at ¶¶ 38–44, 62, 69–70, 75, 103–105, 109–113.)  Further, giving CMPB the benefit of

25   every reasonable inference, CMPB also alleges facts indicating that Counterdefendants

26   ───────────────────
     [4]    CMPB incorrectly asserts the Court already disposed of this issue in its previous order.
27   (ECF No. 100 at 5–6.)  In its previous order, this Court did not determine whether CMPB
     sufficiently alleged unity of ownership and interest because the Court found CMPB failed to
28   satisfy the "inequitable result" prong of the alter ego test.  (ECF No. 90 at 15.)

                                                     7

undercapitalized FMMI in an effort to avoid paying creditors like those from the *Medical West* and Spinner lawsuits.  (*Id.* at ¶ 116.); *see Retail Clerks*, 373 U.S. at 753 n.6.  Construing the facts in the light most favorable to CMPB, the Court finds CMPB sufficiently alleges the "unity of ownership and interest" prong of the alter ego test.

*ii.    Inequitable Result*

Counterdefendants contend CMPB is merely a dissatisfied creditor who is discontent with the contract it negotiated and who "simply wants more money for royalties."  (ECF No. 98-1 at 19; *see also* ECF No. 96-1 at 10–11.)   In opposition, CMPB admits it must be more than just a creditor attempting to recover on unpaid debts to state a claim.  CMPB then argues that recognizing Counterdefendants' corporate separateness would promote fraud or injustice because Counterdefendants acted in bad faith by removing or changing expiration dates on their products.  (ECF No. 99 at 8–12; ECF No. 100 at 3–6.)  Counterdefendants respond that CMPB's alleged bad faith conduct based on changing the expiration dates is not sufficient to show Counterdefendants abused the corporate form in such a way that "recognition of the corporate entity would sanction a fraud or promote injustice."  (ECF No. 102 at 5) (citing *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003)); *see also* (ECF No. 103 at 9.)

"The essence of the alter ego doctrine is that justice be done."  *NuCal Foods, Inc. v. Quality Egg LLC*, 877 F. Supp. 2d 977, 992 (E.D. Cal. 2012) (citing *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 301 (1985)).  The parties agree that "to prove injustice, the plaintiff must be more than just a creditor attempting to recover on unsatisfied debts; it must show that a defendant's conduct amounted to bad faith."  *Id.*  Counterdefendants are correct that CMPB's allegations regarding the changed expiration dates are not the type of bad faith conduct contemplated by the alter ego doctrine.  Instead, courts disregard separate corporate identities "when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose."  *Sonora*, 83 Cal. App. 4th at 538.

Here, CMPB alleges not only bad faith conduct regarding the contract, but it also alleges Counterdefendants used their corporate form to perpetrate a fraud.  Drawing all reasonable inferences in CMPB's favor, CMPB plausibly alleges that FMMI created Reach and Magic

8

1   Straws and transferred assets to those entities in an effort to defraud and deprive successful

2   litigants from recovery in this lawsuit, the *Medical West* lawsuit, and the Spinner lawsuit.  (ECF

3   No. 91 at ¶¶ 62, 73, 75, 116.)  CMPB's allegations that Counterdefendants formed Reach and

4   Magic Straws to "hide money and other assets, avoid liability, prevent creditors from collecting

5   their debts," taken in conjunction with its allegations that Counterdefendants transferred assets

6   away from FMMI to avoid paying their creditors, sufficiently raises the inference that

7   Counterdefendants are using their corporate form to accomplish a "wrongful or inequitable

8   purpose."  (*Id.* at ¶ 116); *Sonora*, 83 Cal. App. 4th at 538.

9        For the foregoing reasons, the Court finds CMPB sufficiently pleads both prongs of the

10   alter ego test.  Therefore, the Court DENIES Counterdefendants' motions as to all counterclaims

11   premised on an alter ego theory of liability.

