UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOOD MARKET MERCHANDIZING, INC., <br><br> Plaintiff, <br><br> v. <br><br> CALIFORNIA MILK PROCESSOR BOARD, <br><br> Defendant. | No. 2:15–cv–1083–TLN–CKD <br><br><br> ORDER ON MOTION FOR PROTECTIVE ORDER <br><br><br> (ECF No. 126) |
| CALIFORNIA MILK PROCESSOR BOARD, <br><br> Counterclaimant, <br><br> v. <br><br> FOOD MARKET MERCHANDIZING, INC., et al. <br><br> Counterdefendants. | |

Presently before the court is defendant and counterclaimant California Milk Processor Board ("the CMPB" or "the Board")'s motion for a protective order limiting the scope of the Rule 30(b)(6) deposition noticed by plaintiff and counterdefendant Food Market Merchandising,

Inc. ("FMMI").[1]  (ECF No. 126.)  The parties filed a joint statement regarding the discovery dispute.  (ECF No. 126.1.)  The court heard remote arguments on the motion on June 1, 2022.  Thomas Knox appeared for defendant the CMPB; and Howard Sagaser and Carl Christensen appeared for plaintiff FMMI.  For the following reasons, the court GRANTS defendant's motion for protective order.

## BACKGROUND

### A. The Underlying Action

The California Milk Processor Board is "an instrumentality existing under the laws of the State of California and the regulations promulgated by the California Department of Food and Agriculture."  (Third Am. Answer & Counterclaim ("TAAC"), ECF No. 91 at 2.)  "CMPB was created in 1993 to market and promote the consumption of fluid milk in the State of California."  (TAAC ¶ 37.)  The CMPB created the well-known "got milk?" advertising campaign and is the owner of federally registered GOT MILK? trademarks and service marks.  (Id.)

FMMI is a Minnesota corporation and for a time was the licensee of the GOT MILK? trademark ("the Mark") for "flavored drinking straws, toys, novelties, household products, confections, and personal care items."  (Amended Complaint, ECF No. 11 ¶ 6.)  The CMPB and FMMI entered a Licensing Agreement for said license effective November 3, 2011.  (Id. ¶ 9.)  Due to a series of events not relevant to the instant deposition dispute, the CMPB terminated the Agreement as of 2014 and required FMMI to stop distributing products bearing the Mark.  (TAAC, Counterclaim ¶¶ 82, 93.)  According to CMPB, FMMI did not stop.  (Id. ¶¶ 93, 126.)

However, it was FMMI that first brought suit related to the Mark.  In 2015, FMMI sued the CMPB (in the Southern District of New York) for one count of trademark abandonment on a "naked licensing" theory.[2]  (ECF No. 11.)  The central claim of FMMI's nine-page operative

---

[1] This matter was referred to the undersigned pursuant to Eastern District of California Local Rule 302(c)(1) and 28 U.S.C. § 636(b)(1).  For simplicity, the court refers to the parties simply as plaintiff and defendant, except where reference to the counterclaims dictates otherwise.

[2] As explained more fully below, "naked licensing" occurs when the trademark owner/licensor "fails to exercise adequate quality control over the licensee" and thereby abandons its rights to the mark.  FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 515-16 (9th Cir. 2010).

complaint is that "[b]y failing to exercise any actual quality control over the Mark and failing to include meaningful minimum quality control standards in the Agreement, CMPB engaged in naked licensing and has abandoned its rights in the Mark." (Id. ¶ 39.) On that ground, FMMI seeks a declaration that the CMPB has "abandoned any rights it might otherwise have had in the Mark" and that FMMI "is the rightful owner of the Mark." (Id. at 8-9, ¶¶ 47-48.)

After successfully having the case transferred to this district, the CMPB brought countersuit against FMMI and related employees and entities with counterclaims for trademark infringement, unfair competition, false designation of origin, fraud, and breach of contract, among others. (ECF Nos. 22, 53, 91 (series of amended answers and counterclaims).) In May 2020, the district judge dismissed the CMPB's counterclaims for trademark dilution and contract rescission but allowed the rest to proceed. (ECF No. 113.) Thereafter, FMMI and the other counterdefendants filed an answer.

