UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FOOD MARKET MERCHANDISING, INC.,

Plaintiff,

v.

CALIFORNIA MILK PROCESSOR BOARD,

Defendant.

CALIFORNIA MILK PROCESSOR BOARD,

Counter-Claimant,

v.

MAGIC STRAWS, LLC, et al.,

Counter-Defendants.

No. 2:15-cv-01083-DAD-CKD

ORDER GRANTING COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

(Doc. Nos. 161, 165, 166)

This matter is before the court on the motion for summary judgment brought by counter defendants Food Market Merchandising, Inc. ("FMMI" or "plaintiff"), Magic Straws, LLC ("Magic Straws"), Reach Companies, LLC ("Reach"), and Jon Tollefson ("Tollefson") (collectively "counter defendants") (Doc. Nos. 161, 165)[1] and the motion for summary judgment brought by defendant California Milk Processing Board ("defendant" or "CMPB"). (Doc. No.

[1] On September 3, 2025, counter defendants filed two notices of their motion (Doc. Nos. 161, 165), the latter being an amended notice of motion for summary judgment.

166.) On September 11, 2025, the motions were taken under submission pursuant to Local Rule 230(g).[2] (Doc. No. 168.) For the reasons explained below, the court will grant counter defendants FMMI, Magic Straws, Reach, and Tollefson's motion for summary judgment in part and grant defendant CMPB's motion for summary judgment.

## BACKGROUND

This case arises from a dispute between FMMI and CMPB regarding a trademark licensing agreement between the parties.

### A. Factual Background[3]

Defendant CMPB is an instrumentality existing under the laws of the State of California and the regulations promulgated by the California Department of Food and Agriculture. (Doc. No. 166-20 at ¶ 3.) CMPB was created in 1993 to market and promote the consumption of fluid milk in California. (*Id.* at ¶ 4.) Defendant CMPB owns the federally registered service mark and trademark[4] "got milk?" ("the mark"). (DSUF at ¶ 1.) Defendant CMPB uses the mark in advertising campaigns to promote the purchase and consumption of fluid milk in California. (*Id.*

---

[2] The court apologizes for the delay in the issuance of this order. The Eastern District of California is currently facing a judicial crisis due to a deluge of immigration-related habeas petitions now pending before this court. To appreciate the magnitude of that crisis, one need only consider the following. This district has six authorized district judgeships, the same number it had in 1979, and between August of 2025 and July 21, 2026, 5,583 immigration habeas petitions have been filed in this court with 3,556 of those petitions being accompanied by motions for temporary restraining orders.

[3] This factual background is undisputed, except where otherwise noted, is derived from the following sources: (1) the first amended complaint (Doc. No. 11); (2) the third amended answer and counterclaims (Doc. No. 91); (3) the undisputed facts as stated by plaintiff and the other counter defendants and as responded to by defendant (Doc. No. 163) ("PSUF"); (4) the undisputed facts as stated by defendant and as responded to by plaintiff (Doc. No. 166-2) ("DSUF"); and (5) the declarations and exhibits attached to the pending motions and the oppositions thereto, submitted to the court. Where the parties object to the statements or evidence used and the court does not address their objections specifically, they are overruled, often for reasons already addressed in response to prior objections, because the party admitted to the fact elsewhere, or because evidence cited directly provides adequate foundation.

[4] *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) (noting that "the only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services.") (citations omitted).

at ¶ 6.) CMPB has licensed the mark hundreds of times to various consumer brands including well-known and successful brands. (*Id.* at ¶ 9.)

On or about November 3, 2009, plaintiff FMMI and defendant CMPB entered into a licensing agreement whereby defendant granted plaintiff a non-exclusive and non-transferable license to create, distribute, and sell flavored drinking straws, toys, and other products bearing the mark. (PSUF ¶ 1.) On or about November 3, 2011, plaintiff and defendant entered into a new license agreement (the "2011 agreement"), with similar terms, in which plaintiff agreed to pay seven percent of the aggregate invoice price for sales bearing the mark for the immediately preceding calendar quarter. (*Id.* at ¶ 2.) Under the 2011 agreement, defendant was afforded the right to audit and inspect all of plaintiff's records for all information pertaining to performance of the agreement. (*Id.* at ¶ 3.) Plaintiff sold products bearing the mark to retailers as a wholesale seller. (*Id.* at ¶ 5.) Plaintiff has sold hundreds of thousands of units of products bearing the mark. (*Id.* at ¶ 10.) On or about November 18, 2011, Magic Straws was created as a new limited liability company with the Minnesota Secretary of State. (*Id.* at ¶ 6.) Magic Straws purchased products bearing the mark from plaintiff and sold those products as a distributor to third-party retailers and directly to consumers. (*Id.* at ¶ 7.) On or about December 27, 2012, Reach was created as a new limited liability company with the Minnesota Secretary of State. (*Id.* at ¶ 11.) In or around August 2013, defendant, through its agent Beanstalk, began negotiating an agreement with Paul Henson ("Henson"), an employee of FMMI at that time, whereby defendant would convey a license of the mark to Henson's newly formed company, Diversified Consumer Goods, LLC ("DCG"). (*Id.* at ¶ 15.)

In June 2014, FMMI and CMPB executed a first amendment to the 2011 licensing agreement, whereby the parties mutually agreed that the 2011 agreement would terminate on December 31, 2013. (DSUF at ¶ 23.)[5] CMPB alleges that that, in or around July or August 2014, it entered into a separate written license agreement with DCG through Henson, which granted

[5] The connection between the remaining counter defendants is not explained by the parties' statements of undisputed facts or responses thereto. Tollefson was a co-founder and the president of FMMI. (Doc. Nos. 164-3 at 3; 171-1 at ¶ 2.) Henson was employed by Reach and the founder of Diversified. (Doc. No. 164-3 at 8.)

DCG a non-exclusive and non-transferable license to use the mark "on or in connection with" flavored drinking straws. (Doc. No. 91 at 35–36.) Later that year, CMPB and DCG executed a trademark license assignment and assumption agreement which authorized DCG to assign its rights and obligations under DCG's agreement with CMPB to Diversified Flavor, LLC ("Diversified"). (*Id.* at 36.)

In its operative first amended complaint ("FAC"), FMMI alleges that its relationship with CMPB was "one-sided" throughout the entire period that FMMI was authorized to manufacture and distribute products bearing the mark. (Doc. No. 11 at ¶ 11.) Specifically, FMMI alleges that CMPB has abandoned its ownership of the mark by failing to exercise any control over the goods that FMMI sold bearing it, and FMMI is the rightful owner of the mark because FMMI has engaged in substantial efforts to develop, grow, and protect it. (*Id.* at ¶¶ 44, 46, 48.)

In its operative third amended answer ("TAA") CMPB alleges that FMMI violated the first amendment to the 2011 agreement because FMMI continued selling products bearing the mark after December 31, 2013, despite being contractually obligated to cease doing so once the 2011 agreement terminated. (Doc. No. 91 at 35.) CMPB also alleges that FMMI, Magic Straws, Reach, DCG, Diversified, Tollefson, and Henson are all alter egos of one another. (*Id.* at 39.) Specifically, CMPB alleges that Tollefson and Henson hold key positions at FMMI, Reach, Magic Straws, DCG, Diversified. (*Id.* at 39–40.) CMPB further alleges that Reach and Magic Straws were created to shield FMMI's assets from creditors including, but not limited to, a former FMMI employee who brought suit against FMMI and the named plaintiffs in a separate class action. (*Id.* at 33, 42.) CMPB also alleges that Reach and Magic Straws were created so FMMI could transfer part of its inventory of products bearing the mark to these companies before the 2011 agreement terminated. (*Id.* at 42.) CMPB further alleges that Henson fraudulently induced CMPB to execute a license agreement under the guise of DCG and Diversified being "unrelated to FMMI." (*Id.* at 43.)