12              B.      CMPB's Trademark Claims: Claims One through Eight

13                      i.      *Claims One, Two, and Three: Trademark Infringement*

14        Counterdefendants argue CMPB's trademark infringement claims fail because the sale of

15   genuine goods bearing a true mark is permissible and is not likely to cause consumer confusion,

16   even if those sales occur against CMPB's wishes.  Counterdefendants further argue CMPB fails

17   to allege a single specific instance of unauthorized manufacturing after the expiration of the 2011

18   License Agreement between FMMI and CMPB.  (ECF No. 96-1 at 7–9: ECF No. 98-1 at 5–7.)  In

19   opposition, CMPB contends Counterdefendants' use of the mark is unauthorized and the goods

20   are non-genuine because the expiration dates have passed on some or all of the products, the GOT

21   MILK? display cases were used to display other products, and some product packaging was not

22   approved by CMPB.  (ECF No. 99 at 4–5; ECF No. 100 at 7–8.)  CMPB further argues it

23   sufficiently alleges Counterdefendants have continued to manufacture, distribute and/or sell

24   flavored drinking straws bearing the Mark in violation of the FALA.  (*Id.*)

25        CMPB's infringement claims are based upon the Lanham Act ("the Act"), 15 U.S.C. §

26   1114.  The Act prohibits the use in commerce, without the consent of the registrant, of "any

27   reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the

28   sale, offering for sale, distribution, or advertising of any goods" in a way that is likely to cause

1   confusion, mistake, or to deceive.  15 U.S.C. § 1114.  In order to establish a claim for direct

2   infringement, CMPB must allege facts to support that "(1) it has valid, protectable trademarks,

3   and (2) that defendant's use of the marks in commerce is likely to cause confusion."  *Free Kick*

4   *Master LLC v. Apple Inc.*, 140 F. Supp. 3d 975, 979 (N.D. Cal. 2015).  Here, the parties agree

5   CMPB has a valid, protectable trademark.  Further, the parties do not dispute that the flavoring

6   straws were genuine at the time of manufacture under the 2011 License Agreement.  Instead, the

7   parties disagree about whether the products lost their "genuineness" when they were sold past the

8   expiration dates and whether that is likely to cause consumer confusion.

9          The Ninth Circuit has "approached the 'genuine good' inquiry both as a threshold

10  question for the applicability of trademark law, and as part of the test for consumer confusion."

11  *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1092 (9th Cir. 2013).  This dual

12  approach reflects the purpose of trademark law, which "is designed to prevent sellers from

13  confusing or deceiving consumers about the origin or make of a product."  *Id.*; *see also Monte*

14  *Carlo Shirt, Inc. v. Daewoo Int'l Am. Corp.*, 707 F.2d 1054 (9th Cir. 1983).  When the product

15  being sold is genuine, "[b]uyers of the product, although perhaps mistaken about how the product

16  came into the retailer's hands, get precisely what they bargain for."  *Monte Carlo*, 707 F.2d at

17  1057, n.3.  Therefore, trademark law generally does not reach the sale of genuine goods bearing a

18  true mark, even if the sale is not authorized by the mark's owner.  *NEC Electronics v. Cal Circuit*

19  *Abco*, 810 F.2d 1506, 1509 (9th Cir. 1987), *cert. denied*, 484 U.S. 851 (1987).

20         However, the Ninth Circuit has not yet addressed when a good loses its "genuineness."

21  Looking to other districts and circuits, there is authority that "genuine" products may lose their

22  "genuineness" if they are sold or distributed in a manner which causes them to lose their original

23  character and the excellence indicated by the trademark.  *Novell, Inc. v. Weird Stuff, Inc.*, NO.

24  C92-20467 JW/EAI, 1993 WL 13767335, at *9 (N.D. Cal. Aug. 2, 1993); *see also Adolph Coors*

25  *Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 135–136 (D. Colo 1980); *El Greco Leather*

26  *Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 395–96 (2d Cir. 1986), *cert. denied,* 484 U.S.

27  817 ("The mere act of ordering a product to be labeled with a trademark does not deprive its

28  holder of the right to control the product and the trademark.").

1    Counterdefendants contend the situation alleged here resembles the facts presented in

2    *Monte Carlo*.  (ECF No. 96-1 at 15; ECF No. 98-1 at 13.)  In *Monte Carlo*, the Ninth Circuit

3    found that a discount retailer's sale of Monte Carlo shirts "planned and sponsored by Monte Carlo

4    and produced for it on contract for future sale" would not create consumer confusion because

5    "[t]he shirts were not altered or changed from the date of their manufacture to the date of their

6    sale." 707 F.2d at 1058.  However, unlike the instant dispute, *Monte Carlo* addressed the sale of

7    non-perishable goods that were unaltered from the date of manufacture to the date of sale.