As relevant to this dispute, the answer asserts 31 affirmative defenses, 18 of which contend (in a variety of fashions) that the CMPB is not authorized to own a trademark at all, or at least is not authorized to license that trademark to promote or otherwise advertise products that are not "fluid milk" or do not touch and concern the State of California. (Answer, ECF No. 114 at 25-32.)

These 18 affirmative defenses are all based on counterdefendants' reading of the CMPB's authorizing sources of law: (A) the California Marketing Act of 1937, Cal. Food & Agr. Code §§ 58601-59293 ("the Act"), and (B) the "Marketing Order for Advertising, Promotion, Research Education Relating to Fluid Milk Products in California" (the "Marketing Order"). (See Answer at 27.) "The Act calls for the issuance of marketing orders by the [California] Director of Food and Agriculture upon approval of the producers and handlers of that commodity which is its subject. Marketing orders can encompass a variety of activities including advertising programs. The Act also provides for an Advisory Board composed of producers of the subject commodity. The operations of the advisory boards are financed by a tax on the producers." State of Cal. ex rel. Christensen v. F.T.C., 549 F.2d 1321, 1323 n.1 (9th Cir. 1977). "[T]he director may issue marketing orders which regulate producer marketing, the processing, distributing, or handling in

any manner of any commodity by any and all persons that are engaged in such producer marketing, processing, distributing, or handling of such commodity within this state [of California]." Cal. Food & Agric. Code § 58741; see Gallo Cattle Co. v. California Milk Advisory Bd., 185 F.3d 969, 970–71 (9th Cir. 1999) (discussing the Act and mechanics of another milk-related marketing order).[3]

Pursuant to that authority, in 1993 the California Department of Food and Agriculture issued the Marketing Order that counterdefendants identify in their affirmative defenses. See Marketing Order for Advertising, Promotion, Research, and Education Relating to Fluid Milk Products in California (eff. Jan. 1, 1993, incorporating amendments through June 10, 2019), *available at* https://www.cdfa.ca.gov/mkt/mkt/pdf/fluidmilk.pdf. This Marketing Order is what established the CMPB. See Marketing Order, Art. I, § A, ¶ 8 ("'Board', 'Advisory Board', and 'Processor Advisory Board', are synonymous terms that mean the California Milk Processor Board established pursuant to this Marketing Order.").

**B. The Discovery Dispute**

On April 8, 2022, FMMI served notice that on May 4, 2022, it would take the deposition of the CMPB's "person most qualified" under Rule 30(b)(6). (ECF No. 126.1 at 12, Ex. A.) The notice listed 12 topics for examination. (Id. at 13-14.) The CMPB's counsel sent FMMI's counsel a letter objecting to nine of the listed topics, and through meet-and-confer efforts, the parties reached agreement as to four disputed topics—leaving five topics to be addressed on this motion. (Id. at 3-4.) On May 4, 2022, the CMPB filed this motion for protective order under Rule 26(c) (ECF No. 126), requesting that the court prohibit FMMI from inquiring into the following topics at the Rule 30(b)(6) deposition:

> 6. The amount of commercial licensing that the CMPB receives from "Got Milk?" from January 1, 2010 to the present.
>
> 7. How "Got Milk?" has increased California milk consumption from January 1, 2010 to the present.

---

[3] Counsel confirmed at the hearing that the CMPB is a separate entity from the California Milk Advisory Board, which created the "Happy Cows" campaign and supports the California dairy industry overall.

>8. The identity and location of the entities licensed by CMPB to use the "Got Milk?" slogan during the period January 1, 2010 to the present.
>
>10. The number and identity of trademarks owned by CMPB.
>
>11. The sources of revenue of CMPB during the period of January 1, 2015 to the present.

(ECF No. 126.1 at 13-14; see id. at 4.)[4]

The CMPB argues these topics of questioning should be prohibited because none are relevant to the sole "naked licensing" claim in the amended complaint, to any of the claims in the CMPB's answer and counterclaims, or FMMI's affirmative defenses to the CMPB's counterclaims. (Id. at 5.)