**B. Procedural Background**

On March 10, 2015, plaintiff FMMI filed a complaint initiating this trademark action against defendant CMPB in the United States District Court for the Southern District of New

York. (Doc. No. 1.) On April 30, 2015, plaintiff filed its operative FAC. (Doc. No. 11.) In the FAC, plaintiff FMMI asserts one cause of action against defendant: a claim for declaratory judgment that defendant engaged in naked licensing of the mark and that plaintiff is the rightful owner of the mark. (Doc. No. 11 at ¶¶ 40–48.) On May 7, 2015, the action was transferred to the United States District Court for the Eastern District of California. (Doc. No. 17.) On May 21, 2015, defendant CMPB filed an answer and counterclaims against plaintiff. (Doc. No. 22.) On June 4, 2015, defendant CMPB filed a first amended answer and counterclaims naming FMMI, Magic Straws, Reach, and Tollefson as counter defendants. (Doc. No. 27.) On September 28, 2015, pursuant to a stipulation between the parties, defendant CMPB filed a second amended answer and counterclaims ("SAA"), adding DCG, Diversified, and Henson as counter defendants in this action. (Doc. No. 53.) On May 31, 2018, the previously assigned district judge granted counter defendants' motion to dismiss the SAA in part. (Doc. No. 90.)

On June 15, 2018, defendant CMPB filed the operative TAA asserting claims against FMMI, Magic Straws, Reach, Tollefson, Henson, DCG, and Diversified as counter defendants. (Doc. No. 91.) In the TAA, defendant asserts the following causes of action:
(1) trademark/service mark infringement in violation of the Lanham Act, 15 U.S.C. § 1114;
(2) trademark/service mark infringement in violation of the Lanham Act, 15 U.S.C. § 1114;
(3) trademark/service mark infringement in violation of the Lanham Act, 15 U.S.C. § 1114;[6]
(4) unfair competition by infringement of common law rights; (5) false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); (6) trademark/service mark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (7) counterfeiting in violation of the Lanham Act, 15 U.S.C. § 1072; (8) contributory trademark/service mark infringement; (9) common law fraud by way of intentional misrepresentation; (10) breach of license agreement; (11) breach of

/////

/////

[6] The first counterclaim of defendant's TAA is premised upon allegations made against FMMI (Doc. No. 91 at 46), and the second and third counterclaims appear to be premised upon similar, if not identical, allegations made against FMMI, Magic Straws, Reach, Tollefson, Henson, DCG, and Diversified counter defendants (*id.* at 48–50).

license agreement;[7] (12) breach of contract for violation of the first amendment to the 2011 license agreement; (13) rescission; and (14) breach of license agreement. (*Id.* at 44–68.) On May 6, 2020, the previously assigned district judge granted Magic Straws and FMMI's motions to dismiss the TAA in part, dismissing defendant CMPB's counterclaim six for trademark/service mark dilution without leave to amend and dismissing defendant's counterclaim thirteen for rescission without leave to amend. (Doc. No. 113.)

On July 7, 2020, the previously assigned district judge granted a motion to withdraw as attorney filed by counsel for Diversified, DCG, and Henson. (Doc. No. 115.) On March 31, 2022, defendant CMPB filed a request for entry of default against DCG and Diversified after those counter defendants failed to obtain new representation as required by Local Rule 183(a). (Doc. No. 124.) On April 4, 2022, the Clerk of the Court entered default against DCG and Diversified. (Doc. No. 125.) On October 5, 2022, this case was re-assigned to the undersigned. (Doc. No. 132.)

On September 3, 2025, the parties filed their respective motions for summary judgment. (Doc. Nos. 161, 165, 166.) On October 6, 2025, the parties filed their oppositions to each other's motions for summary judgment. (Doc. Nos. 170, 171.) On October 6, 2025, the parties filed their replies in support of their motions for summary judgment. (Doc. Nos. 171, 172.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including

---

[7] Defendant CMPB's ninth claim for breach of the licensing agreement asserted in the TAA is premised upon Henson and FMMI's alleged non-payment of royalties, and the tenth claim is premised upon FMMI's alleged breach of a term that provided defendant the right to audit FMMI's books and records. (Doc. No. 91 at 58–61.)

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party will bear the burden of proof on an issue at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, after adequate time for discovery and upon motion, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd sub nom. Richards v. Neilsen Freight Lines*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87 (citations omitted).

Finally, "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) (quoting *Interstellar Starship Servs., Ltd. v. EpixInc.*, 184 F3d 1107, 1109 (9th Cir. 2012)).

**DISCUSSION**

The defendant CMPB moves for summary judgment in its favor on plaintiff's sole claim for declaratory relief. (Doc. No. 166-1.) Counter defendants FMMI, Magic Straws, Reach, and Tollefson move for summary judgment in their favor on all fourteen of defendant's counterclaims

/////

as asserted in CMPB's TAA.[8] (Doc. Nos. 161, 165.) Below, the court addresses each of the parties' motions in turn.

**A. Defendant CMPB's Motion**

Defendant CMPB moves for summary judgment in its favor as to plaintiff FMMI's sole claim for declaratory judgment. (Doc. No. 166.) Defendant's argument is two-fold: (1) the doctrine of licensee estoppel bars plaintiff from bringing a naked licensing claim; and (2) even if licensee estoppel does not apply, plaintiff cannot satisfy the burden required to prevail on its naked licensing claim. (*Id.* at 3–10.)

1. Naked Licensing and Licensee Estoppel

As noted, defendant CMPB moves for summary judgment in its favor as to plaintiff FMMI's naked licensing claim based upon the argument that the doctrine of licensee estoppel precludes plaintiff from challenging the validity of defendant's trademark. (Doc. No. 166-1 at 3–4.) In opposition, plaintiff contends that defendant abandoned the mark when it failed to exercise quality control over it and therefore fails to satisfy the public interest prong under the balancing test set forth in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969). (Doc. No. 169 at 6–8.) In reply, defendant argues that plaintiff has not shown that the Ninth Circuit has extended *Lear*'s holding to the trademark context such as is involved in this case, but even if it does, plaintiff has failed to come forward with evidence on summary judgment that defendant failed to exercise control over the use of the mark. (Doc. No. 172 at 2–3.)