8    The Court finds the instant facts more analogous to those in *Adolph Coors*, where a

9    district court addressed whether a defendant's sale of beer that had not been stored and

10   transported according to Adolph Coors Company's quality control standards constituted

11   trademark infringement.  The court found that although the "defendant did nothing deliberately to

12   alter the beer, the fact that the defendant distributed and sold Coors beer has resulted in the beer

13   no longer representing the original character and excellence indicated by the Coors trademark,"

14   which constituted a trademark violation under the Lanham Act.  *Adolph Coors*, 486 F. Supp. at

15   136.  Further, the court found the defendant's use of the trademark was likely to confuse the

16   public and deceive them into purchasing inferior quality products, which would damage the

17   goodwill and business reputation of Coors.  (*Id.*)

18   Here, CMPB alleges Counterdefendants sold expired products with faded packaging and

19   an insipid taste, which will confuse consumers into believing CMPB is the source of the inferior

20   goods.  (ECF No. 91 at ¶ 126.)  Despite Counterdefendants' contention that the instant case is

21   dissimilar to *Adolph Coors* because there is no quality control provision, § 2.3 of the 2011

22   License Agreement included a "Quality Standards" clause that states the licensee agrees its

23   products "shall be of such quality, style and appearance so as to maintain high standards and to

24   reflect well upon CMPB."[5]  (ECF No. 91-1 at 29; *see also* ECF No. 102 at 8 – 9; ECF No. 103 at

25   _____

26   [5]    The Court may "consider certain materials—documents attached to the complaint,
     documents incorporated by reference in the complaint, or matters of judicial notice—without

27   converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*,
     342 F.3d 903, 908 (9th Cir. 2003).  CMPB attached a copy of the 2011 License Agreement to the

28   TAACC as Exhibit F and referenced it extensively in the pleadings.  (ECF No. 91-1 at 27–36.)

11

6–7.)  Drawing all reasonable inferences in CMPB's favor, the Court finds CMPB sufficiently alleges Counterdefendants sold non-genuine goods that would likely cause consumer confusion. Accordingly, the Court DENIES Counterdefendants' motions to dismiss as to Claims One, Two, and Three for trademark infringement.

> ii.   *Claims Four and Five: Unfair Competition and False Designation of Origin*

Counterdefendants argue CMPB's claims for unfair competition and false designation of origin fail because CMPB fails to plead a claim for trademark infringement, which follows the same "likelihood of confusion" analysis.  (ECF No. 96-1 at 19–20; ECF No. 98-1 at 22.)  CMPB contends it sufficiently alleges its infringement claims.  (ECF No. 99 at 3; ECF No. 100 at 6.)

Although there are some differences between a trademark infringement claim and a false designation of origin claim under 15 U.S.C. § 1125(a) of the Lanham Act, "the analysis under the two provisions is oftentimes identical."  *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1079 (C.D. Cal. 2012) (quoting *Brookfield Communs., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 n.8 (9th Cir. 1999)).  Both claims rely on the "likelihood of confusion" analysis.  *Am. Circuit Breaker Corp. v. Or. Breakers, Inc.*, 406 F.3d 577, 584 (9th Cir. 2005); *see also New West Corp. v. NYM Co.*, 595 F.2d 1194, 1201 (9th Cir. 1979).  Additionally, the Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims under the Lanham Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994).

In light of the Court's finding that CMPB sufficiently alleges a likelihood of consumer confusion for its trademark infringement claim, the Court DENIES Counterdefendants' motions to dismiss as to Claims Four and Five for the same reasons.

///

///

///

///

1

*iii.   Claim Six: Trademark Dilution*

2  Counterdefendants contend CMPB fails to state a claim for trademark dilution because it

3  fails to allege Counterdefendants used a similar but different mark.  (ECF No. 96-1 at 20; ECF

4  No. 98-1 at 23.)  In opposition, CMPB asserts it sufficiently alleges Counterdefendants sold

5  unauthorized, non-genuine goods.  (ECF No. 99 at 14.)