**DISCUSSION**

**A. Legal Standards**

Under Rule 30(b)(6), a party may serve a deposition notice on an organization that describes "with reasonable particularity the matters for examination." The named organization must then "designate one or more officers, directors, or managing agents, or [] other persons who consent to testify on its behalf." Fed. R. Civ. P. 30(b)(6). "The persons designated must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). "The purpose of a Rule 30(b)(6) deposition is to streamline the discovery process." Risinger v. SOC, LLC, 306 F.R.D. 655, 662 (D. Nev. 2015). A Rule 30(b)(6) deposition requires a corporation to designate knowledgeable persons and "to prepare them to fully and unevasively answer questions about the designated subject matter." Great Am. Ins. Co. of N.Y. v. Vegas

---

[4] The unchallenged, or independently resolved, deposition topics are:

>1. Under what circumstances is the [CMPB] allowed to register trademarks.
>2. Under what circumstances is the CMPB allowed to license trademarks for profit.
>3. Is the CMPB allowed to engage in commercial activities for profit.
>4. The California income tax status of CMPB.
>5. The Federal Income Tax status of CMPB.
>9. The organizational structure of CMPB from January 1, 2015 to the present.
>12. Whether the "Got Milk?" license and activity of CMPB complies with Section 58894 or Section 59236 of the California Marketing Act of 1937.

1  Constr. Co., 251 F.R.D. 534, 539 (D. Nev. 2008).

2  Under Rule 26(c) of the Federal Rules of Civil Procedure, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, among other things, forbidding a deposition or limiting its scope. Fed. R. Civ. P. 26(c)(1). The party seeking the protective order has the burden "to show good cause by demonstrating harm or prejudice that will result from the discovery." Rivera v. NIBCO, Inc., 364 F.3d 1057, 1063 (9th Cir. 2004) (internal quotation omitted). Generalized statements of harm are not enough. Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir. 1992). Rather, the party opposing disclosure must show "that specific prejudice or harm will result if the protective order is not granted." Father M v. Various Tort Claimants (In re Roman Catholic Archbishop of Portland in Oregon), 661 F.3d 417, 424 (9th Cir. 2011) (internal quotation omitted).

**B. Analysis**

***1. Irrelevance as Grounds for Protective Order***

The CMPB seeks a protective order purely based on the irrelevance of the five topics at issue. Relevance is not expressly listed as one of the grounds for issuing a protective order. See Fed. R. Civ. P. 26(c)(1) (listing protection from "annoyance, embarrassment, oppression, or undue burden or expense"); Blankenchip v. Citimortgage, Inc., No. 2:14-CV-2309 WBS AC, 2015 WL 5009079, at *2 (E.D. Cal. Aug. 20, 2015) ("Nothing in Rule 26(c)(1), by its own express terms, authorizes a court to issue a protective order seeking documents from a party on the grounds that the documents are not relevant.").

However, there is "case law opining that the requirement to produce entirely irrelevant documents or information—especially if the request appears to be a mere 'fishing expedition'—is an 'undue burden' on a party." Blankenchip, 2015 WL 5009079, at *2 (collecting cases and ultimately declining to determine "whether a protective order may be obtained solely on the basis of irrelevance" because documents were plainly relevant); see Bell v. City of Boise, 2015 WL 13779037, at *1 (D. Idaho Jan. 6, 2015) ("Extending a deposition beyond the scope of questions that reasonably might lead to the discovery of admissible evidence can create an undue burden

and expense.") Relatedly, the Ninth Circuit has held it is within a district court's broad discretion to quash or modify a Rule 30(b)(6) subpoena seeking documents that have no relation to the litigation. See Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 813 (9th Cir. 2003).

In addition, elsewhere Rule 26 requires that "the court *must* limit the . . . extent of discovery" if it determines "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(iii) (emphasis added). Rule 26(b)(1), of course, permits discovery regarding "any nonprivileged matter that is *relevant to any party's claim or defense* and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1) (emphasis added); see Carrera v. First Am. Home Buyers Prot. Co., 2014 WL 3695403, at *1 (S.D. Cal. July 23, 2014) (burden of showing good cause for protective order "can be met by showing that the sought after discovery is irrelevant").

Finally, as a matter of policy, the court sees no reason that relevance issues should not be considered when the dispute over a Rule 30(b)(6) deposition topic comes to the court on a motion for protective order instead of on a motion to *compel* a witness's testimony on a given topic in advance of the deposition. See Hankey v. Home Depot USA, Inc., No. 2:19-CV-0413-JAM-CKD, 2020 WL 3060399 (E.D. Cal. June 9, 2020) (granting in part and denying in part motion to compel defendant corporation to produce a witness to testify about certain topics based on varying relevance of each topic); Harris v. Best Buy Stores, L.P., 2015 WL 6085307, at *1 (N.D. Cal., Oct. 16, 2015) (same).