"As a general matter, trademark owners have a duty to control the quality of their trademarks." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir. 2010) (citation omitted). "It is well-established that '[a] trademark owner may grant a license and

[8] This includes defendant CMPB's claim for trademark dilution and rescission. (Doc. No. 162 at 9, 14.) As noted above, the previously-assigned district judge dismissed those claims without leave to amend. (Doc. No. 113 at 19–20.) Accordingly, counter defendants FMMI, Magic Straws, Reach, and Tollefson's motion for summary judgment in their favor on those claims is denied as having been rendered moot. *Teton Glob. Invs. LLC v. LC Inv. 2010, LLC*, No. 20-cv-01756-AJB-MSB, 2021 WL 4974857, at *8 (S.D. Cal. Oct. 26, 2021) (denying as moot motion for summary judgment on a claim that was previously dismissed without leave to amend), *aff'd*, No. 21-56239, 2022 WL 10385051 (9th Cir. Oct. 18, 2022).

remain protected provided quality control of the goods and services sold under the trademark by the licensee is maintained.'" *Barcamerica Int'l USA Tr. v. Tyfield Imps, Inc.*, 289 F.3d 589, 595 (9th Cir. 2002) (quoting *Moore Bus. Forms, Inc. v. Ryu,* 960 F.2d 486, 489 (5th Cir.1992)). A licensor's failure to exercise adequate control over the quality of its trademark may result in a finding that the licensor engaged in "naked licensing", which has been described as follows:

> "Naked licensing" occurs when the licensor "fails to exercise adequate quality control over the licensee." [*Barcamerica Int'l USA Tr.*, 289 F.3d] at 596. Naked licensing may result in the trademark's ceasing to function as a symbol of quality and a controlled source. Id. (citing McCarthy § 18:48). We have previously declared that naked licensing is "inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Id.* at 598. "Consequently, where the licensor fails to exercise adequate quality control over the licensee, 'a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark.'" *Id.* at 596 (quoting Moore, 960 F.2d at 489).

*FreecycleSunnyvale*, 626 F.3d at 515–16. Courts "analyze[] three areas of control relevant to decide whether a licensor exercises adequate control over its marks:" (1) "whether the license contained an express contractual right on the part of the licensor to inspect and supervise the licensee's operations;" (2) "whether the licensor exercised actual control of the licensee's operations;" and (3) "whether the licensor reasonably relied on the licensee to maintain quality control." *F19 Franchising, LLC*, 2023 WL 11950376, at *6 (citing *Barcamerica*, 289 F.3d at 596–97).

In *Lear Inc. v. Adkins*, the Supreme Court abandoned the licensee estoppel doctrine in the patent context and held that courts must balance the private interest in enforcing contracts against the public interest in the use of ideas when a licensee seeks to challenge the validity of a licensor's patent. 395 U.S. 653, 670–71 (1969). Here, as a preliminary matter, plaintiff asks this court to apply the holding in *Lear* in analyzing whether licensee estoppel prohibits it from challenging the validity of defendant CMPB's ownership in the mark. (Doc. No. 169 at 6.) The Ninth Circuit has extended the holding in *Lear* only to the certification mark context, and has recognized that "[c]ertification marks[] . . . differ from trademarks in a number of significant ways." *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 716

(9th Cir. 2005) ("A certification mark is a special creature created for a purpose uniquely different from that of an ordinary trademark or service mark.") (quoting 2 *McCarthy on Trademarks and Unfair Competition*, §19:91 (4th ed. 2005)).

Since the decision in *G &T Terminal Packaging, Inc*, courts in this circuit have continued to acknowledge that "[i]t is a 'long settled principle of law that a licensee . . . of a trademark or trade name may not set up any adverse claim in it as against its licensor.'" *F19 Franchising, LLC*, 2023 WL 11950376, at *9 (quoting *Pac. Supply Co-op. v. Farmers Union Cent. Exch. Inc.*, 318 F.2d 894, 908 (9th Cir. 1963)). "The licensee estoppel doctrine precludes a licensee from challenging the validity of the licensor's trademark based upon conduct that occurred during the life of its license, particularly with respect to the licensee itself." *Monster, Inc. v. Dolby Lab'ys Licensing Corp.*, 920 F. Supp. 2d 1066, 1076–77 (N.D. Cal. 2013) (citing cases).

In support of the argument that this court should apply *Lear* in the trademark context of this case, plaintiff cites to *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472 (9th Cir. 1986). (Doc. No. 169 at 6–7.) There, the Ninth Circuit held that the district court abused its discretion in denying the plaintiff's Rule 56(f) request for discovery regarding defendant's mailing lists and customer responses because this information related to the issue of public confusion. *VISA Int'l Serv. Ass'n*, 784 F.2d at 1475. In so holding, the court stated that "a party entering into a settlement agreement with respect to a trademark will be held to his contract unless enforcement of the contract would result in injury to the public through confusion." *Id.* at 1473. Importantly, both the context surrounding the parties' dispute and the agreement at issue in *VISA* were quite different from the present case. As the Ninth Circuit stated in *VISA*:

> BCH, an association whose membership is comprised of holders of bank credit cards, mailed offers of various kinds of insurance to holders of VISA credit cards. VISA sued BCH for trademark infringement, claiming that BCH's use of the VISA name and logo on its mass mailings misled consumers into believing that VISA was connected with BCH's offer of insurance.
>
> In March 1981, VISA and BCH entered into a Settlement Agreement, which was implemented by means of a Stipulated Judgment. In essence the two documents provided that BCH could use the VISA name to indicate membership requirements of BCH or means of payment. BCH was prohibited, however, from using the VISA name in a way that would cause public confusion by

> suggesting that VISA had sponsored or approved the offering. An exemplar of permissible use of the VISA mark was attached to the Settlement Agreement. The Stipulated Judgment provided that the court retained jurisdiction to effectuate and enforce it.
>
> In April 1982, VISA returned to district court seeking relief from the Stipulated Judgment under essentially two theories, each of which has two components:
>
> a. Rescission or modification of the Stipulated Judgment, on the ground that it was causing injury to the public because of confusion.
>
> b. Enforcement or clarification for purposes of enforcement, on the ground that BCH was violating the terms of the Stipulated Judgment.

*VISA Int'l Serv.*, 784 F.2d at 1473. The issue of public confusion was of great importance to the Ninth Circuit in *VISA* because the stipulated judgment expressly "used the test of public confusion to circumscribe BCH's use of the VISA marks[.]" *Id.* Moreover, and as defendant correctly notes in its reply (Doc. No. 172 at 2–3), the decision in *Lear* was not even mentioned by the Ninth Circuit in *VISA Int'l Serv*. Indeed, the public confusion analysis in VISA was strictly a product of the parties' stipulated judgment. The court is unpersuaded that the holding in *VISA Int'l Serv.* stands for the proposition that *Lear*'s balancing test is to be applied when a trademark licensor invokes the licensee estoppel doctrine in response to a licensee's naked licensing claim. Plaintiff FMMI fails to explain in what way the decision in *VISA Int'l Serv.* applies here where no contract in the form of a settlement agreement is at issue. Accordingly, the court rejects plaintiff's position that the decision in *Lear* has any application in the present case.

Defendant argues that licensee estoppel applies here because plaintiff challenges defendant's ownership of the mark based upon facts which arose during the terms of the license. (Doc. No. 166-1 at 4.) Specifically, defendant argues that the parties entered a license agreement in which plaintiff was required to expressly acknowledge "the validity of, and [defendant's] ownership of, the federally registered Mark, and any U.S. Patent and Trademark Office applications and/or registrations thereto, agrees that it will do nothing inconsistent with such ownership and agrees that all use of the Mark by LICENSEE shall inure to the benefit of [defendant]." (Doc. No. 166-1 at 4.)

/////

In opposing summary judgment, plaintiff relies almost exclusively upon evidence pertaining to itself, as a licensee, during the term of the licensing agreement with CMPB. (Doc. No. 169 at 8–12.) Plaintiff, however, is precluded from challenging defendant CMPB's ownership of the mark based upon evidence of the interactions between plaintiff and defendant during the lifetime of the agreement. *See TAP Mfg., LLC v. Signs*, No. 2:15-cv-00797-SVW-PJW, 2015 WL 12752874, at *3 (C.D. Cal. July 23, 2015) ("Under the doctrine of licensee estoppel, a licensee is precluded from 'challenging the validity of the licensor's trademark based upon conduct that occurred during the life of its license, particularly with respect to the licensee itself" and "[t]hus a licensee may not assert that the licensor's mark is invalid because the licensor granted a naked license to the licensee.") (citing cases).