6  To state a trademark dilution claim, a trademark owner must show "(1) the mark is

7  famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the

8  defendant's use began after the mark became famous; and (4) the defendant's use of the mark

9  dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish

10  goods and services." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158,

11  1164 n.4 (9th Cir. 2011); *see also* 15 U.S.C. § 1125(c)(1).  "Dilution refers to the whittling away

12  of the value of a trademark when it's used to identify different products." *Mattel, Inc. v. MCA*

13  *Records, Inc.*, 296 F.3d 894, 903 (9th. Cir. 2002) (internal quotations omitted).  "Tarnishment

14  occurs when a famous mark is improperly associated with an inferior or offensive product or

15  service." *Versace v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F. Supp. 3d 1007, 1024

16  (N.D. Cal. 2018) (quoting *Panavision Int'l, Ltd. P'ship v. Toeppen*, 141 F.3d 1316, 1326 n.7 (9th

17  Cir. 1998)).  Dilution protects owners "from an appropriation of or free riding on" the substantial

18  investment that they have made in their marks. *MCA Records*, 296 F.3d at 903.

19  "By contrast to trademark infringement, the injury from dilution usually occurs when

20  consumers *aren't* confused about the source of a product." *Id.* (emphasis in original).  A

21  trademark infringement injunction is usually limited to unauthorized trademark uses within one

22  industry or several related industries. *Id.* at 904.  "Dilution law is the antithesis of trademark law

23  in this respect, because it seeks to protect the mark from association in the public's mind with

24  wholly unrelated goods and services." *Id*.  Examples of trademark dilution include "Tylenol

25  snowboards" and "Harry Potter dry cleaners," all of which would weaken the mark and diminish

26  its ability to evoke the original creators or producers in the minds of consumers. *Id.* at 903.

27  In its previous order, the Court dismissed CMPB's dilution claim because CMPB failed to

28  allege Counterdefendants used a different mark or the same mark to identify non-GOT MILK?

1    products.  (ECF No. 90 at 19.)  Again, CMPB fails to allege Counterdefendants used the Mark to

2    identify completely different products or services than those governed by the 2011 License

3    agreement.  Instead, CMPB alleges Counterdefendants sold expired products in violation of

4    CMPB's quality control standards.  While this may cause reputational damage to CMPB, it does

5    not state a dilution claim.  Unlike trademark infringement, "[d]ilution works its harm not by

6    causing confusion in consumers' minds regarding the source of a good or service, but by creating

7    an association in consumers' minds between a mark and a different good or service." *Playboy*

8    *Enterprises, Inc. v. Welles*, 279 F.3d 796, 805 (9th Cir. 2002).  Moreover, because CMPB fails to

9    demonstrate that it can allege Counterdefendants used the Mark on completely different goods or

10   services without contradicting its other allegations, the Court finds amendment would be futile.

11   Accordingly, the Court GRANTS Counterdefendants' motions to dismiss as to Claim Six without

12   leave to amend.

13                     *iv.      Claim Seven: Counterfeiting*

14          Counterdefendants argue CMPB cannot state a claim for counterfeiting because the

15   products were genuine at the time of manufacture and CMPB makes only conclusory allegations

16   that Counterdefendants continued to manufacture GOT MILK? products after the end of the

17   contract.  (ECF No. 96-1 at 20–21; ECF No. 98-1 at 23–24.)  CMPB contends it sufficiently

18   alleges illegal manufacturing by stating, "FMMI continues to manufacture, distribute and/or sell

19   flavored drinking straws bearing the 'got milk?' marks in violation of the First Amendment to

20   License Agreement's provision that FMMI cease all use of the 'got milk?' marks effective

21   December 31, 2013."  (ECF No. 91 at ¶ 93.)

22          Section 1114 of the Act establishes the trademark counterfeiting cause of action and

23   prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered

24   mark in connection with the sale, offering for sale, distribution, or advertising of any goods or

25   services on or in connection with which such use is likely to cause confusion." 15 U.S.C. §

26   1114(1)(a).  Counterfeiting "does not include any mark or designation used on or in connection

27   with goods or services of which the manufacture[r] or producer was, at the time of the

28   manufacture or production in question authorized to use the mark." 15 U.S.C. § 1116(d)(1)(B).

                                                    14

1    In the Ninth Circuit, "the important test is whether the practice of the defendant is likely to cause

2    confusion, not whether the defendant duplicated the plaintiff's mark." *Westinghouse Elec. Corp.*

3    *v. Gen. Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 899 (9th Cir. 1997).  Because the

4    statute was intended to protect consumers against deceptive designations of origin, "[w]hen an

5    original mark is attached to a product in such a way as to deceive the public, the product itself

6    becomes a 'counterfeit' just as it would if an imitation of the mark were attached." *Id.* at 900.