Thus, the court concludes that, at least in the context of a motion for protective order related to the scope of an upcoming Rule 30(b)(6) deposition, a strong showing of irrelevance can satisfy Rule 26(c)'s good cause standard.[5]

### 2. Application

With the grounds and burdens established, the court turns to the five deposition topics in question. Although the parties break the topics into six different headings in the Joint Statement,

---

[5] It is worth noting that the burdens on a motion to compel versus a motion for protective order are reversed—with the party requesting discovery on a motion to compel having to show relevance, but the request*ed* party having to show *ir*relevance on a motion for protective order.

they only provide substantive argument regarding Topic 6, and merely refer back to those arguments for Topics 7, 8, 10, and 11.

Although the CMPB generally asserts that none of these topics are relevant to any of the claims or defenses in any of the operative pleadings, substantively it argues only that these topics are irrelevant to FMMI's *affirmative defenses*—and briefly argues that the topics are overbroad for seeking information prior to the November 3, 2011, effective date of the Licensing Agreement.[6]  (ECF No. 126.1 at 6.)  FMMI maintains that the topics are relevant to both its 18 affirmative defenses and its original claim of naked licensing.  (Id. at 6-7.)

### i. Irrelevance to FMMI's Affirmative Defenses

FMMI's Affirmative Defenses Nos. 14–31 all variously challenge the CMPB's ability—as a matter of law—to hold a trademark (or any intellectual property), to license that trademark for any purpose beyond promoting the sale of fluid milk, and to license that trademark to any entities that are not "producers or handlers participating in the marketing agreement or order" (such as FMMI and the other counterdefendants).  All of these defenses are based on FMMI's reading of the textual provisions of the Act and the Marketing Order.  (See, e.g., Aff. Defenses No. 16 ("[N]owhere in the applicable Marketing Order or the Act permits the board to hold the registered GOT MILK? trademark."); No. 19 (Board exceeded its authority under Act and Marketing Order in "entering into licensing agreements or utilizing licensing agreements for the promotion outside the State of California, or licensing products that are not milk products produced and processed in the State of California."); Nos. 15 & 20 (challenging Board's ability to own or license "intellectual property"); Nos. 22, 23, 30, 31 (licensing the Mark to FMMI for "toys, novelties, household products, confections, personal care items, and drinking straws" went beyond power under Act and Marketing Order because FMMI is not "participating in the marketing agreement or Order" and the License Agreement was not "promoting California produced and processed fluid milk").)

---

[6] The Joint Statement refers to November 31, 2011, as the date of the Licensing Agreement, but this appears to be a typo, as the pleadings and their attachments uniformly indicate a November 3, 2011, effective date. (ECF No. 11 ¶¶ 9-10; ECF No. 91 Answer ¶ 10.)

8

Many of the affirmative defenses expressly quote certain sections of the Act and the Marketing Order and then claim that by violating those provisions (a) the CMPB's counterclaims "are not authorized," (b) the CMPB's "allegations in its counterclaims are invalid," and (c) the asserted "licensing agreements . . . are invalid." (See Aff. Defenses Nos. 20, 21, 26-28.)

In its motion, the CMPB makes a strong showing that the challenged deposition topics are irrelevant to these affirmative defenses, which rest almost exclusively on the CMPB's lack of legal authority with respect to trademarks and licensing. Some of the Affirmative Defenses do contain corresponding factual allegations. For instance, No. 17 asserts that the "GOT MILK? mark was not being utilized for the advertising and promotion of the sale of fluid milk." And No. 18 asserts that "the Board has been using said trademarks to ["engage in promotion or advertising that benefits . . . milk processors and producers outside the State of California"] . . . which the Act and the Marketing Order do not permit." (ECF No. 114 at 28.) Some of the noticed deposition topics arguably go toward proving those allegations—with Topic 7 asking how the Mark has "increased California milk consumption" and Topic 8 requesting the "identity and location" of the CMPB's licensees. (ECF No. 126.1 at 13.) However, the undersigned fails to see how proving these factual allegations would help FMMI prevail on its affirmative defenses which are decidedly legal in nature. For example, learning that the CMPB did in fact license the Mark to other non-California entities around the country does not have any bearing on whether the CMPB was *authorized to do* so by the Act and the Marketing Order. Repeatedly exceeding one's authority does not change the bounds of that authority.