The court observes that, in its opposition, plaintiff FMMI both refers to and offers some evidence pertaining to a third party that defendant CMPB granted a license in the mark, Bridge Brands. Specifically, plaintiff cites to deposition testimony from Tollefson in which he testified to the state of the manufacturing plant that Bridge Brands used to produce its own line of milk straws. (Doc. No. 169-3 at 6.) Tollefson testified that the factory used by Bridge Brands used an inferior straw design, lacked a clean room atmosphere, and implemented questionable health standards. (*Id.* at 7–8.) Plaintiff also cites to the deposition of CMPB's director Stephen James ("James") at which James testified that he told FMMI representatives that FMMI would need to "work out something on their own" with Bridge Brands regarding how FMMI and Bridge Brands would market similar products. (Doc. No. 169-4 at 19–20.) Courts across the country generally agree that a licensee would not be judicially estopped from challenging the validity of the mark based upon a theory that the licensor conferred a naked license on a third party. *See STX, Inc. v. Bauer USA, Inc.*, No. 96-cv-01140-FMS, 1997 WL 337578, at *11 (N.D. Cal. June 5, 1997) (concluding that licensee estoppel did not apply to theories and arguments regarding the licensor's conduct or treatment of third-party licensees); *Westco Grp., Inc. v. K.B. & Assocs., Inc.*, 128 F. Supp. 2d 1082, 1090 (N.D. Ohio 2001) ("The Court finds that licensee estoppel does not stop Defendant K.B. & Associates' claim that Plaintiff Westco abandoned the trademark and trade name through naked licensing to a third party. The case for applying the licensee estoppel

doctrine is 'weak when the licensee asserts a lack of control by the licensor over other users.'") (citation omitted); *cf. John C. Flood of Va., Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d 90, 98 (D.D.C. 2010) ("The equitable considerations that justify licensee estoppel are particularly relevant in this case given that Virginia Flood is the only licensee. Had Virginia Flood pointed to other licensees the quality of whose services had also declined due to inadequate control by 1996 Flood and its predecessors, the scales might have tipped against licensee estoppel."), *judgment entered*, No. 06-cv-01311-RJL, 2010 WL 2640462 (D.D.C. June 30, 2010), and *aff'd and remanded*, 642 F.3d 1105 (D.C. Cir. 2011).

Plaintiff's reference to Bridge Brands in its opposition may suggest an argument that defendant abandoned the mark by way of its treatment of this third party. If so, plaintiff only makes this suggestion in passing in the section of its opposition in which it argues the court should apply the holding in *Lear* in this case. (Doc. No 169 at 7) ("In this case, CMPB exercised virtually no control over the Mark, including having two licensees who sold the same product in two distinct packages and used two different manufacturers, creating confusion in the marketplace."). The court will not address any argument regarding defendant's treatment of Bridge Brands because plaintiff simply does not argue how the factors identified by the court in *Barcamerica* as relevant apply here. "[I]t is not the role of the [c]ourt to make parties' arguments for them." *Atl. Specialty Ins. Co. v. Top Sealand Int'l Co.*, No. 2:22-cv-04468-MCS-GJS, 2024 WL 1699361, at *4 (C.D. Cal. Mar. 6, 2024) (declining to address potential alternative grounds for summary judgment that were raised but not developed in an opposition).

Therefore, the court concludes that licensee estoppel applies to FMMI's claim asserted in its FAC and that no genuine dispute of material fact has been established as to that claim. Accordingly, defendant CMPB's motion for summary judgment in its favor as to this claim will be granted.

/////

/////

/////

/////

**B. Counter Defendants' Motion**[9]

1. <u>Alter Ego Liability</u>

FMMI, Magic Straw, Reach, and Tollefson, as counter defendants, first move for summary judgment in their favor on defendant's alter ego theory of liability. (Doc. No. 162 at 4.) The alter ego doctrine provides that if the "corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." *Sonora Diamond Corp. v. Sup. Ct.*, 83 Cal. App. 4th 523, 538 (2000); *see also Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist.*, No. 3:09-cv-02324-GPC-KSC, 2014 WL 67377, at *8 (S.D. Cal. Jan. 8, 2014) ("The alter ego doctrine applies equally to individuals, corporations, and limited liability companies that seek to evade responsibility for their actions."). In this action, defendant CMPB's claims raising alter ego liability allegations are: (1) fraud against Henson and FMMI and against remaining counter defendants as their alter egos; (2) three separate counts of breach of a license agreement against FMMI and remaining counter defendants as alter egos; and (3) breach of a license agreement against DCG and Diversified and against remaining counter defendants as alter egos of these parties. (Doc. No. 91 at 58–63, 66–68.)

The parties agree that Minnesota law applies to the issue of alter ego liability. (Doc. Nos. 162 at 4; 170 at 4.) The parties' position as to the applicable state law in this regard reflects, in the court's view, a misapprehension of how alter ego liability operates. It is undisputed that FMMI is a corporation, not a limited liability company. (Doc. No. 11 at ¶ 5) (Plaintiff's FAC

---

[9] In a very confusing argument, defendant CMPB contends, without citation to authority, that because counter defendants "did not request summary adjudication, if there is a genuine issue of material fact related to any of CMPB's claims, the motion for summary judgment must be denied." (Doc. No. 170 at 12.) While unclear, defendant may be suggesting that, because counter defendants are moving for summary judgment in their favor on all of defendant's counterclaims, the court may only grant the motion for summary judgment in their favor if counter defendants have shown an absence of a genuine dispute of material fact as to all of defendant's counterclaims. Put another way, it appears that defendant is suggesting that the court may not grant counter defendants' motion for summary judgment in part. However construed, the court rejects the argument as meritless.

alleging that "Plaintiff Food Market Merchandising, Inc. ('FMMI') is a Minnesota Corporation, with a principal place of business located at 6401 106th Street, Bloomington, MN 55438.") (cleaned up); (Doc. No. 114 at ¶ 38) (counter defendants' answer to defendant's TAA stating that "FMMI admits that it is a Minnesota Corporation" in answer to Defendant's counterclaims alleging alter ego liability all arise under state law, over which this court has supplemental jurisdiction).

Ordinarily, "[w]hen a federal court exercises supplemental jurisdiction, 'the federal court applies the choice-of-law rules of the forum state[.]'" *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1067 (9th Cir. 2007) (quoting *Paracor Inf., Inc. v. Gen Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996)). California law further provides that:

> [T]he forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event [that party] must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it.