7          Counterdefendants correctly argue CMPB states only one conclusory allegation that they

8    "continue[d] to manufacture, distribute and/or sell" the products after the conclusion of the

9    FALA.  This allegation is factually deficient and does not raise a plausible claim that

10   Counterdefendants engaged in illegal manufacturing.  However, illegal manufacturing is not the

11   test for a trademark counterfeiting cause of action.  *See Westinghouse Elec. Corp.*, 106 F.3d at

12   899.  Here, as already discussed at length, CMPB alleges sufficient facts showing consumers may

13   be confused as to the origin of the products bearing the mark.  Therefore, CMPB sufficiently

14   states a trademark counterfeiting claim.  Accordingly, the Court DENIES Counterdefendants'

15   motions to dismiss Claim Seven.

16                    *v.       Claim Eight: Contributory Trademark Infringement*

17         Counterdefendants argue CMPB's contributory trademark infringement claim fails

18   because its direct trademark infringement claims fail.  (ECF No. 96-1 at 21–22; ECF No. 98-1 at

19   14.)  Counterdefendants further argue CMPB's allegations are devoid of factual support.  (*Id.*)

20   CMPB contends its amendments sufficiently allege Counterdefendants intentionally induced

21   FMMI to infringe on the Mark.  (ECF No. 99 at 7–8; ECF No. 100 at 14–15.)

22         In order to state a claim for contributory trademark infringement, one must allege the

23   infringer either: (1) did so with an intent to induce illegal substitution; or (2) continued to sell

24   products to customers whom the infringer knew used the products to engage in trademark

25   infringement.  *Inwood Labs. v. Ives Labs.*, 456 U.S. 844, 854 (1982); *see also Fonovisa, Inc. v.*

26   *Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).  Here, the Court already found CMPB

27   states a sufficient claim for trademark infringement, and CMPB also alleges that

28   Counterdefendants supplied goods to FMMI and did so with knowledge of FMMI's infringement.

1    Drawing all reasonable inferences in favor of CMPB, the Court finds CMPB states a plausible

2    claim for contributory trademark infringement.  (ECF No. 91 at ¶ 166.)  Accordingly, the Court

3    DENIES Counterdefendants' motions to dismiss Claim Eight.

4                    C.      CMPB's Fraud Claim: Claim Nine

5            Counterdefendants move to dismiss CMPB's fraud claim for failure to satisfy Rule 9(b)'s

6    heightened pleading standard.  (ECF No. 96-1 at 22–25; ECF No. 98-1 at 20–22.)  FMMI

7    Counterdefendants argue CMPB's amended complaint is based on opinion and does not allege an

8    actionable misrepresentation.  (ECF No. 96-1 at 23–24.)  FMMI Counterdefendants further argue

9    CMPB's purported reliance was unreasonable because CMPB alleges they relied on the

10   representations even though Counterdefendants refused to allow CMPB to access FMMI's books

11   to verify the amount of royalty payments due.  (ECF No. 96-1 at 24.)  Magic Straws also argues

12   CMPB fails to allege how the alleged misrepresentations were false.  (ECF No. 98-1 at 21–22.)

13   In opposition, CMPB baldly asserts that its amended fraud allegations address the concerns raised

14   by the Court's previous order.  (ECF No. 99 at 12; ECF No. 100 at 15.)

15           Under California law, the "indispensable elements of a fraud claim include a false

16   representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages."

17   *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003) (quoting *Moore v. Brewster*,

18   96 F.3d 1240, 1245 (9th Cir. 1996); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th

19   Cir. 2009).  Rule 9(b) requires allegations be "specific enough to give defendants notice of the

20   particular misconduct . . . so that they can defend against the charge and not just deny that they

21   have done anything wrong."  *Kearns*, 567 F.3d at 1124 (citations omitted).  "Averments of fraud

22   must be accompanied by 'the who, what, when, where, and how' of the misconduct charged."  *Id.*

23   (citing *Vess*, 317 F.3d at 1106).  A party alleging fraud must "set forth more than the neutral facts

24   necessary to identify the transaction."  *Id.* (citations and emphasis omitted).  Further,

25   "[s]tatements or predictions regarding future events are deemed to be mere opinions which are

26   not actionable."  *Cansino v. Bank of America*, 224 Cal. App. 4th 1462, 1469 (2014).