FMMI argues that the scope of the CMPB's use of the Mark is important to "investigating any defenses that such activities are de minim[i]s or that the licensing of [the Mark] is appurtenant to California fluid milk goods." (ECF No. 126.1 at 7.) Presumably, this is a reference to investigating the CMPB's "defenses" to FMMI's affirmative defenses. This is essentially the flip side of the example just posed; and the undersigned likewise cannot see how, for example, learning that the CMPB did not license the Mark to non-California entities (or at least not very often) would change the analysis of whether *in this instance* the CMPB exceeded its authority in licensing the Mark to FMMI and the other counterdefendants.

The same is true for each of the other topics. Learning how much revenue the CMPB receives from licensing the Mark (Topic 6), how many trademarks the CMPB owns (Topic 10), and all sources of the CMPB's revenue since 2015 (Topic 11) would not affect the legal analysis of FMMI's affirmative defenses on questions of law. No matter how many other trademarks the CMPB owns, it undisputedly is the registered owner of the Mark licensed to FMMI. Whether that registration has legal effect under the provisions of the Act and the Marketing Order does not depend on the number of other registrations the CMPB might also own.

The court does not dispute the characterization that "[s]hould FMMI prevail on that defense [of the Board's lack of trademark/licensing authority], it could invalidate former contracts between FMMI and CMPB and undermine some of CMPB's counterclaims against FMMI and the other Counterdefendants." (ECF No. 126.1 at 2.) However, deposition Topics 6, 7, 8, 10, and 11 serve no purpose in helping FMMI to prevail on these affirmative defenses.[7]

### ii. Irrelevance to FMMI's Naked Licensing Claim & CMPB's Counterclaims

The CMPB frames irrelevance to the affirmative defenses as the beginning and end of the dispute, leaving unexamined whether these deposition topics might be relevant to FMMI's original claim of naked licensing or any of the CMPB's counterclaims. FMMI does not really explain how the topics are relevant to its naked licensing claim—though again, the burden is on the CMPB in this protective posture. FMMI simply states that it "maintain[s] that CMPB has essentially abandoned [the Mark] by virtue of naked licensing of that mark" and that the CMPB's assertion (in its counterclaims) of its status as the Mark's registered owner means that the Mark's validity has been put at issue. (ECF No. 126.1 at 7.)

The court could deny the CMPB's motion for protective order for failure to address these other sources of potential relevance. However, a brief examination of the law of "naked

---

[7] The court notes that the parties independently resolved the CMPB's original objections to Topics 1, 2, 3, and 12, which all relate to the CMPB's exercise of legal authority—but which FMMI clarified were not seeking legal conclusions. (ECF No. 126.1 at 3.) Thus, FMMI will have avenues to inquire about facts related to the CMPB's understanding of its own authority under the Act and Marketing Order.

licensing" claims assures the court that the challenged topics also have no bearing on FMMI's abandonment cause of action.

The Ninth Circuit most recently gave the following introduction to the naked licensing of trademarks, an issue that "seldom arise[s]" in the circuit courts:

> As a general matter, trademark owners have a duty to control the quality of their trademarks. McCarthy § 18:48. "It is well-established that '[a] trademark owner may grant a license and remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained.'" [Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc., 289 F.3d 589, 595–96 (9th Cir. 2002) (quoting Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992)).
>
> "Naked licensing" occurs when the licensor "fails to exercise adequate quality control over the licensee." Id. at 596. Naked licensing may result in the trademark's ceasing to function as a symbol of quality and a controlled source. Id. (citing McCarthy § 18:48). We have previously declared that naked licensing is "inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." Id. at 598. "Consequently, where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.'" Id. at 596 (quoting Moore, 960 F.2d at 489).

FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 515-16 (9th Cir. 2010). Importantly, in the Ninth Circuit, at least, naked licensing is viewed as "inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." Id. at 516 (emphasis added). The Ninth Circuit has twice upheld mark abandonment findings based on a licensor's inadequate monitoring of its mark with respect to just one licensee, and without much comment on whether the marks at issue had thereby lost significance to consumers. See id. (affirming mark's abandonment based on licensor's behavior with one licensee, the accused infringer); see Barcamerica, 289 F.3d at 598 (upholding cancellation of plaintiff's registered mark based on defense of naked licensing through inadequate quality control over licensee's product bearing the mark) (quoting McCarthy § 18:48 for proposition that "'naked' licensing can result in such a loss of significance of a trademark that its federal registration should be cancelled").