*Wash. Mut. Bank, FA v. Sup. Ct.*, 24 Cal. 4th 906 (2001) (alteration in original) (internal quotation marks omitted) (quoting *Bernhard v. Harrah's Club*, 16 Cal.3d 313, 317–18 (1974), *superseded by statute on other grounds*, Cal. Civ. Code § 1714). Thus, under ordinary choice-of-law principles, California law must be applied to defendant CMPB's counterclaims asserted against FMMI, Henson, DCG, and Diversified to determine the alter ego liability, if any, of the other counter defendants as to each of these claims.[10]

For corporations, courts situated in California, by default, apply California law to impose alter ego liability on other entities for the corporation's debts. *S.E.C. v. Hickey*, 322 F.3d 1123, 1129 (9th Cir. 2003) (explaining how California law applied in an action where a party sought to satisfy a judgment against a corporation by reaching the assets of an individual as an alter ego of the corporation), *opinion amended on denial of reh'g sub nom. Sec. & Exch. Comm'n v. Hickey* 335 F.3d 834 (9th Cir. 2003). However, because counter defendants have invoked Minesota law

---

[10] While not entirely clear, it appears that the parties are focused on the state of incorporation of Reach, and Magic Straws, since those counter defendants are the only limited liability companies which were incorporated in Minnesota. (PSUF ¶¶ 6, 11.)

as to all of defendant CMPB's counterclaims against FMMI, California's governmental interest test would apply in determining whether California or Minnesota's alter ego law applies to the counterclaims directly asserted against FMMI. *Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1395 (2011) (noting that when two states potentially have competing interests in having their laws applied to a case, "California applies a governmental interest analysis to examine potential conflict of law issues"). However, because the parties have failed to even address the governmental interest test, the court is unable to determine whether the alter ego law of Minnesota or California applies in determining whether Magic Straws, Reach, Tollefson, DCG, and Diversified are alter egos of FMMI. *Cen Com Inc. v. Numerex Corp.*, No. 17-cv-00560-RSM, 2018 WL 4184335, at *5 (W.D. Wash. Aug. 31, 2018) (denying a motion for summary judgment on a claim for intentional interference with a contract where both parties failed to address the choice-of-law issue on principles of contract interpretation). Indeed, as one court explained:

> Neither CCA, in its motion for summary judgment, nor Miller, in his opposition to that motion, briefs the choice-of-law issue. Instead, both parties assume that Alaska law governs Miller's negligence and contract claims. But because Miller's injury occurred in Arizona, it is not clear that Alaska law will govern his negligence claim. And even though the contract at issue provides that it should be interpreted under Alaska law, courts are not always bound to apply the law chosen by parties to a contract.

*Miller v. Corr. Corp. of Am.*, No. 03-cv-00226-JWS, 2005 WL 846201, at *1 (D. Alaska Jan. 19, 2005) (footnotes omitted). Accordingly, the court is unable to assess whether FMMI should be pierced to reach the remaining counter defendants because defendant CMPB has failed to engage in any choice-of-law analysis in connection with the pending motions.

With respect to defendant's counterclaims against DCG and Diversified, Delaware law would apply in the court's view because those limited liability companies were incorporated in Delaware. Cal. Corp. Code § 17708.01 ("The law of the state or other jurisdiction under which a foreign limited liability company is formed governs . . . [t]he liability of a member as member and a manager as manager for the debts, obligations, or other liabilities of the limited liability company."). Thus, defendant's counterclaim against DGC and Diversified requires application of

Delaware law to determine alter ego liability because these LLCs were incorporated in Delaware. *Pro 49 Dev., LLC v. Ness Express 1, LLC*, No. 2:24-cv-01850-JAM-JDP, 2024 WL 4712389, at *2 (E.D. Cal. Nov. 7, 2024) ("Accordingly, federal courts in California apply the law of the state of incorporation in assessing the alter ego of an LLC."). However, the parties have also failed to discuss the applicability of Delaware law with regard to defendant's claims against DGC and Diversified.

As to defendant's counterclaim against Henson, this theory of alter ego liability would be premised upon outside reverse piercing the corporate veil, which "occurs when a third party outsider seeks to reach corporate assets to satisfy claims against an individual shareholder." *Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal. App. 4th 1510, 1518 (2008). Again, no party has addressed the applicability of outside reverse piercing to the individual counter defendant. Because the parties have failed to address the law applicable to the ego liability of FMMI, Henson, DGC, or Diversified, the court declines to rule on the issue at summary judgment.

Accordingly, the court will deny counter defendants' FMMI, Magic Straws, Reach, Tollefson, DCG, and Diversified's motion for summary judgment in their favor as to defendant's alter ego theory of liability and, because counter defendants failed to address the applicability of Delaware law, the court will also deny counter defendants' motion for summary judgment in their favor with respect to defendant CMPB's fourteenth claim for breach of the licensing agreement brought against counter defendants DGC and Diversified and all remaining counter defendants in an alter ego capacity.

2. Trademark/Service Mark Claims (Claims 1–5, 7–8)

Counter defendants FMMI, Magic Straws, Reach, and Tollefson move for summary judgment in their favor on counterclaims one through five and seven in defendant CMPB's TAA. Those counterclaims are as follows: (1) three separate counts of trademark/service mark infringement; (2) an unfair competition claim; (3) a false designation of origin claim; (4) a counterfeiting claim; and (5) a contributory trademark infringement claim. (Doc. No. 162 at 6–10.) In arguing that these claims should be dismissed, counter defendants insist that, because FMMI sold genuine goods during the term of the license agreement, there is no likelihood of

confusion as to the origin of those goods. (*Id.* at 8–10.) Counter defendants also argue throughout the motion that, pursuant to the first sale doctrine, defendant CMPB's right to control goods bearing the mark was extinguished after the first sale of those goods was conducted. (*Id.* at 8–10.)

The court first observes that, while several of these counterclaims are premised on different causes of action brought by plaintiff, the test for the sufficiency of each claim is either identical or involve similar considerations no matter how it is brought. *See Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079 (9th Cir. 2020) ("[T]here is nothing in the statutory language of Section 1114 that suggests that a counterfeit claim should be construed differently from an infringement claim.") (internal quotation marks and citation omitted); *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098 (9th Cir. 2016) (describing the eight factor test that courts apply in determining whether consumer confusion is present in a trademark infringement claims on summary judgment); *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012) ("[T]rade and service marks are analyzed under the same basic 'likelihood of confusion' framework."); *Guru Denim LLC v. Sweet People Apparel Inc.*, No. 2:24-cv-00407-MEMF-MAA, 2025 WL 2019222, at *7 (C.D. Cal. June 24, 2025) (noting that the elements of a trademark infringement claim are "(1) it has a valid and protectable mark and (2) [the alleged infringer's] use of the mark is likely to cause consumer confusion.") (citation omitted); *Talavera v. Glob. Payments, Inc.*, 670 F. Supp. 3d 1074, 1105 (S.D. Cal. 2023) (stating the elements of false designation of origin are "(1) the defendant use[d] in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services."); *Mine O'Mine, Inc. v. Calmese*, No. 2:10-cv-00043-KJD, 2011 WL 2728390, at *8 (D. Nev. July 12, 2011) ("The test for unfair competition under both common-law and the Lanham Act is identical to the test used for trademark infringement."), *aff'd*, 489 F. App'x 175 (9th Cir. 2012); *Bangkok Broad. & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1118 (C.D. Cal. 2010) ("The two elements for contributory trademark infringement are[:] . . . (1) supply of a product[;] and (2) knowledge of the direct infringement.") (alterations in original) (citation omitted).

Finally, "[t]he 'first sale' doctrine states that once a product enters the market, its trademark is not infringed by subsequent sales." *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1100 (S.D. Cal. 2018). "It is the essence of the 'first sale' doctrine that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995).