27           Here, CMPB sufficiently pleads a claim for fraud.  CMPB alleges FMMI intentionally

28   misrepresented the amount of past due royalties with the intent to defraud CMPB out of money

                                                    16

1  owed and to induce CMPB into agreeing to the FALA.  (ECF No. 91 at ¶¶ 169–171.)  CMPB also

2  alleges it relied on FMMI's representations based on their prior business relationship and in spite

3  of FMMI's refusal to provide its financial records, which resulted in CMPB being damaged by

4  the reduced royalty payments.  (*Id.* at ¶¶ 172–173.)  Further, CMPB alleges FMMI

5  misrepresented the facts of the payments due as they existed at the time of the misrepresentation,

6  rather than alleging mere opinions about future events.  *Cansino*, 224 Cal. App. 4th at 1469

7  (2014).  Finally, there is at the very least a reasonable inference that CMPB's reliance was

8  justified in light of the parties' ongoing business relationship and refusal to provide records.  *See*

9  *City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 840 (9th Cir. 2004) ("Except in the

10  rare case where the undisputed facts leave no room for a reasonable difference of opinion, the

11  question of whether a plaintiff's reliance is reasonable is a question of fact") (quoting *Alliance*

12  *Mortgage Co. v. Rothwell,* 10 Cal. 4th 1226, 1239 (1995)).

13       In sum, CMPB satisfies Rule 9(b) because it sufficiently alleges 'the who, what, when,

14  where, and how' of its fraud allegations.  *See Kearns*, 567 F.3d at 1124.  Accordingly, the Court

15  DENIES Counterdefendants' motions to dismiss as to Claim Nine.

16              D.       CMPB's Breach of Contract Claims: Claims Ten through Fourteen

17                        i.        *Claims Ten, Eleven, and Twelve*

18       In its previous order, the Court found CMPB sufficiently pleaded its Tenth, Eleventh, and

19  Twelfth claims for breach of the 2011 Licensing Agreement and the FALA.  (ECF No. 90 at 23–

20  27.)  Counterdefendants FMMI, Reach, and Tollefson do not ask the Court to revisit its decision

21  in their motion to dismiss.  (ECF No. 96.)  However, Counterdefendant Magic Straws again

22  requests the Court dismiss these claims because CMPB fails to allege its alter ego theory.  (ECF

23  No. 98-1 at 15.)  In light of the Court's finding that CMPB sufficiently states a plausible claim for

24  alter ego liability, the alter ego argument raised by Magic Straws as to these claims is unavailing.

25  Because there are no other grounds for revisiting the Court's previous denial, the Court again

26  DENIES Counterdefendants' motions to dismiss as to Claims Ten, Eleven, and Twelve.

27  ///

28  ///

1
                 *ii.        Claim Thirteen: Rescission of FALA*

2
        Counterdefendants argue Claim Thirteen should be dismissed because CMPB's rescission

3
claim depends on its insufficient fraud claim.[6]  (ECF No. 96-1 at 25.)  Counterdefendants also

4
argue CMPB's claim fails because California Civil Code § 1691 required CMPB to act "promptly

5
upon discovering facts which entitle him to rescind" and to "[r]estore to the other party

6
everything of value which he has received from him under the contract or offer to restore the

7
same upon condition that the other party do likewise."  (*Id*.)  Counterdefendants argue CMPB can

8
no longer restore FMMI's license rights, which is fatal to the rescission claim.  (*Id.*)  In

9
opposition, CMPB baldly asserts that it sufficiently alleges its fraud claim.  (ECF No. 100 at 16.)

10
        Under California law, "a party to a contract has grounds to rescind the contract if the

11
consent of the party seeking rescission was obtained through fraud."  *Citicorp Real Estate, Inc. v.*

12
*Smith*, 155 F.3d 1097, 1103 (9th Cir. 1998).  However, "in order to escape from its obligation the

13
aggrieved party must rescind by prompt notice and offer to restore the consideration received, if

14
any."  *Id.*  California courts have interpreted this "promptness" requirement strictly, demanding

15
action by the aggrieved party within a month of discovery of the breach unless an adequate

16
explanation for delay is provided.  *Diversified Paratransit, Inc. v. Checkmate Staffing, Inc.*, 359

17
F. App'x 736, 739 (9th Cir. 2009); *see also Campbell v. Title Guar. & Trust Co.,* 121 Cal. App.

18
374, 377 (1932); *Gedstad v. Ellichman,* 124 Cal. App. 2d 831, 834 (1954).  When the party

19
seeking rescission has not otherwise given notice or made an offer to restore the benefits received

20
under the contract, "the service of a pleading in an action or proceeding that seeks relief based on

21
rescission shall be deemed to be such notice or offer or both."  Cal. Civ. Code § 1691.