The Ninth Circuit's view of naked licensing as "inherently deceptive" and its above affirmances without analyzing the subject marks' loss of significance suggest that a party

asserting naked licensing need not show consumer deception or loss of distinctiveness to secure a finding of abandonment. But see 15 U.S.C. § 1127 (definitions) ("A mark shall be deemed to be 'abandoned' . . . [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.").

Even assuming loss of mark significance is still a component to be considered in a naked licensing claim in the Ninth Circuit, it is unclear exactly how any of the five challenged topics might show the mark's loss of significance. Topics 8, 10, and 11—regarding the CMPB's other licensees, marks, and sources of revenue—certainly do not relate to loss of significance for *this* mark. The amount of licensing revenue from the Mark since 2010 (Topic 6) comes slightly closer, arguably bearing on the Mark's power over time, but the amounts received from licensing agreements is still too attenuated from the questions of consumer deception or loss of distinctiveness. Similarly, Topic 7's inquiry about how the Mark has increased milk consumption since 2010 could arguably relate to the continuing significance of the Mark at a highly generalized level, but it is even less connected to consumer deception/loss of distinctiveness than Topic 6.

The court sees no relevance to any of the five topics as to the central focus of a naked licensing claim: the extent of control the licensor exercised *over the particular licensee* in terms of maintaining the quality and consistency of goods bearing its mark. It is irrelevant to this claim how the CMPB conducted its business overall, or how it conducted itself with respect to its other marks and other licensees. These lines of questioning would not help determine whether the Board abandoned this particular mark by failing to monitor the Mark's usage by this particular set of licensees.

The only other basis for relevance asserted by either party is FMMI's argument (more of a passing statement, really) that "the validity of the CMPB trademark has been put at issue" by the CMPB's assertion in its TAAC that it is the registered owner of the GOT MILK? trademarks. (ECF No. 126.1 at 6-7, citing TAAC ¶ 37.) Even assuming as much, the court cannot guess at how these challenged deposition topics would reveal information likely to lead to relevant

evidence of the Mark's "validity." Topics 6 and 7 relate to the overall success of the Mark, while Topics 8, 10, and 11 relate to the CMPB's overall business activities—inquiring about other licensees, other marks, and the Board's overall revenue sources. These have no obvious relevance to the Mark's validity, and FMMI does not explain its implied argument to the contrary.

Finally, though not addressed by either party, the court has considered whether any of these five topics might be relevant to any of the CMPB's twelve counterclaims remaining in this action. The CMPB's not-dismissed trademark and other unfair competition claims (#1–5, and 7–8) all relate to the counterdefendants' conduct regarding the Mark. The trademark dilution claim (#6) alleged that the GOT MILK? marks "are strong" and that counterdefendants' acts blurred and impaired their distinctiveness; however, that claim was dismissed with prejudice in 2020. The CMPB's remaining four not-dismissed claims (for fraud and multiple counts of breach of contract (#9–12 and #14)) have almost nothing to do with any of the Board's marks.

Thus, the court concludes that the CMPB has met—if just barely—its burden to gain a protective order on grounds that the five disputed deposition topics are irrelevant to any claim or defense in this action.

**CONCLUSION**

For these reasons, IT IS ORDERED THAT:

1. The California Milk Processor Board's motion for protective order (ECF No. 126) is GRANTED.
2. In connection with any Rule 30(b)(6) deposition noticed for the CMPB, counsel for plaintiff and counterdefendant Food Market Merchandising, Inc. is prohibited from inquiring into the following topics:

    > 6. The amount of commercial licensing that the CMPB receives from "Got Milk?" from January 1, 2010 to the present.
    >
    > 7. How "Got Milk?" has increased California milk consumption from January 1, 2010 to the present.
    >
    > 8. The identity and location of the entities licensed by CMPB to use the "Got Milk?" slogan during the period January 1, 2010 to the present.

////

      10. The number and identity of trademarks owned by CMPB.

      11. The sources of revenue of CMPB during the period of January 1, 2015 to the present.

Dated: June 1, 2022

_/s/ Carolyn K. Delaney_
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

19.fmmi.1083