Here, in moving for summary judgment on defendant CMPB's various trademark infringement claims, counter defendants FMMI, Magic Straws, Reach, and Tollefson state in conclusory fashion that FMMI sold all of the goods within its possession during the term of the license with defendant CMPB, but do not point to any evidence before the court on summary judgment that definitively establishes as much. (Doc. No. 162 at 6–10.) To be sure, there is evidence that FMMI sold some goods to Magic Straws. For example, counter defendants have presented the deposition testimony from Lauren Sutton ("Sutton") of Beanstalk. (Doc. No. 164-7.) In that testimony, it was revealed that Henson informed Sutton that Magic Straws was distributing milk straws bearing the mark.[11] Counter defendants also cite to Tollefson's deposition in which he testified that FMMI "bought the product" and sold it "to Magic Straws" who then sold and distributed those products to "third parties," "retailers" and, in some cases "[d]irect to consumers."[12] (Doc. No. 164-3 at 12.) Counter defendants also cite to evidence on summary judgment that relates to their assertion that defendant had no control over to whom FMMI could sell products bearing the mark. (Doc. Nos. 164-1; 164-2; 164-4.)

While this evidence shows that there were some authorized sale of genuine goods from FMMI to Magic Straws, it does not support counter defendants' contention that *every* good

---

[11] Counter defendants cite to a page from Sutton's testimony that appears to have been omitted from the excerpt from her deposition that they attach in support of their motion. However, the court reviewed the entire transcript from Sutton's deposition and confirmed that this email exchange exists.

[12] The court finds this evidence to be arguably inconclusive because he testified only that he "believe[d] it's possible" that Magic Straws ordered and started selling product in 2011, but he could not "go into [his] system, run [] a report and send it over[]" because "there's no way to do that." (Doc. No. 164-3 at 11.)

produced by FMMI bearing the mark was lawfully sold. "A party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B) (emphasis added). Indeed, counter defendants' insistence that an authorized sale of all goods occurred does not address the bases upon which defendant's trademark/service mark claims rest: (1) that counter defendants sold flavored milk straws past their expiration date; (2) that display cases bearing the mark were used to sell, display, and advertise products that either bore non-genuine designations of the mark or lacked the mark entirely; and (3) that packaging bearing the mark was used without defendant's approval. (Doc. No. 91 at 45–46, 48, 51–52, 56.) Counter defendants' missing of the mark in this regard is important in light of defendant's allegations that the goods were expired.

Under the first sale doctrine, "the trademark holder may establish infringement only if he demonstrates that the goods are materially different." *Grateful Palate, Inc. v. Joshua Tree Imports, LLC*, 220 F. App'x 635, 637 (9th Cir. 2007). "The resale of a materially different product constitutes trademark infringement because the product is not genuine and may cause confusion regarding the product's source, quality, or sponsorship." *Garmon Corp. v. HealthyPets, Inc.*, No. 5:18-cv-00809-ODW-SHK, 2019 WL 2145455, at *2 (C.D. Cal. May 16, 2019). Other courts have noted that goods may be materially different when they are expired which therefore might counsel against shielding sellers from liability under the first sale doctrine. *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 852–54 (N.D. Tex. 2009). In sum, while there is some evidence before the court on summary judgment that FMMI sold goods to Magic Straws and that Magic Straws sold goods to third parties, that evidence does not establish that that counter defendants are entitled to summary judgment in their favor on all of defendant's trademark/service mark counterclaims under the first sale doctrine.

Accordingly, the court will deny summary judgment in favor of counter defendants FMMI, Magic Straws, Reach, and Tollefson on defendant CMPB's counterclaims 1–5 and 7–8.

/////

3. Fraud (Claim 9)

FMMI, Magic Straws, Reach, and Tollefson next move for summary judgment in their favor with respect to defendant CMPB's fraud claim. (Doc. No. 162 at 10.) Specifically, they argue that CMPB has failed to present evidence on summary judgment that FMMI's representations regarding outstanding royalty payments were false, that those statements were made with the intent to induce reliance, or that any such statements resulted in defendant's actual and justified reliance. (*Id.* at 10–12.) In opposition, defendant CMPB contends that the difference between actual sales during the relevant period and sales reported to defendant along with the cursory nature of the 2014 royalty report raises a genuine dispute of material fact as to whether FMMI made fraudulent representations.[13] (Doc. No. 170 at 7–9.)

"The elements of a fraud/intentional misrepresentation claim are: (1) a misrepresentation, (2) knowledge of falsity, (3) intent to defraud, (4) justifiable reliance, and [(5)] resulting damage." *Ives v. Allstate Ins. Co.*, 520 F. Supp. 3d 1248, 1257 (C.D. Cal. 2021) (citing *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996)). "With respect to the issue of an actionable misrepresentation, to 'constitute fraud, the misrepresentation [ ] must be a material and knowingly false representation of fact.'" *Musk v. Altman*, 818 F. Supp. 3d 1109, 1126 (N.D. Cal. 2026) (alteration in original) (quoting *Huntsman* v. *Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 790 (9th Cir. 2025)).

Defendant CMPB's fraud claim is premised upon unpaid royalties from mid-2012 to early 2014. (Doc. No. 91 at ¶ 169) (alleging that in or about February or March 2014, "FMMI had not paid any royalties to CMPB under the 2011 License Agreement for approximately 1 ½ years."). In its opposition, defendant CMPB states that, in 2014, it received a royalty report from FMMI

[13] While defendant does not respond to counter defendants' other arguments, an opposing party's non-opposition does not, by itself, constitute grounds to grant summary judgment in favor of the moving party. *See Leramo v. Premier Anesthesia Med. Grp.*, No. 09-cv-02083-LJO-JTL, 2011 WL 2680837, at *8 (E.D. Cal. July 8, 2011) (noting that when arguments are unopposed, the court still must consider whether the moving party is entitled to judgment as a matter of law), *aff'd*, 514 F. App'x 674 (9th Cir. 2013); *see also Cristobal v. Siegel*, 26 F.3d 1488, 1495 (9th Cir. 1994) ("A court should deny a motion for summary judgment if the movant's papers themselves demonstrate the existence of a material issue of fact.") (cleaned up).

representing all royalties owed from 2012 through the second quarter of 2014 were $338,990.78 based upon $4,842,583 in sales. (Doc. No. 170 at 8.) CMPB argues that this number is much lower than the numbers that Robert Spinner ("Spinner"), a former FMMI salesperson, testified was earned from the sale of straws bearing the mark throughout 2012 and 2013. (*Id.*) In support of this contention, defendant CMPB relies upon Spinner's deposition testimony and a written commission breakdown Spinner submitted with an affidavit he filed in his own employment action brought against FMMI, reflecting that he sold approximately $16 million worth of milk straws bearing the mark in 2012. (Doc. No. 170-24 at 8.)

Counter defendants FMMI, Magic Straws, Reach, and Tollefson argue that Beanstalk, the agent that CMPB hired to manage all of its trademark license agreements, reviewed and verified the accuracy of the royalty report detailing the $338,990.78 due in royalty payments. (Doc. No. 162 at 11.) In support of this position, counter defendants cite to an email thread between Aaron Bible ("Bible"),[14] who Tollefson directed Beanstalk to coordinate with, and Beanstalk's team, where Beanstalk asked Bible to confirm that the 2013 report reflected that $338,980.78 in royalties were due from the period between November 2, 2011 to December 31, 2013. (Doc. No. 164-9.) The evidence before the court on summary judgment creates a genuine dispute of material fact as to the misrepresentation element of defendant CMPB's fraud claim. Spinner's deposition testimony and the report he submitted in his employment action paint a different picture as to FMMI's profits during the period in question. Drawing all reasonable inferences in favor of defendant CMPB as the non-moving party, the court concludes that CMPB has presented evidence of the existence of a genuinely disputed issue of material fact as to the misrepresentation element of the fraud claim.

In moving for summary judgment, FMMI, Magic Straws, Reach, and Tollefson also argue that defendant CMPB did not actually rely on any false representations when it executed the first amendment with FMMI because CMPB had access to the report on overdue royalties for almost two months before entering into the amended license agreement and also because CMPB's agent

[14] Bible worked for counter defendant Reach.