22
        Although the Court finds CMPB sufficiently alleges its fraud claim, nowhere does CMPB

23
allege that it promptly notified FMMI Counterdefendants of its intention to rescind the contract.

24
CMPB alleges it became aware that FMMI was continuing to use the mark in violation of the

25
FALA on February 26, 2015.  (ECF No. 91 at ¶ 87.)  CMPB also asserts it "intends service of this

26

---

27
[6]    Magic Straws generally contends Claim Thirteen fails because CMPB did not properly allege its alter ego claims but does not make any arguments specifically addressing the claim.

28
(ECF No. 98-1 at 15.)

pleading to serve as notice of rescission." (ECF No. 91 at ¶ 204.) Yet CMPB's first answer and counterclaim was not filed until May 21, 2015. (ECF No. 22.) CMPB fails to offer any explanation for its nearly three-month delay in notifying Counterdefendants of its intention to rescind.

The Court previously dismissed the rescission claim with leave to amend based on CMPB's failure to state a fraud claim, but in doing so the Court noted that the aggrieved party must allege it rescinded by prompt notice. (ECF No. 90 at 27) (citing *Citicorp Real Estate*, 155 F.3d at 1103). In light of the Court's previous ruling and having given CMPB an opportunity to amend, the Court finds further amendments would be futile because CMPB fails to demonstrate that it can remedy its deficient pleading. Indeed, CMPB did not oppose Counterdefendants' argument that CMPB failed to promptly notify them or offer any explanation for its delay. "Failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." *Stichting Pensioenfonds ABP v. Countrywide Financial Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011). For these reasons, the Court GRANTS Counterdefendants' motion to dismiss Claim Thirteen without leave to amend.

>                    *iii.*        *Claim Fourteen: Breach of 2014 License Agreement*

Finally, Counterdefendants move to dismiss Claim Fourteen because CMPB fails to allege a sufficient basis to impose alter ego liability for conduct committed by DCG, Diversified, and Henson. (ECF No. 96-1 at 9–10; ECF No. 98-1 at 15.) However, for the reasons discussed above, the Court finds CMPB states a plausible alter ego theory as to all Counterdefendants. Therefore, the Court DENIES Counterdefendants' motions to dismiss as to Claim Fourteen.

## IV.   CONCLUSION

For the reasons set forth above, Counterdefendants' Motions to Dismiss (ECF Nos. 96, 98) are hereby GRANTED in part and DENIED in part as follows:

1. Counterdefendants' Motions to Dismiss CMPB's claims based on alter ego theory are DENIED;

2. Counterdefendants' Motions to Dismiss Claims One, Two, and Three for trademark

infringement are DENIED;

3. Counterdefendants' Motions to Dismiss Claims Four for unfair competition and Five for false designation of origin are DENIED;

4. Counterdefendants' Motions to Dismiss Claim Six for trademark dilution are GRANTED without leave to amend;

5. Counterdefendants' Motions to Dismiss Claims Seven for counterfeiting are DENIED;

6. Counterdefendants' Motions to Dismiss Claim Eight for contributory trademark infringement are DENIED;

7. Counterdefendants' Motions to Dismiss Claim Nine for fraud are DENIED;

8. Magic Straws's Motion to Dismiss Claims Ten, Eleven, and Twelve for breach of contract is DENIED;

9. Counterdefendants' Motions to Dismiss Claim Thirteen for rescission are GRANTED without leave to amend;

10. Counterdefendants' Motions to Dismiss Claim Fourteen for breach of the 2014 License Agreement are DENIED; and

11. Counterdefendants shall file a responsive pleading within thirty (30) days of the date of electronic filing of this Order.

IT IS SO ORDERED.

DATED:  May 5, 2020

Troy L. Nunley
United States District Judge

20