Beanstalk verified the amount owed. (Doc. No. 162 at 12.) To establish reliance, defendant CMPB "must show (1) that [it] actually relied on the [counter defendants'] misrepresentations, and (2) that [it was] reasonable in doing so." *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 863 (2007) (citing 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 808, at pp. 1164–1165, § 812, at pp. 1173–1174), *as modified* (Dec. 26, 2007); *see also Ohio Six Ltd. v. Motel 6 Operating L.P.*, No. 11-cv-08102-MMM-EX, 2012 WL 12886208, at *15 (C.D. Cal. Nov. 16, 2012) (noting that, in assessing justifiable reliance, courts must consider the "individual plaintiff's sophistication, experience and competence[]" and that the "plaintiff must show that circumstances were such to make it reasonable for him to accept defendant's statements without an independent inquiry or investigation.") (cleaned up).

Here, drawing all reasonable inferences in favor of defendant CMPB as the party opposing summary judgment, there is at minimum a genuine dispute of material fact as to reliance. In her communications with Bible, Sutton expressly stated that defendant depended upon the 2013 royalty report in drafting the amendment. (Doc. No. 170-28 at 3) (email chain between Sutton and Bible where Sutton informed Bible that "[i]n order to finalize this new arrangement, we will need to receive your 2013 royalty reports" and defendant would "need to reference" the actual total earned royalties in the amendment). From this same evidence before the court on summary judgment, intent can also be inferred. *Ohio Six Ltd.*, 2012 WL 12886208, at *15 ("Under California law, a '[d]efendant's intent to induce plaintiffs to alter their position can be inferred from the fact that he made the representations with knowledge that plaintiffs would act in reliance on them.'") (citing cases). Finally, it is almost always the case that "fraudulent intent is an issue for the trier of fact to decide." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1061 (2012) (citation omitted).

As to the reasonableness of defendant CMPB's reliance, there is something to be said about CMPB's sophistication with licensing agreements given that it has conferred numerous licenses to other licensees. (Doc. No. 166-20 at ¶ 22) (declaration from James stating that CMPB "licensed the got milk? marks hundreds of times to consumer brands including some of the most well-known and successful brands in the market to promote the consumption of fluid milk in the

State of California").[15] It is undisputed that the parties before the court had an arguably longstanding business relationship and there was no indication that FMMI was "being anything less than forthright." *Ohio Six Ltd.*, 2012 WL 12886208, at *17 (concluding that a party was justified in relying on representations despite being arguably the more sophisticated of the parties since the parties had a long-standing relationship and there was no indication that misrepresentations were being made).

For these reasons, the court concludes that a genuine issue of disputed material fact with respect to defendant CMPB's ninth claim for fraud has been shown to exist based upon the evidence presented on summary judgment. Accordingly, counter defendants FMMI, Magic Straws, Reach, and Tollefson's motion for summary judgment in their favor on defendant CMPB's fraud claim will be denied.

4. Breach of Licensing Agreements (Claims 10–11)[16]

Counter defendants FMMI, Magic Straws, Reach, and Tollefson next move for summary judgment in their favor on defendant CMPB's breach of licensing agreement claim. (Doc. No. 162 at 12.) As with ordinary contracts, "trademark license agreements are governed by general principles of contract law." *2Die4Kourt v. Hillair Cap. Mgmt., LLC*, No. 16-cv-01304-JVS-DFM, 2016 WL 4487895, at *5 (C.D. Cal. Aug. 23, 2016), *aff'd*, 692 F. App'x 366 (9th Cir. 2017). To prevail on these claims, defendant must satisfy the following elements: "a valid

[15] Counter defendants object to this evidence as "conclusory, speculative, and argumentative as to the terms 'Hundreds,' 'well-known,' and 'successful.'" (Doc. No. 169-1 at ¶ 9.) The objection is overruled because "objections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

[16] Counter defendants also move for summary judgment in their favor on defendant's twelfth claim for breach of licensing agreement. (Doc. No. 162 at 14.) However, in so moving, counter defendants simply re-iterate their arguments that the counter defendants are not alter egos of one another and any alleged sales of the milk straws bearing the mark were valid sales of genuine products subject to the first sale doctrine. Counter defendants fail to cite any evidence in support of their motion in this regard. (*Id.*) The court rejects counter defendants' arguments regarding alter ego liability and the applicability of the first sale doctrine for the reasons previously stated in this order. Accordingly, counter defendants' motion for summary judgement in their favor on defendant's twelfth counter claim will also be denied.

contract, [defendant's] performance, [counter] defendant's breach and damages." *Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1144 (E.D. Cal. 2017) (citing *Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811, 821 (2011)). The court addresses each in turn.

a. *Claim 10*

Defendant CMPB's claim for breach of the licensing agreement is premised upon the agreement that it and FMMI entered into in 2011. (Doc. 91 at ¶ 182.) According to defendant CMPB, FMMI breached the 2011 agreement by filing this trademark suit against CMPB in direct violation of the terms of the parties' agreement. (Doc. No. 91 at 60–61.)

In moving for summary judgment on defendant's breach claim, counter defendants have pointed to no evidence establishing that defendant CMPB failed to respond to or approve of any products sent to it during the period the 2011 license agreement was in effect. In this regard, counter defendants FMMI, Magic Straws, Reach, and Tollefson rely upon the deposition testimony from Tollefson in which he confirmed that FMMI provided "samples to CMPB as required by" the agreement. (Doc. No. 164-3 at 9.) However, once this this statement is contextualized, it is clear that Tollefson was referring to the 2009 agreement between FMMI and defendant CMPB, not the 2011 agreement which is the agreement at the center of defendant CMPB's counter claim.[17] Defendant CMPB also only offers evidence of emails regarding review and approval of FMMI's products in 2010, which precedes the 2011 agreement. (Doc. Nos. 170-17 at 2; 170-18 at 3; 170-20 at ¶ 38.) Moreover, neither party has offered any authority for the proposition that they may rely upon such evidence to support or dispute a finding that a material breach of a subsequent agreement occurred. Thus, because neither the evidence presented on summary judgment by counter defendants nor that presented by defendant pertains to conduct that occurred during the term of the 2011 agreement, it would appear that the parties' respective evidence in favor or opposition of defendant's tenth claim for breach of the 2011 license agreement has no bearing on this claim.

---

[17] The court discerned this information after reviewing the full transcript of Tollefson's deposition, which was only submitted after the court directed the parties to do so pursuant to the local rules of this district.

Accordingly, counter defendants' motion for summary judgment in their favor on defendant's counterclaims for breach of the licensing agreement will be denied.

b. *Claim 11*

Counter defendants also move for summary judgment in their favor on defendant CMPB's eleventh claim for breach of the licensing agreement, arguing that the first amendment to the licensing agreement terminated the audit provision originally included in the 2011 agreement. (Doc. No. 162 at 13–14.) Defendant CMPB argues that the first amended license agreement amended the agreement to terminate at an earlier date, but the post-termination three-year right to audit FMMI's books and records remained unaffected. (Doc. No. 170 at 10–11.) In support of their interpretations of the parties' agreement, the parties cite to limited evidence. Specifically, counter defendants cite to the 2011 agreement, the first amendment to the 2011 agreement, and deposition testimony from James. (Doc. No. 162 at 13.) In its opposition, defendant cites to the 2009 agreement, 2011 agreement, first amendment to the 2011 agreement, the TAA, and counter defendants' answer to the TAA. (Doc. No. 170 at 10–11.)

The parties' dispute as to this claim centers around paragraph four of the first amendment to the 2011 agreement, which provides that "[defendant CMPB], CDFA, and the State of California (or its or their authorized agent) shall have the right to perform a royalty compliance audit of [FMMI], covering all activities and records during the Term of the Agreement." (Doc. No. 164-6 at 2.) Because the parties dispute the meaning of a term in the agreement, on summary judgement "the [c]ourt must determine whether that term is reasonably susceptible to either party's interpretation." *Tessera, Inc. v. Toshiba Corp.*, No. 15-cv-02543-BLF, 2016 WL 11894761, at *6 (N.D. Cal. Nov. 16, 2016) (citing *Badie v. Bank of Am.*, 67 Cal.App.4th 779, 798 (1998)).

The parties do not dispute that the 2011 agreement and first amendment should be read together. (Doc. Nos. 170 at 10–11; 171 at 13.) The 2011 agreement includes a provision which states that FMMI "shall maintain and make available to [defendant CMPB] . . . for inspection, copying[,] and audit . . . books and records of all information relevant to the performance of" the agreement. (Doc. No. 164-2 at 3.) The 2011 agreement provides that FMMI's obligations under

that provision "shall continue for three (3) years after [plaintiff's] final payment under" the agreement. (*Id.*) The first amendment includes a provision governing audits of FMMI's records which states as follows:

> In consideration of [FMMI's] agreement to enter into this FIRST AMENDMENT and amend the Agreement's expiration date as stated in Section 2 of this FIRST AMENDMENT, [defendant CMPB] agrees to accept Two Hundred Thousand Dollars ($200,000) in full payment of the Total Royalties. In satisfaction of such amount, [FMMI] shall make the following payments to Beanstalk (on behalf of [defendant CMPB]) in accordance with the following schedule:
>
> | Payment<br>Due Date | Amount Due |
> |---|---|
> | June 8, 2014 | $35,000.00 |
> | July 1, 2014 | $35,000.00 |
> | August 1, 2014 $ | $35,000.00 |
> | September 1, 2014 | $35,000.00 |
>
> In the event that [FMMI] fails to make any of such payments on or before the applicable due date above . . . [defendant CMPB], CDFA, and the State of California (or its or their authorized agent) shall have the right to perform a royalty compliance audit of [FMMI], covering all activities and records during the Term of the Agreement.

(Doc. No. 164-6 at 1–2.)

The court can only conclude that the first amendment creates a condition precedent to defendant CMPB's rights to perform an audit during the amended term of the agreement. It makes no sense to have both this provision and the original audit provision govern the parties' agreement because the original audit provision was broad enough that it would encompass the condition set forth in the amendment. Any other reading, would violate the "the rule of contract construction which provides that a construction which renders portions of a contract surplusage should be avoided." *Berg v. MTC Elecs. Techs.*, 61 Cal. App. 4th 349, 361 (1998) (citing *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 12 (1989)). Because this new provision supplants the prior provision, the court concludes that the exclusion of the three-year audit provision means that the parties did not intend that provision to survive the

amendment. *Evox Prods. LLC v. Kayak Software Corp.*, No. 15-cv-05053-PSG-AGR, 2017 WL 5634858, at *5 (C.D. Cal. Apr. 4, 2017) (concluding that the omission of a provision from a contract that was included in a prior draft meant that provision was no longer a term of the parties' agreement); *see also* Cal. Civ. Proc. Code § 1858 ("In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."). The James deposition testimony upon which counter defendants rely does not undermine this conclusion. Although he testified that he believed that CMPB could still conduct audits of FMMI's records after the 2011 agreement, James testified that it appeared that the first amendment modified this right such that it terminated upon the final payment of the outstanding royalties. (Doc. No. 164-4 at 10.)[18]

As such, the court finds that there is no ambiguity as to the 2011 agreement—defendant CMPB's right to audit FMMI's records terminated when FMMI made the last payment in the payment schedule set forth in the 2011 agreement. Therefore, there is no genuine dispute of any material fact as to defendant CMPB's eleventh claim for breach of licensing agreement and the court will grant summary judgment in favor of counter defendants FMMI, Magic Straws, Reach, and Tollefson as to defendant's eleventh claim. *JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. 08-cv-04310-MMM-PLA, 2009 WL 10672777, at *3 (C.D. Cal. June 29, 2009) (noting that summary judgment is appropriate with respect to contract interpretation issues where there is no evidence supporting an interpretation urged by the opposing party).

**CONCLUSION**

For the reasons explained above,

1. Counter defendants' Food Market Merchandising Inc., Magic Straws, LLC, Reach Companies, LLC; and Jon Tollefson's motion for summary judgment (Doc. Nos. 161, 165) is GRANTED in part as follows:

---

[18] Though James ultimately testified that he was not qualified to testify about the meaning of this provision. (*Id.*)

a. Counter defendants' Food Market Merchandising Inc., Magic Straws, LLC, Reach Companies, LLC; and Jon Tollefson's motion for summary judgment in their favor is GRANTED as to claim eleven for breach of the licensing agreement in defendant California Milk Processing Board's third amended answer;

b. Counter defendants' Food Market Merchandising Inc., Magic Straws, LLC, Reach Companies, LLC; and Jon Tollefson's motion for summary judgment in their favor is DENIED as to claims 1–10 and 12–14 in defendant California Milk Process Board's third amended complaint;

2. Defendant California Milk Processing Board's motion for summary judgment (Doc. No. 166) in its favor as to plaintiff Food Market Merchandising's sole claim for a declaratory judgment that defendant California Milk Processing Board engaged in naked licensing is GRANTED; and

3. The parties are directed to meet and confer regarding either any new motion for summary judgment or on their availability for a Final Pretrial Conference and Jury Trial. If a new motion for summary judgment will be filed, then the parties are directed to file a joint proposed briefing schedule on that motion within fourteen (14) days of the docketing of this order. Otherwise, the parties are directed within fourteen (14) days from the docketing of this order to contact Courtroom Deputy Pete Buzo at (916) 930-4016 or pbuzo@caed.uscourts.gov with several proposed dates for the rescheduling of a Final Pretrial Conference and Jury Trial in this action with those

/////

/////

/////

/////

/////

/////

proposed dates to include a minimum of 10 weeks between the Final Pretrial Conference and Jury Trial.[19]

IT IS SO ORDERED.

Dated: **September 29, 2026**

Dale A. Drozd
DALE A. DROZD
UNITED STATES DISTRICT JUDGE

[19] At various points in this order the court has reluctantly concluded that all parties have failed to address the correct applicable legal standards or presented evidence on summary judgment in support of their stated position. Of course, it is possible that the court misapprehends the parties' arguments and evidence. In retrospect, the court may have found oral argument on the pending motions to be useful in order to provide the parties the opportunity to respond to the courts questions and concerns. Under the operative scheduling order in this case, law and motion is closed. However, if upon reading this order any party has a strong, good faith belief that the court has misconstrued their arguments or the law upon which they rely, the court would consider modifying the scheduling order in response to a motion to do so in order to allow for motions for reconsideration and/or renewed motion(s) for summary judgment, upon which the court would likely schedule oral argument. On the other hand, if this case is destined for trial, the court's trial calendar for the foreseeable future is fairly clear, with few criminal cases set and, in light of its unfortunate age, this case would take priority over almost all other civil cases. In short, a fairly firm trial date could be set in this action in the not too distant future.